WEIL, GOTSHAL & MANGES LLP
Attorneys for the Debtors
767 Fifth Avenue
New York, New York 10153
(212) 310-8000
Deryck A. Palmer, Esq.
Andrew M. Troop, Esq.

FILED

APR 18 2003

Denise H. Curtis, Clerk
U.S. Bankruptcy Court for D.C.

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF COLUMBIA

----------------------------------------------------------------x
           :

**In re:**           :

           :

**GREATER SOUTHEAST COMMUNITY**    :    Case No.
**HOSPITAL CORPORATION I, et al.,**    :    02- 2250 (SMT)
           :    **Jointly Administered**
      **Debtors.**    :    **(Chapter 11)**

           :

----------------------------------------------------------------x

## MOTION FOR ORDERS (A) APPROVING SALE PROCEDURES AND (B) AUTHORIZING SALE OF SUBSTANTIALLY ALL ASSETS OF PINE GROVE HOSPITAL CORPORATION FREE AND CLEAR OF ALL LIENS, INTERESTS, CLAIMS AND ENCUMBRANCES

TO THE HONORABLE S. MARTIN TEEL, JR.,
UNITED STATES BANKRUPTCY JUDGE:

Pine Grove Hospital Corporation ("Pine Grove") and certain of its affiliated

debtors,[1] as debtors and debtors in possession (collectively, with Pine Grove, the "Debtors"),

respectfully represent:

### Jurisdiction

1.      This Court has jurisdiction to consider this matter pursuant to 28 U.S.C.

§1334. Consideration of this matter is a core proceeding pursuant to 28 U.S.C. §157(b). Venue

of this proceeding is proper before this Court pursuant to 28 U.S.C. §§1408 and 1409.

---

[1] The affiliated debtors are PACIN-Hadley Memorial Hospital Corporation of Washington, D.C. ("Hadley"), Michael Reese Medical Center Corporation of Chicago, Illinois ("Michael Reese"), Pacifica Hospital of the Valley Corporation of Sun Valley, California ("Pacifica"), Greater Southeast Community Hospital Corporation I of Washington, D.C. ("Greater Southeast") and their ultimate parent corporation, Doctors Community Healthcare Corporation ("DCHC").

BO1:\83430\08\1SD$08!.DOC\41776.0003

## The Debtors' Business Operations

2.      DCHC is a privately-held healthcare management company organized

under the laws of the State of Delaware with its corporate offices located in Scottsdale, Arizona.

DCHC manages and owns, directly and indirectly, five acute-care hospitals located in California,

Illinois and Washington, D.C.  The five hospitals are: Greater Southeast, Hadley, Michael Reese,

Pacifica and Pine Grove.  DCHC is the ultimate corporate parent of the other Debtors.

## Background

3.      On November 20, 2002 (the "Commencement Date"), the Debtors each

commenced with this Court a voluntary case under chapter 11 of title 11 of the United States

Code (the "Bankruptcy Code").  Each of the Debtors continues to operate its business and

manage its properties as a debtor in possession pursuant to sections 1107(a) and 1108 of the

Bankruptcy Code.

4.      The Debtors' chapter 11 cases (the "Cases") have been consolidated for

procedural purposes only and are being jointly administered pursuant to Rule 1015(b) of the

Federal Rules of Bankruptcy Procedures (the "Bankruptcy Rules").

5.      On or about November 25, 2002, the Office of the United States Trustee

for the District of Columbia  appointed an official committee of unsecured creditors in the

Debtors' chapter 11 cases (the "Creditors' Committee").

## Relief Requested

6.      By this Application, the Debtors seek entry of orders pursuant to sections

363, 365 and 1146 of the Bankruptcy Code, as supplemented by rules 2002, 6004 and 6006 of

the Federal Rules of Bankruptcy Procedure, (a) approving certain sale procedures (the "Sales

Procedures", attached hereto as Exhibit A) pursuant to which the Debtor will seek to obtain one

or more purchasers for substantially all the assets of Pine Grove, and (b) authorizing and

approving such sale, including the assumption and assignment of executory contracts and/or unexpired leases to the successful purchaser.

### Basis for Relief

7. . Prior to the Commencement Date, Pine Grove operated as a stand-alone psychiatric hospital in Canoga Park, California, with two locked psychiatric units, one each for adolescent boys and girls.

8. In December, 2002, after the Commencement Date, Pine Grove's so-called "LPS Designation" was suspended. The LPS Designation is the certification that enabled Pine Grove to operate its two locked psychiatric units.

9. Following the loss of its LPS Designation, Pine Grove closed one of its locked units, decreasing its census population (and projected revenues) by approximately one-half, and began to sustain losses of approximately $300,000 per month. At the same time, Pine Grove explored alternative business options. The options considered included seeking the reinstatement of the LPS Designation at Pine Grove and reopening the facility, transferring the psychiatric units to Pacifica, and converting Pine Grove to another line of business not requiring an LPS Designation.

10. Ultimately, the Debtors have concluded that neither they as a group or Pine Grove on its own can afford to take the steps necessary to resume operations. Similarly, Pine Grove lacks the resources to remake itself as a different line of business. Finally, transferring the psychiatric units to Pacifica is not feasible. Various governmental agencies in and around Los Angeles County, California, with jurisdiction over the transfer or granting of LPS Designations have indicated that a transfer of Pine Grove's suspended designation is not likely to be approved and a new designation is not likely to be granted.

11.     As the Debtors explored these options, they also have been contacted by a number of third parties who have expressed interest in Pine Grove's assets.  In fact, to date, the Debtors have received approximately 30 signed confidentiality agreements from parties with an interest in Pine Grove.  Moreover, the diversity of potential purchasers is vast, ranging from potential purchasers with an interest in the facility as a health care facility, to purchasers with an interest in the facility as a community center, to purchasers with an interest in the facility's real estate for single family home or apartment developments.

12.     Based on the interest expressed in Pine Grove, and Pine Grove's own inability to continue to operate without losses, the Debtors concluded (a) to close Pine Grove and (b) to sell Pine Grove's assets through a competitive bidding process.

13.     Accordingly, Pine Grove has stopped accepting new patients, has transferred its preexisting patients to other facilities in accordance with applicable rules and regulations, and has terminated all but three of its employees.  These three remaining employees are assisting in the final wind-down of Pine Grove and are available to assist, as required, potential purchasers with due diligence.

14.     Also, Pine Grove, through the Debtors' investment bankers, Cain Brothers & Company LLC, has begun the active solicitation of parties with an interest in Pine Grove.  Sales books are available for potential purchasers as is a diligence room at Pine Grove.

### The Proposed Sale Procedures

A.     **Summary of Procedures**

15.     In order to achieve the maximum value for the Pine Grove assets, the Debtors seek authorization to engage in a prompt, but reasonable and competitive, sale process for these assets.

