FILED IN

JOHN MARSHALL DROP BOX

**ORIGINAL**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| In re: | ) | |
| | ) | **FILED** |
| GREATER SOUTHEAST COMMUNITY | ) | Case No. 02-02250 |
| HOSPITAL CORPORATION I, et al. | ) | MAY - 2 2003 |
| | ) | (Chapter 11) |
| | ) | Denise H. Curtis, Clerk |
| | ) | U.S. Bankruptcy Court for D.C. |
| | ) | **Hearing Date: May 7, 2003** |
| Debtors. | ) | **Hearing Time: 2 p.m.** |
| | ) | |
| | ) | Jointly Administered |

**EMERGENCY MOTION OF JOINT COMMITTEE OF UNSECURED
CREDITORS FOR AUTHORIZATION TO COMMENCE ADVERSARY PROCEEDING
TO ADJUDICATE CLAIMS ASSERTED BY NCFE ENTITIES**

The Joint Committee of Unsecured Creditors of Greater Southeast Community

Hospital Corporation I, et al. (the "Committee") hereby files this emergency motion (the

"Motion"), pursuant to Sections 105, 1103 and 1109 of Title 11 of the United States Code (the

"Bankruptcy Code") for an order, to the extent necessary, authorizing the Committee to

commence an adversary proceeding to adjudicate claims asserted by the NCFE Entities (as

defined below).  In support of this Motion, the Committee respectfully represents as follows:

**INTRODUCTION**

1.      The Committee seeks authorization (to the extent such authority is needed) to

commence an adversary proceeding to adjudicate, defend and/or resolve claims asserted by the

NCFE Entities (as defined below) against the Debtors' estates.  More specifically, the Committee

avers that valuable legal and equitable defenses exist to the more than $400 million in purported

claims that have been or may be asserted against the Debtors by National Century Financial

Enterprises, Inc. ("NCFE"), and its related affiliates, National Premier Financial Services, Inc.

("NPFS"), NPF-Capital, Inc., NPF-X, Inc., NPF-II-W, Inc., NPF-LL, Inc., NPF-PW, Inc., NPF-

SW, Inc., NPF-CSL, Inc., NPF-CSC, Inc., NPF-CSI, Inc., NPF-IX, Inc., NPF-LP, Inc.,  NPF VI, Inc., and NPF-XII, Inc. (collectively the "NCFE Entities").  In particular, the Committee intends to commence an adversary proceeding: (i) to recharacterize as equity any claim that the NCFE Entities have or may assert against the estates of the Debtors arising from funds allegedly provided by the NCFE Entities to the Debtors and, (ii) alternatively, to equitably subordinate the claims of the NCFE Entities to those of the general unsecured creditors because of the egregious and improper conduct of the NCFE Entities (the "Adversary Proceeding" or "Complaint").  The Adversary Proceeding is based upon Bankruptcy Code sections 105, 502, and 510 and other applicable bankruptcy and non-bankruptcy law.  A draft of the Adversary Proceeding is attached hereto as **Exhibit 1**.

2.    Since the outset of these cases, the Debtors encouraged the Committee to investigate actions against, and/or defenses from claims of, the NCFE Entities, but requested that the Committee refrain from initiating formal action until after a debtor-in-possession credit facility was approved by this Court.  In recent weeks, the Debtors have been working with the Committee to bring the re-characterization and subordination action against the NCFE Entities.  However, the Debtors have not consented to joining the Complaint, or to the Committee filing the Complaint.

3.    Based upon further information and belief, the NCFE Entities and the Debtors are resolving their differences concerning debtor in possession financing.  As a condition of such agreement, the NCFE Entities have demanded that the Debtors cease all litigation against the NCFE Entities.  Given the demand by the NCFE Entities and the events that have unfolded in this case, the Committee cannot predict whether or not the Debtors will consent to, or seek to, join in the Complaint.  Upon information and belief, the Debtors may agree to a standstill

arrangement encompassing all pending and potential litigation as between the NCFE Entities and the Debtors as part of a settlement regarding the debtor-in-possession financing.[1]

4.      Because resolution of the claims of the NCFE Entities is central to these cases, and these cases already have been pending for more than six months, the Committee believes it is essential to file the Complaint now and to adjudicate this proceeding quickly.  The Committee has filed this Motion in an effort to address any argument that the Committee may not have standing to bring the Complaint.

## JURISDICTION AND VENUE

5.      The Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory predicates for relief are sections 105(a), 1103(c)(5) and 1109.

## BACKGROUND

6.      On November 20, 2002 (the "Petition Date"), Greater Southeast Community Hospital Corporation I, together with five affiliated companies (collectively the "Debtors"), commenced these cases by filing voluntary petitions under chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code").  These cases are being jointly administered.  Since the Petition Date, the Debtors continue to operate their businesses and manage their assets as debtors-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

7.      On or about November 25, 2002, the Office of the United States Trustee appointed the Committee.

---

[1]  The Committee opposes any agreement by Debtors that precludes or otherwise prejudices the Committee from immediately initiating and prosecuting against the NCFE Entities the defenses referenced herein or in the Compliant.  In that regard, the Committee reserves all rights to object to any agreement made by the Debtors to stay all litigation against the NCFE Entities.

8.    The NCFE Entities have asserted significant claims against the Debtors' bankruptcy estates as a result of certain purported prepetition transactions between both parties (the "NCFE Claims"). Upon information and belief, the NCFE Claims may exceed $400 million, a figure which grossly exceeds any reasonable valuation of the Debtors. In comparison, the aggregate amount of unsecured claims asserted by alleged creditors other than the NCFE Entities equals approximately $100 million.

9.    The NCFE Entities allege that the NCFE Claims are secured by all or substantially all of the assets of the Debtors. Further, the NCFE Entities assert that they own certain of the Debtors' accounts receivable as of the Petition Date, or if their ownership interest is invalid, that they have a security interest in those accounts receivable.

10.    The collective claims of the NCFE Entities represent the largest claims asserted, or expected to be asserted, against the Debtors' estates. The Debtors and the Committee recognized early that potential defenses to the NCFE Claims would have to be investigated and analyzed in order for other creditors to participate in distributions from these estates. Recognizing that unsecured creditors are the true stakeholders in the Adversary Proceeding, and that a reasoned and practical division of labor would benefit the estates, the Debtors provided the Committee with their consent to investigate and analyze potential recharacterization and equitable subordination claims against the NCFE Entities. The Committee possessed a reasonable expectation that it would control the prosecution of such defenses for the benefit of creditors of the estates.

11.    The Committee and its professionals, at the behest of, and with the approval of, the Debtors, devoted significant resources to assessing and untangling the financial relationship between the NCFE Entities and the Debtors, understanding the role that the NCFE Entities and

their management played as a significant shareholder of DCHC, and evaluating defenses to claims asserted, or likely to be asserted, by the NCFE Entities.  As a result, the Committee has concluded, *inter alia*, that justifiable grounds exist to recharacterize the NCFE Claims or to equitably subordinate the NCFE Claims to those of general unsecured creditors.

12.    The Committee has on several prior occasions made demand upon the Debtors to formally consent to the Committee's prosecution of the Adversary Proceeding.  The Committee's demands have not been categorically dismissed, but instead, have been met with vacillating responses from the Debtors.  The Committee remains uncertain as to whether the Debtors ultimately will consent in the near future.  The Debtors' continued delay is troubling, but should not prevent this action from proceeding expeditiously.

## RELIEF REQUESTED

13.    The Committee submits that the Debtors' refusal to sue or assign such rights/claims to the Committee is unjustified, and accordingly requests that this Court authorize the Committee to commence, prosecute, and/or settle the Adversary Proceeding on behalf of the Debtors' estates and their unsecured creditors.

## BASES FOR THE RELIEF REQUESTED

14.    This Motion is filed out of an abundance of caution.  In fact, strong argument can be made that it is not necessary for the Committee to receive a formal grant of standing to recharacterize or equitable subordinate the NCFE Entities' claims.  In contrast to certain provisions of the Bankruptcy Code that states that certain actions may be brought by a "trustee," Bankruptcy Code sections 105, 502, and 510 do not contain any such allegedly "limiting" language.  It is well established that any party in interest may object to a creditors' claim in

bankruptcy. 11 U.S.C. § 502(a) ("[a] claim or interest, proof of which is filed under section 501 of this title, is deemed allowed, unless a party in interest, [sic], objects.").

15.     Nevertheless, in an effort to avoid any potential dispute concerning standing after litigation commences, the Committee seeks formal authority to file and prosecute the Complaint.

**A.     The Court Has Authority To Assign The Adversary Proceeding To The Committee.**

16.     Section 1103(c) of the Bankruptcy Code sets out the powers of a statutory creditors' committee. Among these powers, Bankruptcy Code section 1103(c)(5) provides that committees may "perform such other services as are in the interest of those represented." 11 U.S.C. § 1103(c)(5). In one of the seminal cases recognizing the concept of derivative standing, Unsecured Cred. Comm. v. Noyes (In re STN Enterprises), 779 F.2d 901 (2d Cir. 1985), the Second Circuit, held that the combined force of sections 1103(c)(5) and 1109(b) of the Bankruptcy Code provided the requisite statutory authority for creditor committees "to initiate suit with the approval of the bankruptcy court." Id. at 904. Therefore, according to STN and its progeny, a committee possesses an implied, but qualified, right to prosecute claims belonging to the bankruptcy estate.

17.     Numerous bankruptcy courts have held that an unsecured creditors' committee may initiate an adversary proceeding in the name of a debtor-in-possession if the debtor-in-possession unjustifiably refuses to bring suit. See, e.g., Canadian Pac. Forest Prods. v. J.D. Irving, Ltd. (In re Gibson Group), 66 F.3d 1436, 1446 (6th Cir. 1995) (holding that a creditor or creditors' committee may have derivative standing to initiate an avoidance action where the debtor-in-possession refuses to sue; a colorable claim that would benefit the estate if successful exists, based on a cost-benefit analysis performed by the court, and the inaction is an abuse of discretion in light of the debtor-in-possession's duties in a Chapter 11 case); Louisiana World

Exposition v. Federal Ins. Co., 858 F.2d 233 (5th Cir. 1988) (holding that committee possesses derivative standing where colorable claims exist, the debtor unjustifiably refuses to sue, and the court grants the committee leave to sue); In re Xonics Photochemical, Inc., 841 F.2d 198 (7th Cir. 1988); STN, 779 F.2d at 904.

18.    In determining whether a debtor's refusal to sue is unjustified, bankruptcy courts typically apply a two-part test evaluating: (a) whether the creditors' committee presents a colorable claim or claims for relief; and (b) whether the action asserting the claims is likely to benefit the estate.  See e.g. In re KDI Holdings, 277 B.R. 493, 507-508 (Bankr. S.D.N.Y. 1999) (citing STN, 779 F.2d at 904).

19.    In determining whether a colorable claim exists, the bankruptcy court must engage in an inquiry that is "much the same as that undertaken when a defendant moves to dismiss a complaint for failure to state a claim." In re KDI Holdings, 277 B.R. at 508.  To determine whether the action is likely to benefit the estate, the court must assess: (i) the probabilities of legal success and financial recovery if successful; and (ii) whether it is preferable to have the action pursued by a trustee instead of the creditors' committee and the terms relative to attorneys' fees on which the suit must be brought.  In Official Comm. of Unsecured Creditors v. Hudson United Bank (In re America's Hobby Center, Inc.), 223 B.R. 275 (Bankr. S.D.N.Y. 1998), the court noted that the purpose of these determinations is to "justify the anticipated delay and expense to the bankruptcy estate that the initiation and continuation of the litigation will likely produce." Id. at 282 (citing STN, 779 F.2d at 906).