16.     The Debtors propose to permit interested bidders a brief period to conduct due diligence on the assets, and then to select one or more proposed buyers for the Pine Grove assets[2] (collectively, the "Stalking Horse Bidder"), finalize a purchase agreement or agreements with the Stalking Horse Bidder (collectively, the "Stalking Horse Bid"), and subject the Stalking Horse Bid to competitive bidding. It is the Debtor's intention to have this process completed, and the sale to the successful bidder or bidders through the auction process (collectively, the "Successful Bidder") confirmed by order of this Court, on or before May 29, 2003.

17.     The Debtors have formulated the Sale Procedures attached as Exhibit A for the sale of the Pine Grove assets, pursuant to which:

a.     interested parties, who execute and deliver a confidentiality agreement and provide the Debtors with information that demonstrates the financial capability of the party to consummate a transaction if it is selected as the Successful Bidder (such parties, as determined by the Debtors in consultation with the Creditors' Committee, "Potential Bidders"), will have the opportunity to conduct due diligence of the assets with the assistance of Pine Grove's employees;

b.     a form of asset purchase agreement covering Pine Grove's real estate assets, and a form of asset purchase agreement covering Pine Grove's non-real estate assets (collectively, the "Form Agreement") will be circulated by the Debtors to Potential Bidders on April 21, 2003;

c.     Potential Bidders who wish to bid on the Pine Grove Assets must submit their initial bids by 5:00 p.m. Eastern Daylight Time on May 1, 2003 (the "Initial Bid Deadline"). Initial bids must consist of a blacklined asset purchase agreement showing changes

---

[2] The Debtors are preparing two forms of asset purchase agreements, one relating to the real estate assets of Pine Grove, and one relating to the non-real estate assets of Pine Grove. It is contemplated that interested parties may submit bids for either or both sets of assets.

from the Form Agreement and a certified check in an amount equal to 10% of the Potential Bidder's proposed purchase price as a refundable good faith deposit;

d.  within one week after the Initial Bid Deadline (i.e., May 8, 2003), the Debtors will select the Stalking Horse Bidder from the Potential Bidders submitting bids by the Initial Bid Deadline, and will proceed to negotiate the Stalking Horse Bid;

e.  within two weeks after the Initial Bid Deadline (i.e., May 15, 2003), the Debtors will finalize the Stalking Horse Bid, and will give notice of the Stalking Horse Bid to all Potential Bidders who submitted bids by the Initial Bid Deadline and any parties who by that date have otherwise qualified as Potential Bidders;

f.  all persons wishing to submit a bid and make a competing offer to purchase the Pine Grove assets must submit the Required Bid Documents (as defined in the Sale Procedures) not later than 12:00 p.m. Eastern Daylight Time on the date that is five business days after the Debtors have announced the Stalking Horse Bid (i.e., May 22, 2003) (the "Bid Deadline").  As set forth in the Sale Procedures, the Required Bid Documents include, but are not limited to, (a) an executed purchase agreement, marked to show changes from the Stalking Horse Bid, and (b) a refundable good faith deposit in the form of a certified check in an amount equal to 10% of such proposed purchase price.[3]  Further, to be a Qualified Bid, the purchase price proposed by the competing bid must exceed the purchase price proposed by the Stalking Horse Bidder by not less than 5%.  There is no requirement that a competing offer propose to purchase more or less assets than proposed by the Stalking Horse Bid.  The Debtors, in

---

[3] If the Debtors are still holding a deposit from a Potential Bidder that was not selected as the Stalking Horse Bidder, the amount of this certified check need be equal to only the difference between the original deposit and 10% of the bid submitted to compete with the Stalking Horse Bid.

consultation with the Creditors' Committee, may choose to disregard any bid that is conditioned on obtaining financing or on the outcome of unperformed due diligence by the bidder;

g.    The Debtors, in consultation with the Creditors' Committee, shall determine which parties submitting bids prior to the Bid Deadline are "Qualified Bidders" (as defined in the Sale Procedures), and shall determine which Qualified Bid is the highest, best or otherwise financially superior bid for the Pine Grove assets.  (The Stalking Horse Bidder is deemed to be a Qualified Bidder and the Stalking Horse Bid is deemed to be a Qualified Bid.) The Debtors shall inform all Qualified Bidders of the selection of the highest, best or otherwise financially superior bid for the Pine Grove assets by 5 p.m. Eastern Daylight Time on the first business day after the Bid Deadline (i.e., May 23, 2003);

h.    If one or more Qualified Bids other than the bid of the Stalking Horse Bidder are received by the Bid Deadline, the Debtors shall conduct an auction at the offices of Stutman, Treister & Glatt, Professional Corporation, 3699 Wilshire Boulevard, Los Angeles, California, 90010 commencing at 10:00 a.m. local Los Angeles, California time, on the date that is two (2) business days after the Bid Deadline (i.e., May 27, 2003);

i.    At the auction, bidding shall begin at the amount of the highest, best or otherwise financially superior Qualified Bid announced by the Debtors as provided in sub-paragraph "g," above.  Bidding increments thereafter shall be not less than $50,000.  Following the conclusion of the bidding, the Debtors, in consultation with the Creditors' Committee, shall select and announce the highest, best or otherwise financially superior offer for the Pine Grove assets (the "Successful Bid") as provided in the Sale Procedures.

18.    The Debtor's acceptance of any qualified bid at the Auction shall be contingent on the approval of the Court at the hearing to be held to approve the sale (the "Sale Hearing").  The Successful Bid will be presented for approval at the Sale Hearing without the

need for further notice or motion by the Debtors. The Debtors request that the Sale Hearing be scheduled for May 29, 2003.

19. In the event that the Stalking Horse Bidder is not the successful purchaser of the Pine Grove assets, the Debtors intend, and hereby seek approval, to pay the Stalking Horse Bidder an amount equal to 3% of the purchase price proposed by the Stalking Horse Bidder as compensation for the time and expenses spent by the Stalking Horse Bidder in negotiating the purchase agreement against which all other Qualified Bidders are required to compete, and which establishes the floor for the value of the Pine Grove assets.

20. Awarding these types of protections to potential purchasers who serve a stalking horse role is typical where they have been approved in advance by the Bankruptcy Court. Courts award these types of protections to stalking horse bidders to compensate those bidders for the loss of a signed deal where the deal itself has acted as a catalyst for the receipt of other, more favorable bids. In re S.N.A. Nut Company, 186 B.R. 98, 101 (Bankr. N.D. Ill. 1995), citing In re Morrose Corp., 1992 WL 33848, *5 (Bankr. S. D.N.Y. 1992). Because here the "break-up fee" will be paid only if the Stalking Horse Bid is topped, and because the Stalking Horse Bid will serve as the basis for other better bids in this circumstance, the payment of the break-up fee is appropriate as providing a real benefit to preserving and realizing value for this estate. Calpine Corp. v. O'Brien Env. Energy, Inc. (In re O'Brien Env. Energy, Inc.), 181 F. 3d 527, 535 (3rd Cir. 1999).