## I.    The Committee Can Satisfy The STN Test.

20.    In the present case, the Committee can satisfy the two-part test established by the in STN.

### A.    The Adversary Proceeding Contains Colorable Claims Against the NCFE Entities

21.    First, the Debtors' estates possess colorable claims to recharacterize and/or equitably subordinate the NCFE Claims.

22.    Count One of the Adversary Proceeding seeks to recharacterize as equity any claim that the NCFE Entities have or may assert against the Debtors arising from funds provided by the NCFE Entities to the Debtors, more fully alleged herein.  Alternatively, Count Two of the Adversary Proceeding seeks to equitably subordinate the claims of the NCFE Entities to those of the unsecured creditors because of the inequitable conduct of the NCFE Entities in using the Debtors as an instrumentality of a Ponzi scheme orchestrated by the NCFE Entities, all to the overwhelming harm of the Debtors and its unsecured creditors, who are left with unsecured claims in excess of $100 million.

23.    This Adversary Proceeding arises from the relationship between the Debtors and the NCFE Entities and how that relationship evolved over the years from that of a debtor and purported creditor to that of ownership and unchecked influence.  In addition, NCFE purchased an 11.5% interest in DCHC, and Paul Tuft (CEO of DCHC) was obliged to pledge his 72.5% stock interest in DCHC to NCFE, Lance Poulsen and the various NCFE Entities.  Based upon information and belief, the NCFE Entities directed the Debtors in planning strategy, considering expansion opportunities, and interviewing management prospects.  The NCFE Entities also became the sole source of funding for Debtors' daily operations, operations losses, and expansion efforts.

24.     As the Debtors' financial situation became worse (from 1997 through 2002, the Debtors lost more than $447 million), the NCFE Entities directed the Debtors to transfer the recorded liabilities due to the NCFE Entities from one of the individual Debtor hospitals to another, even though such transfers and the recorded balances did not match the particular debtor hospital that utilized the funds.

25.     Because of their insider position, the NCFE Entities had access to financial information of the Debtors.  Based upon this access, the NCFE Entities knew or should have known that the Debtors were undercapitalized and knew or should have known that the Debtors could never repay the hundreds of millions of dollars advanced or the 'interest" and fees owing. The NCFE Entities knew or should have known that each of the Debtor hospitals was operating at a loss, and that the losses incurred by the Debtors were increased by the usurious interest rate and fees charged by the NCFE Entities.

26.     Upon information and belief, the NCFE Entities were involved actively in creating and implementing the Debtors' strategic plan.  This is evident in numerous areas, including, but not limited to, DCHC's acquisitions of hospitals.

27.     Since at least 1997, the NCFE Entities were actively involved with the Debtors in identifying and analyzing potential acquisition targets.  Involvement by the NCFE Entities is evident in at least the acquisitions of Michael Reese, Grant, and Greater Southeast, as well as various target hospitals pursued, but not acquired, including Boston Regional Medical Center, a hospital in Iowa, and Dimensions.  It is apparent that the NCFE Entities not only supported the acquisition strategy, but actively encouraged and participated in it.

28.     Additionally, the NCFE Entities encouraged DCHC to build a significant corporate platform for the purpose of growing the business through acquisitions.  The total

operating expenses for the parent DCHC operations were $6.9 million in 1997. These expenses increased in every year and totaled an astounding $28 million in 2002.

29.    In the six calendar years prior to the Debtors' filing for protection under the Bankruptcy Code, the Debtors incurred consolidated losses of more than $447 million.

30.    The NCFE Entities, unconcerned by the bleak financial situation of the Debtors, forged ahead in providing funds to the Debtors. Although the NCFE Entities knew or should have known that they would never be repaid for the funding provided, it did not matter because the fees and interest charged and the repayments recorded by the NCFE Entities as having come from the Debtors (as well as from other providers funded by the NCFE Entities) were needed so that the NCFE Entities could appear to meet their obligations to their bondholders.

31.    The NCFE Entities used the Debtors in order to perpetuate a classic Ponzi scheme whereby the NCFE Entities investors who purchased bonds from earlier offerings got paid with money put up by new investors who purchased bonds from subsequent offerings rather than from revenues that the NCFE Entities were supposed to be generating from the purported receivables-backed funding to the Debtors and other hospital providers. The NCFE Entities used the interest expense recorded at, but never paid by, the Debtors to beef up its financial statements so that it could obtain more financing through the issuance of more bonds to pay prior bondholders.

32.    Ultimately, however, the Ponzi scheme orchestrated by the NCFE Entities imploded as they lost their bond ratings and could no longer generate the funds to perpetuate their scheme. After it was reported that the reserve funds of the NCFE Entities were deficient by hundreds of millions of dollars and the FBI executed a search warrant at the corporate headquarters of the NCFE Entities, the NCFE Entities filed for bankruptcy protection on November 18, 2002.

33.    Without the funding from the NCFE Entities, the Debtors were compelled to file for bankruptcy protection on November 20, 2002, in order to continue providing healthcare services at the five hospitals.

34.    By this time, the NCFE Entities had invested over two hundred million dollars, excluding recorded, but unpaid interest and fees for acquisitions and funding of losses. Without this continued investment, the Debtors would not have been able to continue to operate, would not have been able to purchase at least three of its current five hospitals, and the unsecured creditors would not have continued to provide services and extend credit to the Debtors.

35.    Accordingly, the Committee submits that a sufficient factual basis exists upon which to maintain causes of action for recharacterization and equitable subordination against the NCFE Entities.

**B.    The Granting of this Motion Is in The Best Interests of the Debtors' Estates**

36.    Granting this Motion, and permitting the Committee to prosecute the Adversary Proceeding will benefit the estates, because: (i) the probabilities of legal success and financial recovery weigh in favor of pursuing the Adversary Proceedings; and (ii) it is preferable to have the Committee and its professionals pursue this action under existing Court-approved compensation terms rather than the Debtors or a trustee.

37.    The recharacterization or equitable subordination of the NCFE Claims will maximize the value of the Debtors' estates for all unsecured creditors who were harmed as a result of the improper and inequitable conduct of the NCFE Entities. The NCFE Claims are disproportionably higher than the aggregate claims of all other creditors seeking distributions from the Debtors' estates. Neither the estimated liquidation value nor reorganization value of the

Debtors' estates will be sufficient to satisfy the purported secured claims of the NCFE Entities and provide for a distribution to priority or general unsecured creditors.

38.     The Committee is the proper party to bring the suit, not a "Trustee," for at least several reasons. The Committee and its professionals, at the behest of and with the approval of the Debtors, have conducted due diligence with respect to the Adversary Proceeding and, as a result, is intimately familiar with the extensive documentation and other evidence forming the factual predicate for these claims. Appointment of a trustee (or pursuit by the Debtors) to commence the Adversary Proceeding will result in inordinate delay as the trustee and its professionals start afresh the process begun by the Committee months ago. Appointment of a trustee to pursue this Adversary Proceeding will increase the Debtors' financial burdens at a time when the estate lacks the liquidity to retain additional professionals. As the estates have already funded the Committee's investigation into these claims, estate resources will be wasted if used to fund a duplicative investigation. Finally, the primary beneficiaries of the prosecution of the Adversary Proceedings are the general unsecured creditors whose interests are represented by the Committee. The general unsecured creditors whom the Committee represents have the greatest stake in the outcome of the Adversary Proceeding and will be more likely to vigorously pursue the litigation than the Debtors or a trustee.

## C.     The Debtors' Failure to Sue Is Inconsistent With its Fiduciary Duties

39.     The Debtors' refusal to sue, or to provide the Committee with their formal consent to sue, is not consistent with the Debtors' fiduciary duties. The Debtors have a duty to maximize value for the benefit of unsecured creditors. Commencement of the Adversary Proceeding is consistent with this fiduciary obligation because unsecured creditors have, apart from recovery from Chapter 5 actions, little prospect of receiving distribution from these cases if the NCFE Claims go unchallenged.

40.     Although the Committee believes displacement of management at this crucial juncture is not in the best interests of the estates, potential conflict of interest possessed by certain exiting officers and directors with respect to the Adversary Proceeding against NCFE cannot, and should not, prevent the Committee from taking action which undeniably is in the best interests of unsecured creditors and these estates. See e.g. Louisiana World Exposition v. Federal Ins. Co., 858 F.2d at 252-53 (holding that "where the debtor-in-possession is unable or unwilling to fulfill its obligation--due, for instance, to a conflict of interest--the Committee may assert the cause of action on behalf and in the name of [the debtor] if authorized to do so by the bankruptcy court.")(citations omitted).

## III.     The Court Has Authority to Approve the Committee's Commencement of the Adversary Proceeding Should the Debtors Formally Consent

41.     Should the Debtors formally consent to the Committee's commencement of the Adversary Proceeding prior to the hearing on the Motion, the Court should authorize the Committee to commence, prosecute, and/or settle the Adversary Proceeding on behalf of the estates.

42.     This Court has already ruled that unsecured creditors may prosecute various causes of action with the consent of the debtors. See Order Establishing Procedures for the Official Committee of Unsecured Creditors to Settle Chapter V and Related Claims, entered on or about May 22, 2001 in *In re Greater Southeast Community Hospital, Inc., et al*, Case No. 99-01159. In that case, this Court granted the Committee authority to prosecute actions under chapter 5 of the Bankruptcy Code, as well as claims against the Debtors' auditors.

43.     Other courts have held that a debtor may assign certain causes of action to a creditors' committee, if the litigation is deemed to be in the best interest of the debtor's estate and necessary and beneficial. See, e.g., Commodore Electronics Ltd. v. Gould (In re

601207.0001 DC 743243 v3                         13

Commodore International Ltd.), 262 F.3d 96, 99-100 (2d Cir. 2001) ("A creditors' committee may acquire standing to pursue the debtor's claims if (1) the committee has the consent of the debtor in possession or trustee, and (2) the court finds that suit by the committee is (a) in the best interest of the bankruptcy estates, and (b) is 'necessary and beneficial' to the fair and efficient resolution of the bankruptcy proceedings."); Liberty Mutual Ins. Co. v. Official Unsecured Creditors' Committee (In re Spaulding Composites Co., Inc.), 207 B.R. 899, 904 (Bankr. 9th Cir. 1997) ("Allowing the DIP to coordinate litigation responsibilities with an unsecured creditors' committee can be an effective method for the DIP to manage the estate and fulfill its duties."); see also Coral Petroleum, Inc. v. Banque Paribas-London, 797 F.2d 1351, 1363 (5th Cir. 1986) (approving stipulation allowing Committee to pursue estate claims); In re Greenberg, 266 B.R. 45, 50 (Bankr. E.D.N.Y. 2001) (following Commodore and stating that "the trustee's duties may be assigned to creditors provided that the relevant underlying bankruptcy policies are satisfied"); Official Creditors' Committee of Arundel Housing Components, Inc. v. Georgia-Pacific Corp. (In re Arundel Housing Components, Inc.), 126 B.R. 216, 217 (Bankr. D. Md. 1991) (indicating that court had previously authorized the committee to pursue estate preference litigation); In re Colfor, Inc., 1998 Bankr. LEXIS 158, at *5 (Bankr. N.D. Ohio 1998) (finding that "a stipulation [is] effective to confer standing upon a committee of unsecured creditors").