**B.    Proposed Sale Procedures Will Maximize Value**

21. A public auction consistent with the Sale Procedures will facilitate and stimulate competitive bidding for the Pine Grove assets and, accordingly, should maximize the value of those assets for the benefit of the Debtors' creditors. The proposed Sale Procedures will serve to "market test" the purchase price contemplated by the purchase agreement negotiated

with the Stalking Horse Bidder, eliminating any doubt as to the reasonableness of the consideration to be received by the Debtors from the sale of these assets. Moreover, the use of a Stalking Horse Bidder establishes the floor for value to be received by the Debtors. The amount of that return should only increase if there is competitive bidding.

22. Accordingly, approval of the Sale Procedures is in the best interests of the Debtors' estates.

### The Proposed Sale

**A.    Approval of the Proposed Sale is Appropriate**

23. A sale of the assets of Pine Grove in compliance with the Sale Procedures satisfies the standards governing sales of substantially all of a debtor's assets under the Bankruptcy Code. Section 363(b) of the Bankruptcy Code provides that "[t]he trustee, after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 361(b)(1). Courts interpreting section 363(b)(1) of the Bankruptcy Code have held that transactions should be approved under section 363(b)(1) when they are supported by the sound business judgment of management. See In re Delaware & Hudson Ry. Co., 124 B.R. 169, 176 (D. Del. 1991) (outlining requirements for sale of assets pursuant to section 363); In re Phoenix Steel Corp., 82 B.R. 334, 335-36 (Bankr. D. Del. 1987) (stating that judicial approval of a section 363 sale requires a showing that the proposed sale is fair and equitable, that a good business reason exists for completing the sale, and that the transaction is in good faith); see also In re Titusville Country Club, 128 B.R. 396, 399 (Bankr. W.D. Pa. 1991); In re Industrial Valley Refrig. & Air Cond. Supp., 77 B.R. 15, 20 (Bankr. E.D. Pa. 1987).

24. The "sound business purpose" test requires a debtor to establish four elements to sell property outside the ordinary course of business:

a) that a "sound business purpose" justifies the sale of assets outside the ordinary course of business;

b) that adequate and reasonable notice has been provided to interested persons;

c) that the debtor has obtained a fair and reasonable price; and

d) good faith.

See Titusville Country Club, 128 B.R. at 399; In re Sovereign Estates, Ltd., 104 B.R. 702, 704 (Bankr. E.D. Pa. 1989); Phoenix Steel Corp., 82 B.R. at 335-36; Industrial Valley, 77 B.R. at 21. The proposed sale of the assets of Pine Grove is justified under section 363(b) of the Bankruptcy Code because it satisfies all of the factors under the "sound business purpose" test.

(i)     The Proposed Sale is Supported by Sound Business Judgment

25.     Clear business reasons exist to justify the sale of the Pine Grove assets under section 363(b) of the Bankruptcy Code.  As described above, Pine Grove can no longer operate its locked psychiatric units, and is incurring costs of $300,000 per month in connection with these assets.  The Debtors have determined that the most cost-effective and value-maximizing course of action is to sell these underperforming assets.

26.     Based on the foregoing, the proposed sale is supported by sound business judgment and is in the best interest of the Debtors' collective estates and Pine Grove's individual estate.

(ii)    Debtors have Provided Reasonable and Adequate Notice
        of the Sale to Interested Parties

27.     The Debtors have provided notice of this motion in accordance with this Court's January 23, 2003 order establishing notice procedures in this case.  In addition, the Debtors have served a copy of this motion on (a) relevant state and local taxing authorities; (b) all parties, if any, who are known to claim interests in or liens upon any of the assets of Pine

Grove; (c) all parties who may have expressed an interest in the assets of Pine Grove; and (d) all parties to executory contracts or unexpired leases with Pine Grove.

28. Under the circumstances of this case, this notice is sufficient. Any parties wishing to object to the sale of the assets of Pine Grove will have an opportunity to do so and be heard. Further, persons potentially interested in bidding for the assets of Pine Grove will have an opportunity to bid – and indeed, at present 30 potential bidders are known to the Debtors.

(iii)   The Sale Price Will Be Fair and Reasonable

29. As noted above, the Debtors propose to select the highest and best offer and negotiate an asset purchase agreement with the person making that offer, on or before May 15, 2003. Thereupon, this negotiated offer will serve as a "stalking horse" bid, and be subjected to higher and better bids at an auction to be conducted in accordance with the Sales Procedures.

30. The Debtors believe that this process, which has already generated multiple expressions of interest from potential purchasers, will generate a fair and reasonable price for the assets sold.

(iv)   Good Faith

31. The selection of the "stalking horse" bid will be the product of arm's-length, good faith negotiations between the Debtors and the interested parties and an anticipated competitive bidding process. The Debtors intend to ask the Court, at the hearing to confirm the sale of the Pine Grove Assets to the Successful Bidder, to find that the Successful Bidder is a good faith purchaser as that term is used in section 363(m) of the Bankruptcy Code.

**B.    Sale Free and Clear of Liens, Claims, Encumbrances and Interests**

32. The Debtors request authority to sell the Pine Grove assets free and clear of any and all liens, claims, encumbrances or interests which may be asserted (collectively, the "Encumbrances"), with any Encumbrances to attach to the sale proceeds.

33.     In accordance with section 363(f) of the Bankruptcy Code, a debtor-in-possession may sell property free and clear of any lien or interest in such property if:

b)  such sale is permitted under applicable non-bankruptcy law;

c)  the party asserting such lien, claim or interest consents to such sale;

d)  the interest is a lien and the purchase price for the property is greater than the aggregate amount of all liens on the property;

e)  the interest is the subject of a bona fide dispute; or

f)  the party asserting the interest could be compelled, in a legal or equitable proceeding, to accept a money satisfaction for such interest.

11 U.S.C. § 363(f); In re Elliot, 94 B.R. 343, 345 (E.D. Pa. 1988) (section 363(f) written in disjunctive; court may approve sale "free and clear" provided at least one of the subsections is met.)

34.     Other than the parties identified on Exhibit B, the Debtors are not aware of any creditors asserting liens against the Pine Grove assets. The Debtors expect that these parties will not oppose the sale of the Pine Grove assets free and clear of their liens, but to the extent that they do, the Debtors believe that the holder of any such lien could be compelled to accept money satisfaction of its interest. In any event, any liens will attach to the net proceeds of the sale, and these proceeds will be applied in accordance with any debtor-in-possession financing facility then in place, or if no such facility is in place, the proceeds will be held by the Debtors and used by them in accordance with any cash collateral order then in place. Accordingly, the Pine Grove assets may be sold free and clear of liens pursuant to sections 363(b) and 363(f) of the Bankruptcy Code.