44.     The Commodore standard is satisfied here, should the Debtors formally consent. First, the Committee will have the consent of the Debtors to commence, prosecute, and/or settle the Adversary Proceeding on behalf of the estates. Second, for the reasons stated previously herein, the Committee's prosecution of the Adversary Proceeding is (i) in the best interest of the estates and (ii) necessary and beneficial to the fair and efficient resolution of these bankruptcy cases.

## NOTICE

45.    A copy of this Motion has been served in accordance with this Court's January 23, 2003 order establishing notice procedures.  The Debtors submit that no other or further notice need be provided.

## CONCLUSION

WHEREFORE, the Committee respectfully requests that this Court enter an Order: (a) authorizing the Committee to commence, prosecute, and/or settle the Adversary Proceeding on behalf of the Debtors' estates; and (b) granting such other and further relief as this Court deems just and proper.

Date:   Washington, D.C.
        May 2, 2003

Respectfully submitted,

AKIN GUMP STRAUSS HAUER & FELD LLP

By: _____
    Sam J. Alberts (DC Bar No. 443260)
    Jonathan L. Gold (DC Bar No. 452025)
    Joseph Osborne (DC Bar No. 384814)
    1333 New Hampshire Avenue, NW
    Washington, D.C.  20036
    Telephone: 202-887-4000
    Facsimile: 202-887-428

    Counsel to the Joint Committee
    Of Unsecured Creditors

## CERTIFICATE OF SERVICE

The undersigned certifies that a true and correct copy of the Emergency Motion of Joint Committee of Unsecured Creditors for Authorization to Commence Adversary Proceeding to Adjudicate Claims Asserted by NCFE Entities was served the 2nd day of May, 2003 by U.S. Mail, first class postage prepaid, and/or electronic mail to the parties on the attached service list.

Jonathan L. Gold

601207.0001 DC 743243 v3

19

## PAPER AND ELECTRONIC SERVICE LIST

Any and all of the Debtors
c/o Doctors Community Healthcare Corp.
6730 North Scottsdale Rd., Ste. 290
Scottsdale, AZ 85253
pleadings@doctorscommunity.com

Deryck A. Palmer, Esq.
Weil, Gotshall & Manges, LLP
767 Fifth Ave
New York, NY 10153
(Counsel for Debtors)
deryck.palmer@weil.com

Andrew M. Troop, Esq.
Weil Gotshall & Manges, LLP
100 Federal St.
Boston, MA 02110
(Counsel for Debtors)
andrew.troop@weil.com

Peter D. Isakoff, Esq.
Holly E. Loiseau, Esq.
Weil, Gotshall & Manges, LLP
1501 K Street NW, Ste. 100
Washington, DC 20005
(Counsel for Debtors)
peter.isakoff@weil.com
holly.loiseau@weil.com

B. Amon James, Esq.
Office of the U.S. Trustee
115 S. Union Street, Rm. 210
Alexandria, VA 22314
b.amon.james@usdoj.gov

Kevyn D. Orr, Esq.
Jones, Day, Reavis & Pogue
51 Louisiana Ave., NW
Washington, DC 20001
(Counsel for NCFE Debtors)
korr@jonesday.com

Ken Kansa, Esq.
Sidley, Austin, Brown & Wood, LLP
Bank One Plaza
10 S. Dearborn St.
Chicago, IL 60603
(Counsel for Medline Industries, Inc.)
kkansa@sidley.com

Guy S. Neal, Esq.
Natalie M. Kuehn, Esq.
Sidley Austin Brown & Wood, LLP
1501 K St., NW
Washington, DC 20005-1208
(Counsel for Medline Industries, Inc.)
gneal@sidley.com
nkuehn@sidley.com

Michael Bernstein, Esq.
Charles A. Malloy, Esq.
Arnold & Porter
555 12th St., NW, 7th Fl.
Washington, DC 20004
(Counsel for Health Care REIT, Inc.)
michael_bernstein@aporter.com
charles_malloy@aporter.com

David Fisher, Esq.
Corporation Counsel, DC
441 4th St., NW, 6th Floor N.
Washington, DC 20001
(Counsel for the District of Columbia)
david.fisher@dc.gov

Michael R. Goodstein, Esq.
Arter & Hadden, LLP
1801 K St., NW, Ste. 300L
Washington, DC 20015
(Counsel for Provident Bank)
michael.goodstein@arterhadden

## ELECTRONIC SERVICE LIST

Neil Demchick
Navigant Consulting
2 N. Charles St., Ste. 400
Baltimore, MD 21201
(Committee Financial Advisor)
ndemchick@navigantconsulting.com

Donald A. Workman, Esq.
Roderick B. Williams, Esq.
Foley & Lardner
Washington Harbour
3000 K St., NW, Ste. 500
Washington, DC 20007-5109
(Counsel for ComEd)
dworkman@foleylaw.com
rwilliams@foleylaw.com

Mitchell B. Weitzman, Esq.
Bean, Kinney & Korman, PC
2000 N. 14th St., Ste. 100
Arlington, VA 22201
(Counsel for Blue Cross/Blue Shield of
Arizona)
mweitzman@beankinney.com

Lester M. Kirshenbaum, Esq.
Margarita Y. Ginzburg, Esq.
Kaye Scholer LLP
New York, NY 10022
(Counsel for Official NPF VI
Subcommittee)
lkirshenbaum@kayescholer.com
mginzburg@kayescholer.com

Dennis J. Drebsky
Clifford Chance US LLP
Two Hundred Park Ave.
New York, NY 10166-0153
(Counsel for Official NPF VI
Subcommittee)
dennis.drebsky@cliffordchance.com

Haig Maghakian, Esq.
Milbank Tweed Hadley & McCloy, LLP
601 S. Figueroa St., 30th fl.
Los Angeles, CA 90017
(Counsel for for Official NPF VI
Subcommittee)
hmaghakian@milbank.com

Kermit A. Rosenberg, Esq.
Tighe, Patton, Armstrong, Teasdale PLLC
1747 Pennsylvania Ave., NW, Ste. 300
Washington, DC 20006
(Counsel for TIG Specialty Ins. Co.)
krosenberg@tighepatton.com

Christy Hoffman, Esq.
James & Hoffman, PC
1101 17th St., NW, Ste. 510
Washington, DC 20036-4704
(Counsel for Employees Int'l Union)
choffman@jamhoff.com

Craig B. Young, Esq.
C. Todd Marks, Esq.
Connolly Bove Lodge & Hutz, LLP
1990 M St., NW, Ste. 800
Washington, DC 20036
(Counsel for Inland Reat Estate Group)
cby@cblhlaw.com
ctm@cblhlaw.com

Jeffrey K. Garfinkle, Esq.
Buchalter, Nemer, Fields & Younger
895 Dove St., Ste. 400
P.O. Box 8129
Newport Beach, CA 92658-8129
(Counsel for McKesson Corp.)
jgarfinkle@buchalter.com

John Dawson, Esq.
John Harris, Esq.
Quarles Brady Streich & Lang LLP
One Renaissance Sq.
Phoenix, AZ 85004-2391
(Counsel for General Electric Capital Corp.)
jdawson@quarles.com
jharris@quarles.com

William Douglas White, Esq.
McCarthy & White, PLLC
8180 Greensboro Dr., Ste. 875
McLean, VA 22102
(Counsel for PEPCO)
wdw@mcarthywhite.com

Charles R. Bennett, Jr., Esq.
Hanify & King, PC
One Beacon St.
Boston, MA 02108-3107
(Counsel for Boston Regional Medical
Center)
crb@hanify.com

Terry E. Hall, Esq.
Baker & Daniels
300 N. Meridian St., Ste. 2700
Indianapolis, IN 46204
(Counsel for Senex Services Corp.)
tehall@bakerd.com

Paul E. Harner, Esq.
Jones Day
77 W. Wacker
Chicago, IL 60601-1692
peharner@jonesday.com

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| In re:                                                ) | |
| ) | |
| GREATER SOUTHEAST COMMUNITY          ) | Case No. 02-02250 |
| HOSPITAL CORPORATION I, et al.,             ) | Chapter 11 |
| ) | |
| Debtors.                        ) | ADV. PROC. No: _____ |
| ) | |
| JOINT COMMITTEE OF UNSECURED          ) | |
| CREDITORS,                                          ) | |
| ) | |
| Plaintiff.                      ) | **COMPLAINT** |
| ) | |
| v.                           ) | |
| ) | |
| NATIONAL CENTURY FINANCIAL            ) | |
| ENTERPRISES, INC.; NATIONAL               ) | |
| PREMIER FINANCIAL SERVICES, INC.;     ) | |
| NPF-CAPITAL, INC.; NPF-X, INC.;             ) | |
| NPF-II-W, INC.; NPF-LL, INC.;                   ) | |
| NPF-PW, INC.; NPF-SW, INC.;                    ) | |
| NPF-CSL, INC.; NPF-CSC, INC.;                  ) | |
| NPF-CSI, INC.; NPF-IX, INC.; NPF-LP, INC.; ) | |
| NPF VI, INC.; NPF XII, INC.,                      ) | |
| NPF-WL, Inc.                                           ) | |
| Defendants.                   ) | |
| _____) | Jointly Administered |

**COMPLAINT SEEKING RECHARACTERIZATION
AND SUBORDINATION OF CLAIM**

The Joint Committee of Unsecured Creditors of Greater Southeast Community Hospital

Corporation I ("Greater Southeast"), PACIN Healthcare-Hadley Memorial Hospital Corporation

("Hadley"), Michael Reese Medical Center Corporation ("Michael Reese"), Pine Grove Hospital

Corporation ("Pine Grove"), Pacifica of the Valley Corporation ("Pacifica"), and Doctors

Community Healthcare Corporation (collectively the "DCHC Debtors," "Debtor," or "Plaintiff")

complaining of National Century Financial Enterprises, Inc. ("NCFE"), National Premier

Financial Services, Inc. ("NPFS"), NPF-Capital, Inc., NPF-X, Inc., NPF-II-W, Inc., NPF-LL, Inc., NPF-PW, Inc., NPF-SW, Inc., NPF-CSL, Inc., NPF-CSC, Inc., NPF-CSI, Inc., NPF-IX, Inc., NPF-LP, Inc., NPF VI, Inc., and NPF-XII, Inc. (collectively the "NCFE Entities" or "Defendants"), allege as follows:

## PRELIMINARY STATEMENT

1.    Count One of this action seeks to recharacterize as equity any claim that the NCFE Entities have or may assert against the estates of the DCHC Debtors arising from funds provided by the NCFE Entities to the DCHC Debtors, more fully alleged herein. Alternatively, Count Two of this action seeks to equitably subordinate the claims of the NCFE Entities to those of the unsecured creditors because of the inequitable conduct of the NCFE Entities in using the DCHC Debtors as an instrumentality of a Ponzi scheme orchestrated by the NCFE Entities, all to the overwhelming harm of the unsecured creditors, who are left with unsecured claims in excess of $100 million.

2.    DCHC was established in 1992 with the stated intention of providing healthcare to inner city residents. Shortly thereafter, in 1993, DCHC embarked upon its relationship with the NCFE Entities, a relationship that was to become close and entangled.

3.    This action is about the relationship between the DCHC Debtors and the NCFE Entities. Over the course of ten years, the NCFE Entities provided funding to the DCHC Debtors for daily operations and for the acquisition of seven hospitals (it provided 100% of the funding for at least three of those hospitals purchased since 1997), daily operations, and operating losses.