C.     **Assumption and Assignment of Certain Executory Contracts and/or Unexpired Leases**

35.     The Debtors also seek authority to assume and assign executory contracts and/or unexpired leases, if any, as the ultimate purchaser(s) of the Pine Grove assets may

designate, effective as of the closing of the purchase of the Pine Grove assets. Any executory contracts and/or unexpired leases not designated for assumption and assignment shall remain as assets of the Pine Grove estate to be addressed at a later date in accordance with the Bankruptcy Code.

36.    In the event the ultimate purchaser(s) of the Pine Grove assets designates any executory contracts and/or unexpired leases for assumption and assignment, the Debtors will file with the Court and serve via overnight mail on the party to the executory contract or unexpired lease a pleading setting forth the contract or lease to be assumed and any and all cure amounts the Debtors believe are associated therewith, and the method of cure. The pleading shall be served and filed no later than two days prior to the hearing to approve the sale contemplated by the approved Sale Procedures. If any party to a contract or lease designated for assumption and assignment disputes the cure amounts presented by the Debtors or the method of cure, such party shall deliver a responsive pleading, via facsimile, e-mail or other method, by 9:00 a.m. Eastern Daylight Time on the day of the sale hearing to counsel to the Debtors, Weil, Gotshal & Manges LLP, 1501 K Street, Washington, D.C. attention: Holly Loiseau, Esquire (holly.loiseau@weil.com), facsimile number (202) 857-0940.

37.    The foregoing process will provide adequate notice and an opportunity to object to all parties to executory contracts and/or unexpired leases, if any, that the successful purchaser(s) of the Pine Grove assets designates for assumption or assignment. Further, the ability to assume and assign executory contracts and/or unexpired leases contemporaneously with the closing of the purchase of the Pine Grove assets will enable the Debtors to maximize the value received for those assets and reduce potential claims against the Pine Grove estate by eliminating any claims associated with executory contracts or unexpired leases assumed and assigned to the successful purchaser.

**D.    Request for Relief from Transfer Taxes Under**
**Section 1146(c) of the Bankruptcy Code**

38.    Section 1146(c) of the Bankruptcy Code provides that the making or delivery of an instrument of transfer under a confirmed chapter 11 plan of reorganization may not be taxed under any law imposing a stamp or similar tax.  11 U.S.C. § 1146(c).  Courts have construed this provision to include transfers under a sale outside of, but in furtherance of effectuating, a plan of reorganization.  See, e.g., Director of Revenue, State of Delaware v. CCA Partnership (In re CCA Partnership), 70 B.R. 696 (Bankr. D. Del. 1987), aff'd 72 B.R. 765 (D. Del. 1987), aff'd 833 F.2d 304 (3d Cir. 1987); In re Jacoby-Bender, Inc., 40 B.R. 10 (Bankr. E.D. N.Y. 1984), aff'd 758 F.2d 840 (2d Cir. 1985); In re 995 Fifth Avenue Assocs., L.L.P., 116 B.R. 384 (Bankr. S.D. N.Y. 1990), aff'd 127 B.R. 533 (S.D. N.Y. 1991).  See also In re Smoss Enters. Corp., 54 B.R. 950 (E.D. N.Y. 1985).

39.    The sale of the Pine Grove assets will put an end to continuing losses associated with those assets, enhance the Debtors' liquidity, and thereby increase the ability of the Debtors to formulate and propose a plan of reorganization.  Accordingly, the Debtors respectfully request a ruling of this Court that section 1146(c) of the Bankruptcy Code applies to the proposed sale of the Pine Grove assets.

## Notice

40.    No trustee or examiner has been appointed in these chapter 11 cases.

41.    A copy of this Motion has been served in accordance with this Court's January 23, 2003 order establishing notice procedures.  In addition, this motion has been served on (a) relevant state and local taxing authorities; (b) all parties, if any, who are known to claim interests in or liens upon any of the assets of Pine Grove; (c) all parties who may have expressed an interest in the assets of Pine Grove; and (d) all parties to executory contracts or leases with Pine Grove.  The Debtors submit that no other or further notice need be provided.

42.     No previous application for the relief requested herein has been made in these chapter 11 cases.

WHEREFORE the Debtors respectfully request that the Court enter an order approving the Sale Procedures, including the payment of a break-up fee, establishing of a minimum overbid and the requirement for minimum bidding increments as set forth above and scheduling a hearing date to consider the sale of Pine Grove's assets and granting the Debtors such other and further relief as is just and proper.

Dated: Washington, DC
        April 1&, 2003

Deryck A. Palmer
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York  10153
(212) 310-8000

Andrew M. Troop
WEIL, GOTSHAL & MANGES LLP
101 Federal Street
Boston, MA 02110
(617) 772-8300

Peter D. Isakoff (D.C. Bar No. 358419)
Holly E. Loiseau (D.C. Bar No. 452442)
WEIL, GOTSHAL & MANGES LLP
1501 K Street, N.W., Suite 100
Washington, D.C.  20005
(202) 682-7000

ATTORNEYS FOR DEBTORS AND
DEBTORS IN POSSESSION

# EXHIBIT A

## Sale Procedures

Set forth below are the sale procedures (the "**Sale Procedures**") to be employed with respect to the prospective sale by Pine Grove Hospital Corporation ("**Pine Grove**") and certain of its affiliated debtors, as debtors and debtors in possession (collectively, with Pine Grove, the "**Seller**"), of all or substantially all of the assets of Pine Grove (the "**Assets**"). The Seller shall seek the entry of an order from the Bankruptcy Court authorizing and approving the Sale (as hereinafter defined) to one or more Qualified Bidders (as hereinafter defined) which the Seller, in consultation with the official committee of unsecured creditors (the "**Committee**") may determine to have the highest best or otherwise financially superior offer (the "**Successful Bidder**").

## Assets to be Sold

Seller is offering for sale in one or more transactions (the "**Sale**") all or substantially all of the Assets.

## The Bidding Process

In general, and subject to the details and terms contained in these Sale Procedures, Seller and its advisors, in consultation with the Committee, shall (i) determine whether any person is a Potential Bidder or a Qualified Bidder (as each term is hereinafter defined), (ii) coordinate the efforts of Potential Bidders and Qualified Bidders in conducting their due diligence investigations, (iii) receive offers from Potential Bidders, (iv) select one or more offers from Potential Bidders to purchase the Assets and negotiate a Stalking Horse Bid (as hereinafter defined), (v) receive competing bids from Qualified Bidders and (vi) select a Successful Bidder (as hereinafter defined) (collectively, the "**Bidding Process**"). Any person who wishes to participate in the Bidding Process must be a Potential Bidder to submit an Initial Bid (as hereinafter defined) and a Qualified Bidder to submit a Competing Bid (as hereinafter defined) and to participate in the Auction (as hereinafter defined). Neither Seller nor its representatives shall be obligated to furnish any information of any kind whatsoever to any person who is not determined to be a Potential Bidder. Seller, in consultation with the Committee, shall have the right to adopt such other rules for the Bidding Process (including rules that may depart from those set forth herein), which rules will better promote the goals of the Bidding Process and which are not inconsistent with any of the other provisions hereof or of any Bankruptcy Court order.