4.    NCFE purchased an 11.5% interest in DCHC, Paul Tuft (former CEO of DCHC) was obliged to pledge his 72.5% stock interest in DCHC to NCFE, and the various NCFE

2

Entities otherwise effectively came to control the DCHC Debtors. The NCFE Entities directed the DCHC Debtors in planning strategy, considering expansion opportunities, and interviewing management prospects. Eventually the NCFE Entities became virtually the only source of funding for DCHC Debtors' daily operations, operations losses, and expansion efforts.

5.     As the DCHC Debtors' financial situation worsened (from 1997 through 2002, the DCHC Debtors lost more than $447 million), NCFE directed the DCHC Debtors to transfer the recorded liabilities due to the NCFE Entities from one of the individual Debtor hospitals to another, even though such transfers and the recorded balances did not match the particular Debtor hospital that was utilizing the funds.

6.     Because of their insider position, the NCFE Entities had access to financial information of the DCHC Debtors. Based upon this access, the NCFE Entities knew or should have known that the DCHC Debtors were undercapitalized and knew that the DCHC Debtors could never repay the funds advanced to them or other amounts allegedly owed to the NCFE Entities. The NCFE Entities knew or should have known that each of the DCHC hospitals was operating at a loss. The NCFE Entities knew or should have known that the losses incurred by the DCHC Debtors were increased by the usurious interest rate and fees charged by the NCFE Entities.

7.     Upon information and belief, the NCFE Entities were actively involved in creating and implementing the DCHC Debtors' strategic plan. This is evident in numerous areas, including, but not limited to, DCHC's acquisitions of hospitals and DCHC's creation of a "corporate platform" from which to grow.

8.   The NCFE Entities were actively involved with the DCHC Debtors in identifying and analyzing potential acquisition targets.  Involvement by the NCFE Entities is evident in at least the acquisitions of Michael Reese, Grant, and Greater Southeast, as well as various target hospitals pursued, but not acquired, including Boston Regional Medical Center, a hospital in Iowa, and Dimensions.  DCHC and the NCFE Entities regularly corresponded about such targets and acquisition strategy.  It is apparent that the NCFE Entities not only supported the acquisition strategy, but actively encouraged and participated in it.

9.   Additionally, the NCFE Entities encouraged DCHC to build a significant corporate platform for the purpose of growing the business through acquisitions.  The total operating expenses for the parent DCHC operations were $6.9 million in 1997.  These expenses increased in every year and totaled an astounding $28 million in 2002.

10.   Since the bankruptcy petition, DCHC has scaled back its parent operations to a level more commensurate with running the debtor hospitals.  Current levels of expenditures have decreased to approximately $4.2 million annually and even at that level continue to include compensation levels likely in excess of market levels.

11.   In effect, DCHC spent approximately $24 million more in 2002 than it needed to manage the hospitals.  In fact, based on a $4.2 million level of normal expenditures needed to manage the hospitals, in 2001 and 2002 alone, DCHC spent over $40 million on parent operations than were necessary to manage the hospitals.  These expenditures were made with the knowledge, funding, and apparent encouragement of the NCFE Entities, and were a significant drag on the hospitals and their ability to pay their trade creditors on a current basis.

4

12.    In the six calendar years prior to the DCHC Debtor's filing for protection under the Bankruptcy Code, the DCHC Debtors incurred consolidated losses of more than $447 million.

13.    The NCFE Entities, unconcerned by the bleak financial situation of the DCHC Debtors, forged ahead in providing funds to the DCHC Debtors.  Although the NCFE Entities knew or should have known that they would never be repaid for the funding provided, it did not matter because the fees and interest charged and the repayments recorded by the NCFE Entities as having come from the DCHC Debtors (as well as from other providers funded by the NCFE Entities) were needed so that the NCFE Entities could appear to meet their obligations to their bondholders.

14.    The NCFE Entities used the DCHC Debtors in order to perpetuate their classic Ponzi scheme whereby the NCFE Entities investors who purchased bonds from earlier offerings got paid with money put up by new investors who purchased bonds from subsequent offerings rather than from revenues that the NCFE Entities were suppose to be generating from the purported receivables-backed funding to the DCHC Debtors and other hospital providers.  The NCFE Entities used the interest expense recorded at, but never paid by, the DCHC Debtors, to beef up its financial statements so that it could obtain more financing through the issuance of more bonds to pay prior bondholders.  Therefore, the NCFE Entities disguised the fact that the DCHC Debtors were unable to repay the amounts advanced by the NCFE Entities.

15.    Ultimately, however, the Ponzi scheme orchestrated by the NCFE Entities imploded as they lost their bond ratings and could no longer generate the funds to perpetuate their scheme.  After it was reported that NCFE Entities' reserve funds were deficient by

5

hundreds of millions of dollars and the FBI executed a search warrant at NCFE's corporate headquarters, certain of the NCFE Entities filed for bankruptcy protection on November 18, 2002.

16.    Without the funding from the NCFE Entities, DCHC's part owner, the DCHC Debtors were compelled to file for bankruptcy protection on November 20, 2002, in order to continue providing healthcare services at the five hospitals.

17.    By this time, the NCFE Entities had invested hundreds of millions, excluding recorded, but unpaid interest and fees.  Without this continued investment, the DCHC Debtors would not have been able to continue to operate, would not have been able to purchase at least three of its current five hospitals, and the unsecured creditors would not be owed over $100 million by the DCHC Debtors.

## THE PARTIES

18.    Doctors Community Healthcare Corporation ("DCHC") is a privately-held healthcare management company organized under the laws of the State of Delaware with its corporate offices located in Scottsdale, Arizona.  DCHC manages and owns, directly and indirectly, five acute-care and psychiatric hospitals located in California, Illinois, and Washington, D.C.  The five hospitals are:  Greater Southeast Hospital, Hadley Memorial Hospital, Michael Reese Medical Center, Pacifica of the Valley Hospital, and Pine Grove Hospital.  DCHC is the ultimate corporate parent of the individual hospital Debtors, as defined below.  The term DCHC is used to include any of its corporate predecessors:  PACIN Healthcare Limited Partnership, Capital America Corporation; Capital America Healthcare Corporation; or

Doctors Corporation of America. Collectively the DCHC Debtors employ approximately 3,800 people and provide healthcare services to thousands of applicants.

19. On November 20, 2002, DCHC, Greater Southeast Hospital ("Greater Southeast"), Hadley Memorial Hospital ("Hadley"), Michael Reese Medical Center ("Michael Reese"), Pacifica of the Valley Hospital ("Pacifica"), and Pine Grove Hospital ("Pine Grove") (individually a "Debtor Hospital") filed separate voluntary petitions for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code"). Each of the Debtor Hospital's bankruptcy cases (collectively the "Bankruptcy Cases" and each individually a "Bankruptcy Case") were consolidated for administrative purposes.

20. On November 26, 2002, the Assistant United States Trustee for the District of Columbia appointed the Official Joint Committee of Unsecured Creditors (the "Committee"). The Committee was originally comprised of allegedly general unsecured creditors with claims in one or more of the six Debtor estates. The Committee has standing and may pursue this action pursuant to Bankruptcy Code Sections 105, 502(b)(1), 506, 510(c), 1103 and 1109, and Bankruptcy Rule 7001.

21. Greater Southeast is located in southeast Washington, D.C. It is a 450-bed full service hospital. As of the Petition Date, Greater Southeast also oversaw the operations of the DC Healthcare Alliance and DC General Ambulatory and Emergency Care Centers.

22. Hadley is also located in Washington, D.C. Hadley has 45 beds for long-term acute care and 103 nursing home beds for patients who are chronically ill and require lengthy hospitalization. Together Greater Southeast Hospital and Hadley Memorial Hospital provide a

7

broad spectrum of community-focused healthcare services to residents of Washington, D.C. and southern Prince George's County, Maryland.

23.    Michael Reese is a 482-bed full service hospital located in downtown Chicago, Illinois. Michael Reese provides emergency, general medical, surgical, obstetric, and pediatric services. It also provides services in the areas of urology, ophthalmology, neurology, oncology, rehabilitation, neurosurgical, otolaryngology, dialysis services, critical care, cardiac and vascular surgical services.

24.    Pacifica is a 242-bed acute care hospital located in the San Fernando Valley of California. Pacifica offers a full range of inpatient and outpatient services, including 24-hour emergency care, intensive and coronary care, behavioral health services, maternity, pediatric, and adult sub-acute units.

25.    Pine Grove is an 80-bed psychiatric hospital facility located in Canoga Park, California. Pine Grove's programs are based on a multi-disciplinary treatment approach and offer a comprehensive array of psychiatric services for all ages. Pine Grove ceased operations and was closed in April 2003.

26.    NPF-Capital, Inc., NPF-X, Inc., NPF-LL, Inc., NPF-CSL, Inc., NPF-CSC, Inc., NPF-CSI, Inc., NPF-WL, Inc., NPF-II-W, Inc., NPF-PW, Inc. NPF-SW, Inc., NPF–LP, Inc., NPF-IX, Inc., NPF VI and NPF XII ("NPF Funds") are corporations that are or were in the business of providing financing to healthcare providers. Based upon information and belief, NPF-WL, Inc., NPF-II-W, Inc., NPF-PW, Inc. NPF-SW, Inc., NPF–LP, Inc., NPF-IX, Inc., NPF VI and NPF XII are special purpose entities that are the issuers of a series of securities know as Health Care Receivables Securitization Program Notes ("Program Notes"). These companies

funded accounts receivable primarily through private placement of sales of bonds to institutional investors that were allegedly asset-backed by receivables of health care providers such as the DCHC Debtors. NPF-LL, Inc., NPF-CSL, Inc., NPF-CSC, Inc., and NPF-CSI, Inc. are special purpose entities that are in the business of equipment financing. The term NPF Funds also includes any and all predecessor special purpose entities that assigned or otherwise conveyed to any of the NPF Funds any interests they may possess, including but not limited to, any interests assigned or otherwise conveyed among the NPF Funds, relating to the DCHC Debtors.

27.    National Premier Financial Services, Inc. ("NPFS") is an Ohio corporation and is responsible for certain administrative functions related to servicing the collection of accounts receivable funded by the NPF Funds.

28.    National Century Financial Enterprises, Inc. ("NCFE") is a corporation organized and existing under the laws of Ohio. NCFE's principal place of business is located at 6125 Memorial Drive, Dublin, Ohio. At all times relevant to this claim, NCFE was the sponsor of the securitization vehicles that were in part the source of funds to the DCHC Debtors. Based upon information and belief, NCFE is the corporate parent of the NPF Funds, any predecessors, and National Premier Financial Services, Inc.

29.    Based upon information and belief, the NCFE Entities assert that they hold secured and unsecured claims against the estates of all of the DCHC Debtors in excess of $400 million.

9

## JURISDICTION AND VENUE

30.    This Court has jurisdiction over this adversary proceeding pursuant to title 28 U.S.C. §1334. This is an adversary proceeding arising in a case under title 11 of the United States Code brought pursuant to Bankruptcy Rule 7001.

31.    This matter is a core proceeding pursuant to 28 U.S.C. §157(b)(2).

32.    Venue is proper in this District and this Court pursuant to 28 U.S.C. §1409.

## FACTS

### Initial Capitalization of DCHC

33.    DCHC was founded in 1992 by Paul Tuft with the stated business strategy of providing quality health care services to inner city residents.

34.    The initial capitalization for DCHC was $1 million contributed by four individuals. Paul Tuft and George Kratz contributed $150,000 each. Upon information and belief, two other individuals contributed the remaining $700,000.