## Participation Requirements

Unless otherwise ordered by the Bankruptcy Court or determined by Seller, in consultation with the Committee, each person interested in participating in the Bidding Process must deliver (unless previously delivered) to Seller:

(i)     An executed confidentiality agreement in substantially similar form to that attached hereto as Annex 1; and

(ii)    Current audited financial statements of the Potential Bidder, or, if the Potential Bidder is an entity formed for the purpose of acquiring the Assets, current audited financial statements of the equity holder(s) of the Potential Bidder, or such other form of financial disclosure acceptable to Seller and its advisors, in consultation with the Committee, demonstrating such Potential Bidder's ability to close a proposed transaction.

Each person that delivers the documents described in subparagraphs (i) and (ii) is a "**Potential Bidder**." A "**Qualified Bidder**" is a Potential Bidder that Seller, in consultation with the Committee, determines is reasonably likely (based on financial information submitted by the Potential Bidder, the availability of financing, experience and other considerations deemed relevant by Seller, in consultation with the Committee) to submit a bona fide offer and to be able to consummate the purchase of the Assets if selected as a Successful Bidder.

No later than two business days after a Potential Bidder delivers all of the materials required by subparagraphs (i) and (ii) above, Seller shall determine, and shall notify the Potential Bidder, if such Potential Bidder is a Qualified Bidder.

A form of asset purchase agreement regarding the Pine Grove real property assets, and a form of purchase agreement regarding the Pine Grove non-real property assets (collectively, the "**Form Agreement**") will be provided to Potential Bidders beginning on April 21, 2003.

## Due Diligence

The Seller may afford any Potential Bidder the opportunity to conduct reasonable due diligence of the Assets with the assistance of Pine Grove's employees. The Seller will designate an employee or other representatives to coordinate all reasonable requests for additional information and due diligence access from such Potential Bidders. The Sellers shall not be obligated to furnish any information to a Potential Bidder after the Initial Bid Deadline (as hereinafter defined).

Neither the Seller nor any of its respective representatives are obligated to furnish any information to any person other than a Potential Bidder. The Seller is not responsible for, and will bear no liability with respect to, any information obtained by Potential Bidders in connection with the sale of the Assets.

## Initial Bid Deadline

A Potential Bidder who desires to make a bid (an "**Initial Bid**") shall deliver a written copy of its bid to (1) Deryck A. Palmer, Esq., Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York, 10153, (2) Andrew M. Troop, Esq., Weil,

Gotshal & Manges, 101 Federal Street, Boston, Massachusetts 02110; and (2) Thomas M. Barry, Cain Brothers & Company, LLC ("Cain Brothers"), 425 Fifth Avenue, 25th Floor, New York, New York 10018, not later than 12:00 p.m. (Eastern Daylight Time) on May 1, 2003 the day (the "**Initial Bid Deadline**").

**Stalking Horse Bid Requirements**

All Initial Bids must include the following documents (the "**Required Stalking Horse Bid Documents**"):

- A letter stating that the bidder's offer is irrevocable until May 15, 2003.

- An executed copy of the purchase agreement(s) marked to show modifications to the Form Agreement that the Potential Bidder proposes, including the overall purchase price contemplated by the agreement(s).

- A good faith deposit (the "**Initial Good Faith Deposit**") in the form of a certified check (or other form acceptable to Seller in its sole discretion) payable to the order of Seller (or such other party as Seller may determine) in an amount equal to ten percent (10%) of the proposed price.

- Written evidence of a commitment for financing or other evidence of the ability to consummate the Sale satisfactory to Seller with appropriate contact information for such financing sources.

Seller, in consultation with the Committee, may choose to disregard bids that are conditioned on obtaining financing or on the outcome of unperformed due diligence by the bidder.

**Selection of Stalking Horse Bid**

Cain Brothers shall immediately distribute copies of the bids to counsel for the Committee. On or before May 8, 2003, Seller, after consultation with the Committee, shall select one or more Potential Bidders submitting Initial Bids received by the Initial Bid Deadline (collectively, the "**Stalking Horse Bidder**") with whom the Seller shall negotiate one or more agreements (collectively, the "**Stalking Horse Bid**") for the sale of the Assets, which Stalking Horse Bid shall be subjected to an Auction to be held in accordance with the terms described hereafter.

On or before May 15, 2003, the Seller will finalize the Stalking Horse Bid in the form of one or more agreements (collectively, the "**Agreement**"), and will provide notice and a copy of the Agreement to all Potential Bidders who submitted bids by the Initial Bid Deadline and any parties who by that date have otherwise qualified as Potential Bidders. The Seller will return to each Potential Bidder not selected as the

Stalking Horse Bidder such Potential Bidder's Initial Good Faith Deposit prior to the Bid Deadline (as hereinafter defined), unless otherwise instructed by the Potential Bidder to hold such Initial Good Faith Deposit in connection with the submission of a Competing Bid (as hereinafter defined).

### Auction Bid Deadline

A Qualified Bidder who desires to submit a competing bid to the Stalking Horse Bid (a "**Competing Bid**") shall deliver a written copy of its bid to (1) Deryck A. Palmer, Esq., Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York, 10153, (2) Andrew M. Troop, Esq., Weil, Gotshal & Manges, 101 Federal Street, Boston, Massachusetts 02110; and (2) Thomas M. Barry, Cain Brothers & Company, LLC, 425 Fifth Avenue, 25th Floor, New York, New York 10018, not later than 12:00 p.m. (Eastern Daylight Time) on the day that is five (5) business days after the Sellers have provided notice of the Agreement (the "**Bid Deadline**"). Cain Brothers shall immediately distribute copies of the Competing Bids to counsel for the Committee. Seller, after consultation with the Committee, shall announce the terms of the highest, best or otherwise financially superior Qualified Bid(s) received by the Bid Deadline (the "**Best Competing Bid**") no later than 5:00 p.m. (Eastern Daylight Time) on the first business day after the Bid Deadline.

### Auction Bid Requirements

All Competing Bids must include the following documents (the "**Required Bid Documents**"):

- A letter stating that the bidder's offer is irrevocable until the later of (i) two business days after the Assets have been disposed of pursuant to these Sale Procedures, and (ii) 30 days after the Sale Hearing.

- An executed copy of a purchase agreement(s) marked to show modifications to the Agreement that the Qualified Bidder proposes (the "**Marked Agreement**"), including identifying the overall purchase price contemplated by the agreement(s), which must exceed the purchase price offered by Buyer by at least five percent (5%) (the "**Required Bid Value**").