### NCFE Entities Funding for Hadley Memorial Hospital

### Acquisition of Hadley Memorial Hospital

35.    In 1992, DCHC purchased Hadley for approximately $10.3 million. DCHC paid $1 million in cash, assumed a capital lease of $300,000, and financed the remaining purchase price by agreeing to and executing two notes with the hospital's seller: one in the amount of $6.5 million (the "Hadley Long Term Note") and another in the amount of $2.5 million (the latter note being due on or about April 1994) (the "Hadley Short Term Note").

36.    Upon information and belief, Hadley was initially unsuccessful in its efforts to find a lender to refinance the Hadley Short Term Note that was due in April 1994. In or about June 1994, NCFE provided funding to DCHC to pay off the Hadley Short Term Note. In addition, later that year, NCFE provided another $800,000 in funding to Hadley.

37.    Rather than repay $3.3 million in loans (the combination of the $2.5 million Hadley Short Term Note and the $800,000 in additional funding), in or about November 1994, Hadley and the NCFE Entities entered into a Master Lease Agreement (the "Hadley Equipment Funding Agreement I") whereby NCFE purchased certain equipment from Hadley and leased it back to Hadley. The Hadley Equipment Funding Agreement I required Hadley to pay $116,000 per month for sixty months.

38.    At the end of 1994, Hadley's auditors determined that the present value of the required payments of $116,000 per month for sixty months related to the Hadley Equipment Funding Agreement I was $5.2 million, rather than the $3.3 million received from the NCFE Entities (the combination of the payoff of the Hadley Short Term Note and the $800,000), and therefore they required that Hadley increase the liability to the amount of the $5.2 million. As a result, Hadley effectively now owed an additional $1.9 million to the NCFE Entities, even though no additional funds were received and ownership to certain equipment was transferred. In order to reflect this additional liability of $1.9 million assumed in excess of the value of funds received, the auditors required that Hadley record the $1.9 million as monies due from the NCFE Entities. Furthermore, the auditors determined that the fair market value of the leased equipment was only $1.4 million (not $5.2 million or even $3.3 million). Had the auditors not required these adjustments, the effective interest rate (34%) for the $3.3 million in funding would have been well in excess of any Fair Market rate.

11

39.    In or about 1995, the Long Term Hadley Note was paid off from a portion of the approximately $20 million Healthcare REIT (the "Healthcare REIT Loan I") loaned to Hadley and Brea Hospital.  Upon information and belief, the Healthcare REIT Loan I was collateralized by real property from both Hadley and Brea Hospital.

40.    Ultimately, in or about April 2001, the remaining portion of the Healthcare REIT Loan I was repaid.

### Alleged Accounts Receivable Purchases from Hadley

41.    In or about June 1993, Hadley entered into a Sale and Subservicing Agreement ("Hadley Funding Agreement I") with NPFII-W, Inc., one of the NCFE Funds, and NPFS pursuant to which NPFII-W agreed to fund Hadley's patient accounts receivable and NPFS agreed to service the accounts receivable funded by NPFII-W.

42.    Pursuant to the Hadley Funding Agreement I, NPF-II-W agreed to fund the patient accounts receivable generated by Hadley, the proceeds of which Hadley would use in the funding of operations.

43.    Generally, pursuant to the Hadley Funding Agreement I, Hadley would submit its patient-specific charges to NPFS on a weekly basis.  This weekly submission was Hadley's gross accounts receivable as of the funding date.  NPFS then reduced the receivables by the contractual allowance percentages by payor class.  This allowance was developed from the historical primary insurance collections on each payor class.  The contractual allowance was subtracted from the gross receivables.  The sum was the total eligible accounts receivable (net of contractual

allowances). The NCFE funding program required an over-collateralization of 3%. Accordingly, the total net value was 97% of the total eligible accounts receivable.

44.    NPFS then sent the above funding information to the NCFE Administrator to calculate the reserves -- the Seller Credit Reserve, the Seller Subservicing Reserve, and the Offset Reserve. The Seller Credit Reserve was required to be 6.5% of the total net value. The Seller Subservicing Reserve was required to be 8.5% of the total net value. The Offset Reserve was 2% of the total net value.

45.    The NCFE Administrator then calculated the fees for the period. The Program Cost was calculated based upon the previous week's outstanding purchase balance. The outstanding purchase balance was the accumulated total of amounts due to the NPF Funds and the balance of the three reserve accounts. Program Costs were calculated daily and charged one week in arrears. The Program Cost base rate varied by hospital and was approximately 12% per annum. Bank service fees were charged monthly for lockbox fees, wire transfer charges and bank service fees. Any commitment fees or miscellaneous fees were also included in the fees for the period. Commitment fees were assessed based on the maximum purchase commitments set for each hospital. The commitment fees ranged from 1% to 2% of the maximum purchase commitment.

46.    The Hadley Funding Agreement stated that the designated Subservicer (DCHC) should receive 8.5% of collections each week out of the Subservicing Reserve. Also, the Hadley Funding Agreement provided that any amount held by the NPF Funds over the required amount of reserves was to be returned to each hospital on the day following the weekly funding wire.

13

47. The sum of net value of the accounts receivable, less the reserves, less the fees for the period were suppose to equal the amount of the weekly funding advance to the DCHC Debtors. The funding wire was sent out one week from the date that NPFS received the gross accounts receivable submission.

48. As described above, according to the Hadley Funding Agreement, the NPF Funds would fund eligible accounts receivable generated by Hadley, and advance such funds to Hadley for use in the payment of all essential operating expenses, including payroll, rent, utilities and payment of vendors, as well as to cover operating losses.

49. Hadley's accounts receivable payments were sent by payors (i.e., Medicare, Medicaid, and insurance companies) to lockbox accounts maintained at Huntington National Bank. The proceeds deposited by payors into the lockbox accounts were then routinely swept and transferred to the NPF Funds. (Each of the succeeding accounts receivable financing arrangements for Hadley and for the other Debtor hospitals operated similarly.)

50. Upon information and belief, the 17% Reserves, even though collected by NPFII-W, were never paid to Hadley. In fact, the NCFE Entities have collected in excess of $80 million of Reserves that were never paid to the DCHC Debtors.

51. In or about May 1994, a period overlapping with the timing of NCFE's re-financing of the Hadley Short Term Note, NPWII-W, Inc. and NPF-SW, Inc. executed an assignment agreement in which NPWII-W, Inc., assigned all of its rights arising from the June 1993 Hadley Funding Agreement I to NPF-SW, Inc. At the same time, Hadley entered into a First Amendment to the Sale and Subservicing Agreement ("Hadley Funding Agreement II") with NPF-SW, Inc., one of the NCFE Funds, and NPFS pursuant to which NPF- SW, Inc. agreed

14

to fund Hadley's patient accounts receivable and NPFS agreed to service the accounts receivable funded by NPF-SW, Inc.

52.    Upon information and belief, the Hadley Funding Agreement II paid off any outstanding amounts purportedly owed by Hadley as a result of the Hadley Funding Agreement I, with that amount rolled over into Hadley Funding Agreement II as a beginning balance purportedly owed by Hadley.  Effectively, this transaction occurred without Hadley repaying any of the amounts purportedly owed.

53.    Similarly, in or about November 1994, NPF-SW, Inc. and NPF-PW, Inc. executed an assignment agreement in which NP-SW, Inc., assigned all of its rights arising from the May 1994 Hadley Funding Agreement II to NPF-PW, Inc.  At the same time, Hadley entered into a another Sale and Subservicing Agreement ("Hadley Funding Agreement III") with NPF-PW, Inc., one of the NPF Funds, and NPFS pursuant to which NPF-PW, Inc. agreed to fund Hadley's patient accounts receivable and NPFS agreed to service the accounts receivable funded by NPF-PW, Inc.

54.    Upon information and belief, the Hadley Funding Agreement III paid off any outstanding amounts purportedly owed to Hadley Funding Agreement II by Hadley, with that amount rolled over into Hadley Funding Agreement III as a beginning balance purportedly owed by Hadley.  Again, this transaction occurred without Hadley repaying any of the amounts owed. The new NCFE lender, NPF-PW, Inc. agreed to advance $3.3 million to Hadley, even though the accounts receivables allegedly securing these loans were only valued at $1.6 million.

55.    In or about May 1995, NPF-PW, Inc. executed an assignment agreement in which NPF-PW, Inc., assigned all of its rights arising from the November 1994 Hadley Funding

Agreement III to NPF-VI, Inc.  At the same time, Hadley entered into a First Amended and Restated Sale and Subservicing Agreement ("Hadley Funding Agreement IV") with NPF-VI, Inc., one of the NCFE Funds, and NPFS pursuant to which NPF-VI, Inc. agreed to fund Hadley's patient accounts receivable and NPFS agreed to service the accounts receivable funded by NPF-VI, Inc.

56.    Upon information and belief, the Hadley Funding Agreement IV paid off any outstanding amounts purportedly owed to Hadley Funding Agreement III by Hadley, with that amount rolled over into Hadley Funding Agreement IV as a beginning balance purportedly owed by Hadley.  For a third time, this transaction occurred without Hadley repaying any of the amounts purportedly owed.

57.    The term of the Hadley Funding Agreement IV between Hadley and NPF VI, through a series of subsequent amendments, was ultimately extended to June 30, 2002.  Hadley was charged various fees for each amendment extending the term of the agreement.

58.    The purchase commitment of the Hadley Funding Agreement IV was increased in January 1998 to $27.4 million and again in September 2001 to $209.7 million, again with Hadley paying a fee for each increase in commitment amount.  The increase to $209.7 million represents more than twenty times the purchase price of Hadley, is more than ten times Hadley's yearly net revenues, and is more than forty times Hadley's approximate balance of accounts receivables. No reasonable lender would have advanced funds under these circumstances.

## Other NCFE Funding to Hadley

59.     In or about March 1999, NPF-LL, Inc., and Hadley executed a First Amended and Restated Equipment Lease (the "Hadley Equipment Funding Agreement II") in which the terms of the November 1994 equipment lease (the "Hadley Equipment Funding Agreement I") were amended, and extended the term of the agreement. By this time, Hadley had recorded payments pursuant to this lease agreement of approximately $7 million, for equipment with an estimated value of $1.4 million. Further, by extending the lease, Hadley was agreeing to continue to pay NPF-LL. This payment scheme does not reflect a true lender relationship.

60.     In or about March 1999, Hadley entered into a Payment Allocation and Cross-Default Agreement with NPF VI, NPFS, and NPF-LL, which allowed NCFE to make deductions from cash payments due to Hadley pursuant to the Hadley Funding Agreement VI to offset Hadley's obligations to NPF-LL pursuant to its Hadley Equipment Funding Agreement II. This agreement to repay one entity with funds allegedly received for another entity is not indicative of an independent, arms-length lender relationship.

61.     In or about October 1999, Hadley and the NCFE Entities agreed to a $7.6 million Secured Cognovit Promissory Note ("Hadley Note I"), for which Paul Tuft provided his personal guarantee. In support of this note, Mr. Tuft also pledged his common stock in DCHC (a 72.5% stock interest) and Hadley. Apparently, funds extended by the NCFE Entities were used by Hadley to pay off the $7.4 million that was borrowed in 1996 from Healthcare REIT (the "Healthcare REIT Loan II"). Upon information and belief, the original Healthcare REIT Loan II was used by Paul Tuft to buyout other shareholders in 1996. By 1999 year-end, on a stand-alone basis, Hadley had a negative net equity position of $31 million and, on a consolidated basis, the

DCHC Debtors had a negative equity position of $205 million. Still, the NCFE Entities were willing to advance funds.