- A good faith deposit (the "**Good Faith Deposit**") in the form of a certified check (or other form acceptable to Seller in its sole discretion) payable to the order of Seller (or such other party as Seller may determine) in an amount equal to ten percent (10%) of the proposed price; if Seller is holding an Initial Good Faith Deposit from such bidder, the bidder may supplement such Initial Good Faith Deposit (if necessary) to provide the Good Faith Deposit.

- Written evidence of a commitment for financing or other evidence of the ability to consummate the Sale satisfactory to Seller with appropriate contact information for such financing sources.

Seller, in consultation with the Committee, may choose to disregard Competing Bids that are conditioned on obtaining financing or on the outcome of unperformed due diligence by the bidder. A Competing bid received from a Qualified Bidder that includes all of the Required Bid Documents and meets all of the above requirements is a "**Qualified Bid**."

There is no requirement that a Qualified Bid includes more or less Assets than are covered by the Agreement. Seller, in consultation with the Committee, reserves the right to determine (i) the value of any Qualified Bid, (ii) whether any Qualified Bid (either by itself or in connection with another Qualified Bid(s) provides overall value to Seller that is equal to, or in excess of, the Required Bid Value or any other Qualified Bid and (iii) which Qualified Bid(s) constitutes the highest, best and otherwise financially superior offer. Seller's determination in this regard may include an analysis of the value (whether positive or negative) of any Assets that are included in or excluded from any Qualified Bid, the existence or absence of any escrow or indemnity and consideration of the Topping Fee (as hereinafter defined), if applicable.

## Bid Protection

Recognizing the expenditure of time, energy and resources that will be incurred by the Stalking Horse Bidder(s), Seller will provide certain bidding protections to the Stalking Horse Bidder(s). Specifically, Seller has determined that the Stalking Horse Bid(s) will further the goals of the Sale Procedures by setting a floor which all other potential bids must exceed. As a result, Seller will agree to pay to the Stalking Horse Bidder(s), in certain limited circumstances as set forth in the Form Agreement (and as may be further provided in the Stalking Horse Bid(s)), a topping fee of three percent (3%) plus the cost of a Phase I environmental assessment reimbursed to Seller by the Stalking Horse Bidder(s) (the "**Topping Fee**").

## "As Is, Where Is"

The sale of the Assets shall be on an "as is, where is" basis and without representations or warranties of any kind, nature, or description by Seller, its agents or their estate except to the extent set forth in the applicable agreement of the Successful Bidder as accepted by Seller. Except as otherwise provided in the applicable agreement, all of Seller's right, title and interest in and to the Assets subject thereto shall be sold free and clear of all pledges, liens, security interests, encumbrances, claims, charges, options and interests thereon and there against (collectively, the "**Interests**") in accordance with section 363 and 365 of the Bankruptcy Code, with such Interests to attach to the net proceeds of the sale of the Assets.

Each Potential Bidder and each Qualified Bidder shall be deemed to acknowledge and represent that it has had an opportunity to conduct any and all due diligence regarding the Assets prior to making its offer, that it has relied solely upon its own independent review, investigation and/or inspection of any documents and/or the Assets in making its bid, and that it did not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express, implied, by operation of law or otherwise, regarding the Assets, or the completeness of any information provided in connection therewith or the Auction, except as expressly stated in these Bidding Procedures or, as to the Successful Bidder, the terms of the sale of the Assets shall be set forth in the applicable agreement.

## Auction

If one or more Qualified Bids (other than that of the Stalking Horse Bidder(s), who are deemed to be Qualified Bidders and whose Stalking Horse Bid(s) are deemed to be Qualified Bids) have been received by the Bid Deadline, Seller shall conduct an auction (the "**Auction**") with respect to the Assets. The Auction shall commence on the date that is two (2) business days after the Bid Deadline at the offices of Stutman, Treister & Glatt, Professional Corporation, 3699 Wilshire Boulevard, Los Angeles, California, 90010 commencing at 10:00 a.m. local Los Angeles, California time. Seller shall notify all Qualified Bidders who have submitted Qualified Bids of the time and place of the Auction. If there is no timely Qualified Bid (other than that of the Stalking Horse Bidder(s)), the Stalking Horse Bidder(s) shall be deemed to be the Successful Bidder.

Only a Qualified Bidder who has submitted a Qualified Bid is eligible to participate at the Auction. During the Auction, bidding shall begin initially with the Best Competing Bid and subsequently continue in minimum increments of at least $50,000. Except as otherwise disclosed herein, Seller, in consultation with the Committee, may conduct the Auction in the manner they determine will result in the highest, best or otherwise financially superior offer(s) for the Assets.

Upon conclusion of the bidding, the Auction shall be closed, and Seller, in consultation with the Committee, shall (i) immediately review each Qualified Bid or Bids on the basis of financial and contractual terms and the factors relevant to the sale process, including those factors affecting the speed and certainty of consummating the Sale, and (ii) within one day identify the highest, best or otherwise financially superior offer(s) for the Assets (the "**Successful Bid**" and the entity or entities submitting such Successful Bid, the "**Successful Bidder**"), which highest, best or otherwise financially superior offer(s) will provide the greatest amount of net value to Seller after payment of, among other things, the Topping Fee, if required and advise the Qualified Bidders participating in the Auction of such determination.

## Acceptance of Qualified Bids

Seller shall sell the Assets to the Successful Bidder upon the approval of the Successful Bid by the Bankruptcy Court after hearing (the "**Sale Hearing**"). Seller's presentation of a particular Qualified Bid to the Bankruptcy Court for approval does not constitute Seller's acceptance of the bid. Seller will be deemed to have accepted a bid only when the bid has been approved by the Bankruptcy Court at the Sale Hearing.

## Sale Hearing

The Sale Hearing will be held before the Honorable S. Martin Teel, Jr. on May 29, 2003 at _____ a.m. (Eastern Daylight Time) at the United States Bankruptcy Court for the District of Columbia, but may be adjourned or rescheduled without further notice by an announcement of the adjourned date at the Sale Hearing.

Following the Sale Hearing approving the sale of the Assets to the Successful Bidder, if such Successful Bidder fails to consummate an approved sale, the next highest or otherwise best Qualified Bid, as disclosed at the Sale Hearing, shall be deemed to be the Successful Bid and Seller shall be authorized, but not required, to consummate the sale with the Qualified Bidder submitting such bid without further order of the Bankruptcy Court.

## Return of Good Faith Deposit

Good Faith Deposits of all Qualified Bidders (except for the Successful Bidder) shall be held in an interest-bearing escrow account until the Sale Hearing. If a Successful Bidder fails to consummate an approved sale because of a breach or failure to perform on the part of such Successful Bidder, Seller shall be entitled to retain the Good Faith Deposit as part of its damages resulting from the breach or failure to perform by the Successful Bidder.