62.     In or about January 2001, Hadley and NPF-Capital, Inc. agreed to a $5 million Cognovit Promissory Note and Loan and Security Agreement ("Hadley Note III"), both of which included an "Allocation of Purchase Price" clause allowing NCFE to make deductions from the cash payments due to Hadley pursuant to the Hadley Funding Agreement IV with NPF-VI to offset Hadley's obligations to NPF Capital pursuant to the promissory note and the loan and security agreement. The same clause was included in the July 2001 First Amended and Restated Secured Cognovit Promissory note ("Hadley Note II") between NCFE and Hadley. Upon information and belief, the funds were used to repay a portion of Hadley's debt to Healthcare REIT. By this time, on a stand alone basis, Hadley had a negative net equity position of $46 million and, on a consolidated basis, the DCHC Debtors had a negative equity position of $282 million. Once again, NCFE was still willing to advance these funds.

63.     The Hadley Note III (the January 2001 Cognovit Promissory Note and Loan and Security Agreement) also included cross collateralization clauses. The cross collateralization clause was an after the fact effort on behalf of NCFE to increase its security on assets of Hadley and the other DCHC Debtors that had not previously existed. This was the first time that cross collateralization provisions were added in agreements between the NCFE Entities and Hadley.

## NCFE Funding for Brea Community Hospital

## Acquisition of Brea Community Hospital

64.    In or about November 1994, DCHC purchased plant, property and equipment of Brea Community Hospital ("Brea") for $33.5 million. The assets purchased did not include any accounts receivable.

65.    Prior to the Brea acquisition, NCFE purchased an 11.5% interest in DCHC for approximately $5 million. DCHC used the $5 million as part of the purchase price for Brea. Therefore, NCFE indirectly provided $5 million of the equity portion of the Brea acquisition.

66.    Next, the initial shareholders of DCHC contributed another $5 million in equity to DCHC. This $5 million provided the second $5 million of the equity portion of the Brea acquisition. Therefore, NCFE and the initial DCHC shareholders each contributed $5 million towards DCHC's equity in the Brea acquisition.

67.    The next $8.5 million of the Brea acquisition was also provided by NCFE, effectively as an unsecured loan. The $8.5 million loan was purportedly secured by an equal amount of accounts receivable. However, as stated above, accounts receivable were not purchased as a part of this transaction.

68.    An additional $4.7 million of the Brea acquisition was provided by DCHC's affiliates Doctors Corporation of Greater Washington and Doctors Corporation of Southern California. It is not clear whether the NCFE Entities provided these funds.

69.    Upon information and belief, the assets of Brea were sold in 2001 and 2002. At the time of disposition, Brea had outstanding funding from the NCFE Entities of approximately

19

$35 million. It appears that $24 million of this amount was effectively transferred to other DCHC entities through their intercompany accounts, with $5 million being assumed by DCHC and the remainder assumed by other hospitals.

### NCFE Funding for Pacifica of the Valley Hospital
### The Acquisition of Pacifica

70.     In January 1997, DCHC purchased Pacifica, along with related independent physician practices, for a total of approximately $32 million. DCHC contributed none of its own capital toward the purchase of Pacifica, as the purchase price was funded entirely by others.

71.     Healthcare REIT financed approximately $21.5 million of the acquisition costs (the "Healthcare REIT Note III") and asserts that it received a first trust on the real estate acquired at Pacifica.

72.     NCFE provided all of the additional funding, which totaled approximately $11 million. It is not clear what the value was, if any, of any collateral provided to NCFE for this funding.

73.     Upon information and belief, at the time of the Pacifica acquisition, the funds previously advanced by the NCFE Entities were "undersecured" in the amount of approximately $34 million.

74.     At the time of the Pacifica acquisition, DCHC was operating at a net loss. DCHC had suffered losses of at least $3.3 million in 1995 and at least $3.6 million in 1996.

20

**Alleged Accounts Receivable Purchases**

75.     At or about the time of the Pacifica acquisition, Pacifica entered into a Sales and Subservicing Agreement ("Pacifica Funding Agreement I") with NCFE affiliate NPF-WL and NPFS pursuant to which NPF-WL agreed to fund Pacifica's patient accounts receivable and NPFS agreed to service the accounts.

76.     In or about July 1997, NPF-WL, Inc. and NPF-IX, Inc. executed an assignment agreement in which NPF-WL, Inc. assigned all of its rights arising from the Pacifica Funding Agreement I to NPF-IX, Inc. At the same time, Pacifica entered into a First Amended and Restated Sale and Subservicing Agreement ("Pacifica Funding Agreement II") with NPF-IX, Inc., one of the NCFE Funds, and NPFS pursuant to which NPF- IX, Inc. agreed to fund Pacifica's patient accounts receivable and NPFS agreed to service the accounts receivable funded purchased by NPF-IX, Inc.

77.     Upon information and belief, the Pacifica Funding Agreement II paid any outstanding amounts purportedly owed to Pacifica Funding Agreement I by Pacifica, with that amount rolled over into Pacifica Funding Agreement II as a beginning balance purportedly owed by Pacifica. This was, in effect, a refinancing of the Pacifica Funding Agreement I, after only six months.

78.     In or about April 1999, the terms of the Pacifica Funding Agreement II with NPF-IX were extended to June 30, 2002. Upon information and belief, Pacifica paid a fee to NCFE in exchange for the extension. As of that time, the total outstanding accounts receivable funding at Pacifica were recorded as $28 million and the total accounts receivable were only $11.7 million, therefore "undersecured" by over $12 million by more than 100% of the accounts receivable.

21

79.   In or about June 1999, Pacifica Funding Agreement II was amended and restated with NPF-XII, Inc. replacing NPF-IX as the purported purchaser of the receivables ("Pacifica Funding Agreement III"). It is not clear why Pacifica Funding Agreement II was amended, since it had already been extended to June 30, 2002. In any event, this transaction occurred without Pacifica repaying any of the amounts owed. The new NCFE lender, NPF-XII, Inc. agreed to lend $27 million to Pacifica, even though the accounts receivable allegedly securing these loans was only $11.5 million. No reasonable creditor would have provided such a loan under these conditions.

80.   In or about September 2001, the terms of the Pacifica Funding Agreement II with NPF-IX were extended to June 30, 2005. Upon information and belief, Pacifica paid a fee to NCFE in exchange for the extension. It is unclear why this occurred because NPF-IX had been replaced by NPF-XII in June of 1999.

### Other Funding to Pacifica

81.   In or about October 1997, Pacifica entered into a Loan and Subservicing Agreement ("Pacifica Equipment Funding Agreement I") with NPF-LP, Inc., one of the NCFE Funds, and NPFS pursuant to which NPF- LP, Inc. agreed to provide funds to Pacifica against Pacifica's equipment. Although the title of this document implies that this is a form of accounts receivable financing, and the document identifies accounts receivable as collateral, the document also states that all references to accounts receivable shall have no effect. It is not known why the NCFE Entities structured the equipment financing to look like accounts receivable financing.

82.   In or about April 1999, NPF-LL, Inc., and Pacifica executed an equipment lease.

83.    In or about June 2002, the terms of the Pacifica Equipment Funding Agreement with NPF-LP were extended to June 30, 2005.  Upon information and belief, Pacifica paid a fee to NCFE in exchange for the extension.

## NCFE Funding of Pine Grove

## The Acquisition of Pine Grove

84.    In September 1998, DCHC acquired Pine Grove for $4.9 million.  Neither DCHC nor any other Debtor entity contributed any capital toward the purchase of Pine Grove, as the purchase price was funded entirely by the NCFE Entities.

85.    The funding was in part accomplished by Pine Grove providing promissory notes in the amounts of $1.5 million and $2.3 million to NPF Capital ("Pine Grove Note I") and NPF X ("Pine Grove Note II"), respectively, which were secured by deeds of trust.  Upon information and belief, the remaining $1.1 million was also provided by the NCFE Entities.

86.    At or about the time of the acquisition of Pine Grove in September 1998, the funds previously advanced by the NCFE Entities were "undersecured" by approximately $38 million.

87.    Upon information and belief, it is estimated that the outstanding accounts receivable funding from NCFE at that time totaled approximately $61 million, while the value of the accounts receivables of the DCHC Debtors was only approximately $25 million.  Thus, with respect to the accounts receivable funding, approximately $36 million was "unsecured."  In addition, NCFE was "undersecured" in the amount of approximately $2 million on the notes payable to Hadley.

23

88.    Furthermore, upon information and belief, the net worth deficit for the DCHC Debtors was approximately $45 million.  It is estimated that the DCHC Debtors had lost approximately $44 million in 1997 alone.  No reasonable creditor would have continued to advance funds to the DCHC Debtor under these conditions.

## Alleged Accounts Receivable Purchases

89.    Immediately upon its purchase in September 1998, Pine Grove entered into a Sales and Subservicing Agreement (the "Pine Grove Funding Agreement") with NPF VI and NPFS, pursuant to which NPF VI agreed to fund Pine Grove's patient accounts receivable and NPFS agreed to service the accounts.

## Other Funding of Pine Grove

90.    The September 18, 1998 Loan and Security Agreements with NPF Capital and NPF X relating to the funding of the acquisition costs both included an "Allocation of Purchase Price" clause allowing NCFE to make deductions from the cash payments due to Pine Grove pursuant to the Pine Grove Funding Agreement with NPF VI, to offset Pine Grove's obligations to NPF Capital and NPF X pursuant to the loan and security agreements.

91.    In or about October 1999, the Loan and Security Agreement and the Cognovit Promissory Note between NPF X and Pine Grove that was part of the original acquisition financing were amended to allow NPF Capital to replace NPF X ("Pine Grove Note III").

92.    In or about November 1999, the NPF-Capital and Pine Grove again amended their Loan and Security Agreement and the Cognovit Promissory Note ("Pine Grove Note IV").

24

93.    The October 1999 and November 1999 Amended and Restated Loan and Security Agreement included "Allocation of Purchase Price" clauses allowing NCFE to make deductions from the cash payments due to Pine Grove pursuant to the sale and subservicing agreement with NPF VI to offset Pine Grove's obligations to NPF Capital pursuant to the October 1999 and November 1999 loan and security agreements.

## NCFE Funding for Michael Reese and Grant Hospital

### The Acquisition of Michael Reese and Grant Hospital

94.    In November 1998, DCHC purchased Michael Reese and Grant Hospital ("Grant") for approximately $90 million. Neither DCHC nor any other Debtor entity contributed any capital toward the purchase of Michael Reese and Grant.

95.    At the time of the acquisition of Michael Reese and Grant, the funds previously advanced by the NCFE Entities were "undersecured" in the amount of approximately $39 million. The net worth deficit of the DCHC debtors was approximately $46 million. In addition, the DCHC Debtors had lost approximately $44 million in 1997.

96.    Without any equity component from the DCHC Debtors whatsoever, the precarious financial condition of the DCHC Debtors, and its huge "undersecured" position, NCFE provided approximately $72.4 million in new funding toward the purchase of Michael Reese and Grant. Upon information and belief, $15 million of those funds were extended against equipment ($10.8 million involved an equipment lease between NPF-CSL, Inc. and Michael Reese ("Michael Reese Equipment Funding Agreement I) and the remaining $4 million was related to Grant equipment)), $4 million was extended under a Cognovit Promissory Note ("Michael Reese Note I"), and the remainder was extended under the caption of "A/R Funding

25

Arrangements" (or approximately $53.5 million).  At the time of the acquisition, Michael Reese and Grant combined had approximately $120 million in annualized revenue and less than $30 million in accounts receivable.  Hence, the funding attributed to the accounts receivable (approximately $53.5. million) far exceeded the value of the then existing accounts receivable (less than $30 million).