## Modifications

Seller, in consultation with the Committee, may (a) determine, which Qualified Bid, if any, is the highest, best or otherwise financially superior offer; and (b) reject at any time before entry of an order of the Bankruptcy Court approving a Qualified Bid, any bid that is (i) inadequate or insufficient, (ii) not in conformity with the requirements of the Bankruptcy Code, the Bidding Procedures, or the terms and conditions of sale, or (iii) contrary to the best interests of Seller, its estates and creditors. At or before the Sale Hearing, Seller, in consultation with the Committee, may impose such other terms and conditions as Seller, in consultation with the Committee, may determine to be in the best interests of Seller' estate, its creditors and other parties in interest.

## ANNEX 1

_____, 2003

[NAME]
[ADDRESS]
[ADDRESS]
[CONTACT]

Re:     Doctors Community Healthcare Corporation

Dear _____:

You and your affiliates (collectively, "you") have expressed an interest in being involved in a possible transaction (the "Transaction") involving Doctors Community Healthcare Corporation (together with its subsidiaries, the "Company"). In connection with your analysis regarding the Transaction, you have requested oral and written information concerning the Company (the "Evaluation Material"). The term "Evaluation Material" includes all analyses, compilations, studies or other documents prepared by you or your Representatives (as hereinafter defined) containing or based in whole or in part on any information furnished in this connection. In consideration of your being furnished with the Evaluation Material, both parties agree to the following:

1.      The Evaluation Material will be used solely for the purpose of evaluating a possible Transaction involving the Company and not in any way detrimental to the Company. Such material will be kept confidential by you, and may not be disclosed to any third party (including customers or clients of yours or others who might have an interest in participating in the Transaction) without our prior written approval, except that you may disclose the Evaluation Material or portions thereof to those of your employees and advisors (such persons to whom such disclosure is permissible being collectively called "Representatives") who need to know such information for the purpose of evaluating the Transaction on your behalf (it being understood that those Representatives will be informed of the confidential nature of the Evaluation Material and will agree to be bound by this agreement and not to disclose the information to any other person). You agree to be responsible for any breach of this agreement by your Representatives. In the event that you or any of your Representatives become legally compelled (by deposition, interrogatory, request for documents, subpoena, civil investigative demand or similar process) to disclose any of the Evaluation Material, you shall provide us with prompt

written notice of such requirement prior to any such disclosure so that we may seek a protective order or other appropriate remedy. In the event that such protective order or other remedy is not obtained, you agree to furnish only that portion of the Evaluation Material which you are legally required to disclose and to exercise all reasonable efforts to obtain assurance that confidential treatment will be accorded such Evaluation Material.

2. The term "Evaluation Material" does not include any information which (i) at the time of disclosure or thereafter is generally available to and known by the public (other than as a result of a disclosure directly or indirectly by you or your Representatives) or (ii) was or becomes available to you on a non-confidential basis from a source other than the Company or its advisors, provided that such source is not and was not bound by a confidentiality agreement with or other obligations of secrecy to the Company.

3. Upon request, you promptly will return to us all copies of the Evaluation Material in your possession or in the possession of your Representatives, provided, however, that the portion of the Evaluation Material which consists of analyses, compilations, studies or other documents prepared by you or your Representatives will be destroyed and such destruction shall be certified to us in writing.

4. Without our prior written consent, you will not, and will direct your Representatives not to, disclose to any person either the fact that any investigations, discussions or negotiations are taking place concerning a possible Transaction or the terms and conditions or other facts with respect to the Transaction, including the status or terms thereof.

5. You understand and acknowledge that the Company is not making any representation or warranty, express or implied, as to the accuracy or completeness of the Evaluation Material, and neither the Company nor any of its officers, directors, employees, stockholders, owners, affiliates or agents will have any liability to you, your agents or any other person resulting from such use of the Evaluation Material. You acknowledge that you are aware (and that your Representatives have been advised) that the U.S. securities laws prohibit any person who has material non-public information about a company from purchasing or selling securities of such company or its subsidiaries.

6. You understand and agree that no contract or agreement providing for any Transaction contemplated by this Agreement shall be deemed to exist between you and the Company, or between you and the Company's affiliates, unless and until Definitive Agreements pertaining thereto have been executed and delivered, and you hereby waive, in advance, any claims (including, without limitation, breach of contract) against any such person unless and until you and all other relevant parties shall have executed and

delivered such Definitive Agreements. You also agree that unless and until such Definitive Agreements with respect to a Transaction involving the Company shall have been executed and delivered, there shall not be any legal obligation whatsoever with respect to any such Transaction by virtue of this agreement or any other written or oral expression with respect to such Transaction except, in the case of this agreement, for the matters specifically agreed to herein. For purposes of this paragraph, the term "Definitive Agreements" does not include an executed letter of intent or any other preliminary written agreement, nor does it include any written or verbal agreement in principal or acceptance of an offer or bid on your part. Neither this paragraph nor any other provision in this agreement can be waived or amended except by our written consent which consent shall specifically refer to this paragraph (or such provision) and explicitly make such waiver or amendment.

7. You agree that you will have no discussions or other contact with any employee of the Company or any of its affiliates regarding the Company's business or any Transaction with the Company unless such employee has been designated to you by us as a person with whom you may have such contact.

8. You agree that for a period of three years from the date hereof, you will not, directly or indirectly, solicit for employment or hire any person who is an employee of the Company. For purposes hereof, any person who was employed by the Company on the date of such solicitation or hiring, or who was employed by the Company at any time during the twelve months preceding such solicitation or hiring, shall be considered an employee of the Company.

9. You agree that money damages would not be a sufficient remedy for any breach of this agreement by you or your officers, directors, employees or agents, and that the Company shall be entitled to equitable relief, including injunction and specific performance, in the event of any breach of the provisions of this agreement, in addition to all other remedies available at law or in equity.

10. It is further understood and agreed that no failure or delay by the Company in exercising any right, power or privilege hereunder will operate as a waiver thereof, nor will any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any right, power or privilege hereunder.

11. This agreement is for the benefit of the Company and will be governed by and construed in accordance with the internal laws of the State of Delaware, USA. You hereby irrevocably and unconditionally consent to submit to the jurisdiction of the United States Bankruptcy Court for the District of Columbia for any actions, suits or proceedings arising out of or relating to

this Agreement, and further agree that service of any process, summons, notice or document by U.S. registered mail to your address set forth below shall be effective service of process for any action, suit or proceeding brought against you in such court.

If you agree with the foregoing, please sign and return a copy of this letter to us, which will constitute our agreement with respect to the subject matter of this letter.