97.     Additional short-term and priority real estate financing was provided by the seller to cover the remainder of the purchase price.

98.     The Loan and Security Agreement (executed in conjunction with Michael Reese Note I) between NPF-X and Michael Reese associated with the acquisition financing included a "cross collateralization" clause.

99.     In July 1999, Grant was sold for approximately $20 million.  In conjunction with the sale of Grant, the buyer was not willing to purchase the accounts receivable of Grant for an amount that would pay NPV VI adequately for the funds that it had "advanced."  Therefore, NCFE provided a $2.7 million letter of credit to fund the shortfall of the accounts receivable at Grant, rather than realize a loss on the sale.  In June 1999, Michael Reese had executed a reimbursement agreement with NCFE in order to formalize the letter of credit.  The agreement obligated Michael Reese to pay NCFE any amount drawn under the letter of credit.

100.    Additionally, as a result of the sale of Grant, DCHC was required to payoff the balance of the Michael Reese seller financing.  In order to fund this repayment, the purchaser of Grant first provided short-term financing, which was then repaid by NCFE.

**Alleged Accounts Receivable Purchases from Michael Reese**

101.    At or about the time of its acquisition, Michael Reese entered into a Sales and Subservicing Agreement ("Michael Reese Funding Agreement") with NPF VI and NPFS, pursuant to which NPF VI agreed to fund Michael Reese's accounts receivable and NPFS agreed to service the accounts.

102.    Various amendments to the Michael Reese Funding Agreement resulted in an increase in the funding commitment to $80 million and the term was extended to December 31, 2004. Based upon information and belief, Michael Reese paid fees to NCFE in consideration of each increase in funding commitment and term extension. At the time, Michael Reese's yearly revenues equaled approximately $80 million, while its accounts receivable balance was approximately $20 million. Therefore, the commitment amount was four times the reasonable expectation of available collateral.

**Other Funding Provided to Michael Reese**

103.    In or about April 1999, Michael Reese executed an equipment lease agreement with NPF-LL ("Michael Reese Equipment Funding Agreement II").

104.    In June 1999, Michael Reese issued a promissory note in the amount of $1.2 million to NPF X ("Michael Reese Note II"). As collateral for this promissory note, Michael Reese executed an open-end mortgage with NPF X designed to cover, among other transactions, the original purchase note (Michael Reese Note I) involved in the acquisition of Michael Reese and the original sale and subservicing agreement (the Michael Reese Funding Agreement).

27

105.    In or about November 1999, Michael Reese and NPF-X agreed to increase the face value of the June promissory note to $50 million.

106.    In or about December 1999, Michael Reese and NPF X executed a repayment agreement in which both parties agreed that: (1) North American Healthcare Financial Company would lend $12 million to Michael Reese; (2) Medline (an affiliate of North American Healthcare) would extend a line of credit in the amount of $2 million for the purchase of supplies; (3) Michael Reese would transfer funds obtained via this transaction to NPF X or its affiliates; and (4) NPF X would execute a Subordination and Standstill agreement to facilitate subordination of its claims in certain property of Michael Reese to the claims of North American Healthcare Financial Company.

107.    In or about April 2001, Michael Reese executed another equipment lease agreement with NPF-LL ("Michael Reese Equipment Funding Agreement III").

## NCFE Funding for Greater Southeast
### The Acquisition of Greater Southeast

108.    On December 31, 1999, DCHC purchased Greater Southeast for approximately $21.3 million. Neither DCHC nor any other Debtor entity contributed any capital toward the purchase of Greater Southeast, as the purchase price was funded entirely by NCFE.

109.    At the time of the acquisition, Greater Southeast was in bankruptcy, having filed a voluntary bankruptcy petition in the United States Bankruptcy Court for the District of Columbia on May 27, 1999.

110.   At the time of the acquisition of Greater Southeast, upon information and belief, NCFE was already "undersecured" by approximately $128 million. The net worth deficit of the DCHC Debtors was approximately $143 million. In addition, the DCHC Debtors had lost approximately $58 million in 1999. Under these conditions, no reasonable creditor would have loaned any funds to the DCHC Debtors.

111.   NCFE, through its affiliate NPF X, provided $25 million, purportedly "secured" by accounts receivables, toward the purchase price of Greater Southeast. In addition to a promissory note ("Greater Southeast Note I"), DCHC also executed a collateralized guarantee and a stock pledge agreement and Greater Southeast executed a deed of trust. Greater Southeast Note I was subsequently modified by agreement between Greater Southeast and NPF-X ("Greater Southeast Note III").

112.   As part of the acquisition, Greater Southeast entered into an agreement with NPF-LL in which Greater Southeast sold equipment to NPF-LL and then leased it back (the "Greater Southeast Funding Agreement").

113.   NCFE, also via its affiliate NPF X, extended additional funding of $1 million to Greater Southeast against Greater Southeast's interest in certain Disproportionate Share Receivables ("Greater Southeast Note II") acquired as part of the acquisition.

114.   Upon information and belief, it is estimated that the outstanding accounts receivable funding from NCFE at that time totaled approximately $216 million, while the value of the accounts receivables of the DCHC Debtors was only $42 million. Thus, with respect to the accounts receivable funding, approximately $174 was "unsecured."

29

115.   Furthermore, upon information and belief, as of that time the net worth for the DCHC Debtors was approximately $136 million and the DCHC Debtors had lost approximately $51 million in the first 11 months of 1999 alone.  No reasonable creditor would have continued to advance funds to the DCHC Debtor under these conditions.

116.   The loan and security agreement (Greater Southeast Note I) and cognovit promissory note with NPF X that was part of the acquisition financing included an "Allocation of Purchase Price" clause allowing NCFE to make deductions from the cash payments to Greater Southeast pursuant to the sales and subservicing agreement with NPF XII to offset Greater Southeast's obligations pursuant to the loan and security agreement and the promissory note.

## Alleged Accounts Receivable Purchases from Greater Southeast

117.   In or about December 1999, Greater Southeast entered into a Sales and Subservicing Agreement (the "Greater Southeast Funding Agreement") with NPF XII and NPFS, pursuant to which NPF XII agreed to fund Greater Southeast's accounts receivable and NPFS agreed to service the accounts.

118.   In or about December 1999, DCHC and NCFE executed an agreement to provide an umbrella payment allocation, cross-default and cross-collateralization arrangement with respect to the loan agreement, the Greater Southeast Funding Agreement, the equipment lease agreement, and guarantee agreement between Greater Southeast and various NCFE entities.  The cross collateralization clause purported to make Greater Southeast assets "security" for any amounts owed to NCFE by other DCHC Debtors.  The agreements also purported to make the assets of the other DCHC Debtors security for the funding to Greater Southeast.

## Other Funding Provided to Greater Southeast

119.    In or about October 2001, NPF X provided another $1.7 million to Greater Southeast pursuant to a Promissory Note executed by the parties with a due date of April 9, 2002 ("Greater Southeast Note IV").  The Promissory Note was executed by all of the DCHC Debtors and was secured by the deed of trust previously executed by Greater Southeast in December 1999.

## NCFE Had Intimate Knowledge of that DCHC was Undercapitalized

120.    From the inception of the business relationship, one or more of the NCFE Entities had unfettered access to the financial information of the DCHC Debtors.  One or more of the NCFE Entities was provided financial information on a monthly basis.  In addition, one or more of the NCFE Entities was provided any and all financial information relating to DCHC and its potential acquisitions.

121.    Furthermore, individuals from one or more of the NCFE Entities were routinely provided access to the premises of the DCHC Debtors, including the various individual Debtor hospitals, to review financial data.

122.    As a result of its access to DCHC financial information, the NCFE Entities knew or should have known of the financial position of the DCHC Debtors at all times.  The NCFE Entities knew or should have known that DCHC operated at a substantial loss in each fiscal year beginning with at least the fiscal 1996 year; that the amounts owed to the NCFE Entities by DCHC continued to increase each year, and that DCHC's significant operating losses served to worsen DCHC's capital position.

123.    The NCFE Entities were aware that DCHC was undercapitalized beginning with the initial acquisition of Hadley, with that undercapitalization increasing with each Debtor hospital acquisition, as no outside, unrelated additional equity was invested in the DCHC Debtors after the $10 million investment in 1994 for the purchase of Brea. After 1994, the funding from the NCFE Entities increased to approximately $500 million, while the DCHC Debtors' equity never exceeded $11 million and by the end of 1996 was negative.

124.    The NCFE Entities knew or should have known that, as of no later than December 31, 1996, the DCHC Debtors had no net equity. As of that date, the DCHC Debtors had $11.2 million in notes payable to the NCFE Entities, and $35.1 million in accounts receivable funding from the NCFE Entities, for a total obligation to the NCFE Entities of $46.3 million.

125.    Upon information and belief, it is estimated that the outstanding accounts receivable funding from the NCFE Entities at that time totaled $35 million, while the value of the accounts receivables of the DCHC Debtors was only $5 million. Thus, with respect to the accounts receivable funding, approximately $31 million was "unsecured." In addition, the NCFE Entities were "undersecured" in the amount of approximately $3 million on the notes payable by Hadley.

126.    Furthermore, upon information and belief, the net worth deficit for the DCHC Debtors was approximately $3.4 million. It is estimated that the DCHC Debtors had lost approximately $3.6 million in 1996 alone. No reasonable lender would have continued to advance funds to the DCHC Debtor under these conditions.

127.    The NCFE Entities had knowledge and were aware that the acquisitions of Pacifica, Michael Reese, Grant, and Greater Southeast were each one hundred percent (100%)

32

financed with debt and no equity investment by the DCHC Debtors. The NCFE Entities had knowledge and were aware that each of these entities was undercapitalized from the very moment of its acquisition by the DCHC Debtors.

128. The NCFE Entities knew or should have known that, as of no later than December 31, 1996, that the DCHC Debtors had no prospects of collecting all advances from the assets of the DCHC Debtors.

## NCFE Exercised Control over the Management of DCHC

129. NCFE utilized its position as effectively as an 84% owner of DCHC (including the 11.5% ownership position and the 72.5% stock pledge) and the DCHC Debtors' financier of last resort in combination with the overwhelming amount of funds it was owed, to exercise control over the management of DCHC.

130. The NCFE Entities routinely corresponded with DCHC regarding its overall future visions for operations, funding, and potential acquisitions, for the DCHC Debtors.

131. Lance Poulsen interviewed potential management personnel for DCHC.

132. In or about 1998, the NCFE Entities requested that DCHC suspend its efforts to raise equity capital because NCFE was also attempting to raise equity capital and the efforts of both companies pursuing this at the same time was causing confusion in the market.

133. Mr. Poulsen and the NCFE Entities searched for potential acquisitions for DCHC, as well as provided his evaluation of any potential acquisition identified by DCHC.

134. NCFE was identified as an "affiliate" in DCHC's financial statements.

33

135. Furthermore, the NCFE Entities had control over how DCHC was to use its cash. The NCFE Entities decided how much cash was to be advanced to DCHC, above and beyond the funds advanced with respect to the accounts receivable financing associated with the sale and subservicing agreement. The NCFE Entities also decided which of the Debtor hospitals would be charged with the cash advances, without any regard as to which entity actually used the funds.

136. Additionally, Rebecca Parent, an owner, officer, and director of NCFE, served on DCHC's board of directors.

### The Terms of the Financing Arrangements Were a Sham

137. The terms of the various funding agreements between the DCHC Debtors and the NCFE Entities were often ignored or modified over time at the direction and convenience of one or more of the NCFE Entities. For example, many times financing agreements were extended and the maturity dates for the sale and subservicing agreements were always renewed.