Very truly yours,

DOCTORS COMMUNITY
HEALTHCARE CORPORATION

By:_____
    Name:
    Title:

CONFIRMED AND AGREED
as of the date first written
above:

[NAME]

By: _____
    A duly authorized officer

**<u>EXHIBIT B</u>**

BO1:\83658\03\1SJ%03!.DOC\41776.0003

## Schedule of Parties Asserting Liens Against the Pine Grove Assets

Citicorp Vendor Finance
P.O. Box 7247-0322
Philadelphia, Pennsylvania 19170-0322

JDR Capital Corporation
P.O. Box 429
317-A Delsea Dr.
Sewell, New Jersey 08080-0429

JP Morgan Chase Bank
(f/k/a The Chase Manhattan Bank)
as Trustee for NPF VI, Inc.
450 W 33rd St.
New York, New York 10001-2603

NPF Capital, Inc.
6125 Memorial Dr.
Dublin, Ohio 43017-9000

The Priority Mailing Systems, Inc.
19750 S. Vermont Ave Ste 120
Torrance, California 90502-1114

The Chase Manhattan Bank
450 W 33rd Street
New York, New York 10001-2603

Wells Fargo Financial Leasing
P.O. Box 10336
Des Moines, Iowa 50306-0336

Wells Fargo Financial Leasing, Inc.
4695 MacArthur Ct Ste 350
Newport, CA 92660-8816

## CERTIFICATE OF SERVICE

I, Andrew M. Troop, certify that a true and correct copy of the foregoing Motion of the Debtors for orders pursuant to sections 363, 365 and 1146 of the Bankruptcy Code, as supplemented by rules 2002, 6004 and 6006 of the Federal Rules of Bankruptcy Procedure, (a) approving certain sale procedures (the "Sales Procedures", attached hereto as Exhibit A) pursuant to which the Debtor will seek to obtain a purchaser for substantially all the assets of Pine Grove, and (b) authorizing and approving such sale, including the assumption and assignment of executory contracts and/or unexpired leases to the successful purchaser was served on the parties/counsel listed on the attached service list on April 18, 2003 in accordance with the Court's January 23, 2003 order establishing notice procedures.

_____
Andrew M. Troop

## PAPER SERVICE LIST
### (by first class mail and email)

| Name and Street Address | Email Address, if any |
|---|---|
| Any and all of the Debtors<br>c/o Doctors Community Healthcare Corporation<br>6730 North Scottsdale Road<br>Suite 290<br>Scottsdale, Arizona 85253 | pleadings@doctorscommunity.com |
| Deryck A. Palmer, Esq.<br>Weil, Gotshal & Manges LLP<br>767 Fifth Avenue<br>New York, New York 10153<br>(Counsel for the Debtors) | deryck.palmer@weil.com |
| Andrew M. Troop, Esq.<br>Weil, Gotshal & Manges LLP<br>101 Federal Street<br>Boston, MA 021 10<br>(Counsel for Debtors) | andrew.troop@weil.com |
| Peter D. Isakoff, Esq.<br>Holly E. Loiseau, Esq.<br>Weil, Gotshal & Manges LLP<br>1501 K Street N.W. Suite 100<br>Washington, D.C. 20005<br>(Counsel for the Debtors) | peter.isakoff@weil.com<br><br>holly.loiseau@weil.com |
| B. Amon James, Esq.<br>Office of the United States Trustee<br>115 South Union St., Plaza Level<br>Suite 210<br>Alexandria, Virginia 22314 | B.Amon.James@usdoj.gov |
| Kevyn D. Orr, Esq.<br>Jones Day<br>51 Louisiana Avenue, N.W.<br>Washington, D.C. 20001<br>(Counsel for National Century Financial Enterprises, Inc) | korr@jonesday.com |

DC1:\144509\01\33$501!.DOC\41776.0003

Ken Kansa, Esq.
Bank One Plaza
Sidley, Austin, Brown & Wood LLP
10 South Dearborn Street
Chicago, Illinois 60603
(Counsel for Medline Industries, Inc.)

kkansa@sidlev.com

Guy S. Neal, Esq.
Natalie Kuehn, Esq.
Sidley, Austin, Brown & Wood LLP
1501 K Street, N.W. Suite 600
Washington, D.C. 20005
(Counsel for Medline Industries, Inc.)

gneal@sidley.com

nkuehn@sidley.com

Michael L. Bernstein, Esq.
Charles A. Malloy, Esq.
Arnold & Porter
555 Twelfth Street, N.W.
Washington, D.C. 20004
(Counsel for Health Care Reit, Inc.)

michael_bernstein@aporter.com

charles_malloy@aporter.com

David Fisher, Esq.
Corporation Counsel, D.C.
441 4th Street, N.W. 6th Floor North
Washington, D.C. 20001
(Counsel for the District of Columbia)

David.Fisher@dc.gov

Sam J. Alberts, Esq.
Jonathan Gold, Esq.
Akin, Gump, Strauss, Hauer, & Feld
1333 New Hampshire Avenue, N.W.
Suite 400
Washington, D.C. 20001
(Counsel for the Joint Committee of
Unsecured Creditors)

salberts@akingump.com

jgold@akingump.com

Michael Goodstein, Esq.
Arter & Hadden
1801 K Street N.W. Suite 3001
Washington, D.C. 20006
(Counsel for Provident)

michael.goodstein@arterhadden

## ELECTRONIC SERVICE LIST
### (by email only)

Donald A. Workman, Esq.                    dworkman@foleylaw.com
Roderick B. Williams, Esq.
Foley & Lardner                            rwilliams@foleylaw.com
Washington Harbour
3000 K Street, N.W., Suite 500
Washington, D.C. 20007-5109

Neil Demchick                              ndemchick@navigantconsulting.com
Navigant Consulting
2 North Charles Street, -
Baltimore, Maryland 21201.

Mitchell B. Weitzman, Esq.                 Mweitzman@beankinney.com
Bean, Kinney & Korman, P.C.
2000 North 14th Street Suite 100
Arlington, Virginia 22201

Christy Hoffman, Esq.                      choffman@jamhoff.com
James & Hoffman, P.C.
1101 17th Street, N.W., Suite 510
Washington, D.C. 20036

Kermit A. Rosenberg, Esq.                  krosenberg@tighepatton.com
Tighe Patton Armstrong Teasdale, PLLC
1747 Pennsylvania Avenue, N.W.
Suite 300
Washington, DC 20006-4604

Haig Maghakian, Esq.                       hmaghakian@milbank.com
Milbank, Tweed, Hadley & McCloy LLP
601 S. Figueroa Street, 30th Floor
Los Angeles, California 90017

William Douglas White                      wdw@mcarthywhite.com
McCarthy & White, PLLC
8180 Greensboro Drive - Suite 875
McLean, VA 22102

Craig B. Young, Esq.                              cby@cblhlaw.com
C. Todd Marks, Esq.                               ctm@cblhlaw.com
Connolly Bove Lodge & Hutz, LLP
1990 M Street, N.W.
Suite 800
Washington, D.C. 20036


Margarita Ginzburg, Esq.                          mginzburg@kayescholer.com
Lester M. Kirshenbaum, Esq.                       lkirshenbaum@kayescholer.com
Kaye Scholer LLP
425 Park Avenue
New York, NY 10022


Charles R. Bennett, Jr., Esq.                     crb@hanify.com
Hanify & King,
Professional Corporation
One Beacon Street
Boston, MA 02108-3107