138. The NCFE Entities never paid DCHC the reserves that were collected as required by the terms of the various funding agreements. In addition, the NCFE Entities rarely, if ever, paid the DCHC Debtors the excess reserves or reserve overages that were due to be paid to the DCHC Debtors under the financing agreements.

139. The NCFE Entities never paid DCHC the 8.5% subservicing fee that was due to be paid to DCHC under the financing agreements.

140. The interest rates that the NCFE Entities charged DCHC were significantly higher than market rates for debt during the 1994 to 2002 time period. While the rates in the financing

34

instruments purportedly were in the 11% to 12% range, the effective rates, inclusive of all fees, reached as high as 31%.

**NCFE's Actions Drove the Debtor Into Insolvency, Rendered The Debtors Unable to Obtain Alternative Funding, and Ultimately Pushed the Debtors into Bankruptcy**

141.   Based upon information and belief, despite diligent efforts, DCHC was unable to locate sources of funding other than from the NCFE Entities, including venture capital and debt financing. DCHC retained investment bankers in 1998 to assist in locating venture capital but those efforts were unsuccessful.

142.   While DCHC did obtain financing from Medline and Healthcare REIT for the real estate acquisitions at Michael Reese and Pacifica, respectively, these loans are allegedly fully secured by the real estate and were senior to any other debt on the properties. Further, most of this financing occurred prior to 1998.

143.   Beginning at least as early as 1997 and continuing until the filing of the bankruptcy petition, no reasonable lender would have been willing to finance DCHC in the manner in which the NCFE Entities did, given the undercapitalization and continuing losses incurred by DCHC.

**The Improper Conduct of the NCFE Entities**

144.   NCFE was formed in approximately 1991. It was engaged in the business of providing hospitals, nursing homes, and other health care operations with cash in exchange for control of the hospital's receivables from insurers. Investment bankers sold bonds on behalf of

35

the NCFE Entities, with the agreement that the cash flow from the receivables would both repay and provide a return to the bond investors.

145.   It is estimated that the value of the bonds sold on behalf of the NCFE Entities totaled approximately $19 billion.

146.   At least by January 1997, the NCFE Entities and its officers had involved the DCHC Debtors in a Ponzi scheme whereby the NCFE Entities were no longer concerned with repayment of the sums of money lent to the DCHC Debtors.  By that time, the NCFE Entities realized that it could not realistically expect repayment because the debt was so large and the DCHC Debtors continued to operate at a loss.

147.   The NCFE Entities continued to advance funds to the DCHC Debtors to acquire additional hospital facilities and to fund the accounts receivable even though the NCFE Entities understood they would never be repaid.  With ever increasing accounts receivable being funded, the NCFE Entities could continue to record both fee and interest income, as well as record on its books the ever increasing amount of accounts receivable funded.

148.   The NCFE Entities continued to provide funding because, though it could never expect to get repaid, had it stopped funding the DCHC Debtors, the NCFE Entities would have been forced to recognize huge losses with respect to its funding to the DCHC Debtors.

149.   In order for the NCFE Entities and its officers to maintain the Ponzi scheme, the NCFE Entities had to continue to "provide" funds to the DCHC Debtors.  The NCFE Entities continued to fund DCHC's losses because they could not afford to recognize the losses they knew they had already incurred on the DCHC funding.  The NCFE Entities continued to fund

acquisitions and new accounts receivable to ever larger numbers because by showing these ever increasing numbers on its book the NCFE Entities could sell more bonds to generate new cash to make payments to its existing bond investors, thus maintaining the Ponzi scheme.

150. The NCFE Entities attempted to protect what they could of their funding by seeking to increase their security position on assets not previously burdened. Beginning as early as 1998, the NCFE Entities , knowing they never would be repaid for the financing they provided, nonetheless entered into a number of cross collateralization agreements with the DCHC debtors in a futile attempt to provide some level of protection to their out of control financing.

151. The NCFE Entities were capable of generating large sums of moneys to perpetuate the Ponzi scheme because they had managed to maintain their high bond rating which made investors eager to invest in their funds.

152. Recent events have established, in part, how the NCFE Entities transferred funds among various entities, without any regard to whether any receivables were sold or transferred, at particular times to make it appear that the various entities were well funded when in fact the same funds were being transferred from one fund to the next.

153. Other events have led to allegations that moneys were misappropriated from the reserve accounts of at least two of the NCFE Entities involved in the accounts receivable funding. Upon information and belief, the reserves for these two NCFE Entities were less than $11.5 million, when they were suppose to be at approximately $406 million (the reserves related to the DCHC Debtors were greater than $80 million of that amount).

37

154.    The funding by the NCFE Entities of the DCHC Debtors, at a time when they knew that these entities were undercapitalized and whose operations had shown no ability to repay the vast sums owing and the accruing interest, caused a fraud to be perpetrated upon the DCHC creditors, who continued to provide goods and services.

**NCFE Entities File for Bankruptcy**

155.    During the week of October 21, 2002, the NCFE Entities issued funding commitments to the DCHC Debtors, pursuant to which the NCFE Entities promised to fund the DCHC Debtors.  Despite the assurances of funding received from the NCFE Entities, the NCFE Entities breached their obligations under various purported Sale and Subservicing Agreements and failed to provide the DCHC Debtors with the funds needed to sustain their operations.

156.    On October 29, 2002, the DCHC Debtors sent a letter to the NCFE Entities notifying the NCFE Entities that they had materially breached the purported Sale and Subservicing Agreements and that the DCHC Debtors were terminating the various purported Sale and Subservicing Agreements effective immediately.  Also on that date, the DCHC Debtors engaged in "self-help" to fund their critical operational needs.

157.    On October 31, 2002, the DCHC Debtors received letters from the NCFE Entities advising that they did not know when or whether they would be in a position to continue funding or purchasing accounts receivable.  The letters also advised the Debtors "to take such actions as are reasonable and prudent with respect to your business in light of the foregoing."

158.    On or about November 8, 2002, Lance Poulsen, NCFE's founder, chairman, and chief executive, resigned.

159.    On November 17, 2002, the Federal Bureau of Investigation executed a search warrant at NCFE's Columbus, Ohio headquarters.

160.    On or about November 18, 2002, certain of the NCFE Entities filed for bankruptcy in the United States Bankruptcy Court, Southern District of Ohio.

161.    Due to the conduct of the NCFE Entities, the DCHC Debtors were forced to file for bankruptcy to maintain operations and the unsecured creditors of the DCHC Debtors were left with claims in excess of $100 million.

### Count One – Recharacterization of NCFE's Claims as Equity

162.    Plaintiff realleges and incorporates each of paragraphs 1 through 161.

163.    Throughout the relevant time period from 1993 through 2002, the DCHC Debtors were undercapitalized and/or insolvent and Defendants were aware of such undercapitalization, and/or insolvency.

164.    Defendants acquired an 11.5% ownership interest in DCHC in 1994 and was pledged 72.5% of DCHC's stock and 100% of Greater Southeast and Hadley's stock pursuant to the stock pledge and proxy agreements executed in 1999.

165.    Throughout most of the relevant time period from 1993 through 2002, Defendants exercised control over or participated in many of the DCHC Debtors' management functions and had unlimited access to the DCHC Debtors' financial records and facilities.

166.    From 1996 through 2002, the DCHC Debtors were unable to obtain financing from any source other than Defendants (except that previously identified from Medline and

39

Healthcare REIT) because most of their assets were purportedly pledged as collateral or security for financing from Defendants and because the DCHC Debtors owed the Defendants amounts far in excess of the value of their assets, or their ability to pay.

167.   Throughout the relevant time period from 1993 through 2002, Defendants' advances were used to acquire capital assets including additional hospital facilities, to fund substantial operating losses by the DCHC Debtors, and to pay usurious interest and program fees to Defendants.

168.   Throughout the relevant time period from 1993 through 2002, Defendants advanced funds and continued to advance funds with full knowledge that repayment of the funds was dependent upon the success of the DCHC Debtors.

169.   Throughout the relevant time period from 1993 through 2002, Defendants advanced funds and continued to advance funds for which there was no collateral or security, or insufficient collateral or security, with full knowledge of the DCHC Debtors' financial circumstances and inability to repay the advances.

170.   Pursuant to Sections 105 of the Bankruptcy Code, Plaintiff is entitled to a declaratory judgment that Defendants' purported secured and unsecured loans, purchases of receivables, and other advances were in fact capital and/or equity contributions, that such purported debt is recharacterized as equity for all purposes in these jointly administered cases.

40

## Count Two

### Equitable Subordination of Defendants' Debt Pursuant to Section 510(c)

171. Plaintiff realleges and incorporates each of paragraphs 1 through 170.

172. Defendant NCFE, the parent company of all of the Defendants, is a fiduciary of the DCHC Debtors. One of NCFE's shareholders and directors, Rebecca Parrett, was simultaneously a director of DCHC.

173. For many years, Defendants advanced the DCHC Debtors funds far in excess of their assets, collateral, or ability to repay with knowledge of their undercapitalized and/or insolvent financial condition. Upon information and belief, Defendants continued to advance funds and to cover Debtors' operating losses so that the DCHC Debtors (Defendants' second largest borrower) could remain in business and continue to borrow money from Defendants and to further Defendants' Ponzi scheme. Upon information and belief, Defendants advanced funds to the DCHC Debtors in excess of collateral, security or ability to repay in order to increase their own book of business and inflate their own financial results to enable their officers and principals to obtain increased compensation.

174. Defendants engaged in inequitable and unfair conduct by breaching their fiduciary duties to the DCHC Debtors and dominating and controlling the DCHC Debtors for their own benefit.

175. Defendants' inequitable and unfair conduct has injured creditors of the DCHC Debtors and has conferred an unfair advantage upon themselves. But for Defendants' inequitable and unfair conduct, the DCHC Debtors' creditors would not have continued to provide services and to extend credit to the DCHC Debtors.

41

176.    The subordination of Defendants' claims would be consistent with the principles of the Bankruptcy Code.

177.    Pursuant to Sections 105 and 510(c) of the Bankruptcy Code, Plaintiff is entitled to a determination that Defendants' purported secured and unsecured claims, in their entirety, are subordinated to the unsecured creditors for all purposes in these jointly administered cases.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs pray the Court

A.    Enter judgment that all of Defendants' purported secured and unsecured claims against the DCHC Debtors' estates are recharacterized and deemed as equity for all purposes in these jointly-administered cases;

B.    In the alternative, enter judgment that all of Defendants' purported secured and unsecured claims against the DCHC Debtors' estates are equitably subordinated to the unsecured creditors for all purposes in these jointly administered cases;

C.    Enter judgment avoiding all liens, deeds of trust, guarantees, pledges and other interests in property granted by the DCHC Debtors, either individually or collectively, to the NCFE Entities to secure any alleged indebtedness of the DCHC Debtors; and

42

D.      Enter judgment awarding the Plaintiff any other such further relief as the Court

deems just and proper.


Respectfully submitted,


Dated:                      , 2003
        Washington, D.C.


_____
Sam J. Alberts (#443260)
James C. Osborne, Jr. (#384814)
AKIN, GUMP, STRAUSS, HAUER & FELD, L.L.P.
1333 New Hampshire Avenue, N.W., Suite 400
Washington, D.C.  20036
(202) 887-4000
Counsel to the Joint Committee of Unsecured
Creditors

43