UNITED STATES BANKRUPTCY COURT
DISTRICT OF COLUMBIA

**FILED**

MAY - 7 2003

Denise H. Curtis, Clerk
U.S. Bankruptcy Court for D.C.

-------------------------------------------------------------x
                     :

In re:                          :

GREATER SOUTHEAST COMMUNITY  :    Case No.
HOSPITAL CORPORATION I, <u>et al.</u>,   :    02- 2250 (SMT)
                      :    Jointly Administered
         Debtors.         :    (Chapter 11)
                      :

-------------------------------------------------------------x

## DEBTORS' REPLY TO JOINT COMMITTEE'S LIMITED OBJECTION TO DEBTORS' MOTION FOR ORDERS (A) APPROVING SALE PROCEDURES AND (B) AUTHORIZING SALE OF SUBSTANTIALLY ALL ASSETS OF PINE GROVE HOSPITAL CORPORATION FREE AND CLEAR OF ALL LIENS, INTERESTS, CLAIMS AND ENCUMBRANCES

TO THE HONORABLE S. MARTIN TEEL, JR.,
UNITED STATES BANKRUPTCY JUDGE:

Pine Grove Hospital Corporation ("<u>Pine Grove</u>") and certain of its affiliated debtors,[1] as debtors and debtors in possession (collectively, with Pine Grove, the "<u>Debtors</u>"), respectfully represent:

### Background

1.      On November 20, 2002, the Debtors each commenced with this Court a voluntary case under chapter 11 of title 11 of the United States Code (the "<u>Bankruptcy Code</u>"). Each of the Debtors continues to operate its business and manage

---

[1] The affiliated debtors are PACIN-Hadley Memorial Hospital Corporation of Washington, D.C., Michael Reese Medical Center Corporation of Chicago, Illinois, Pacifica Hospital of the Valley Corporation of Sun Valley, California, Greater Southeast Community Hospital Corporation I of Washington, D.C. and their ultimate parent corporation, Doctors Community Healthcare Corporation.

NY2:\1267926\01\R6C601!.DOC\41776.0003

its properties as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

2.    The Debtors' chapter 11 cases have been consolidated for procedural purposes only and are being jointly administered pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedures.

3.    On or about November 25, 2002, the Office of the United States Trustee for the District of Columbia appointed an official committee of unsecured creditors in the Debtors' chapter 11 cases (the "Committee").

4.    On April 18, 2003, the Debtors filed a Motion for Orders (A) Approving Sale Procedures and (B) Authorizing Sale of Substantially All Assets of Pine Grove Hospital Corporation Free and Clear of All Liens, Interests, Claims and Encumbrances (the "Sale Motion"). Pursuant to the Sale Motion, the Debtors seek authority to sell substantially all of the assets of Pine Grove via a two-step process. In the initial stage, interested parties, who executed and delivered a confidentiality agreement and provided evidence of their financial capability (the "Potential Bidders"), were permitted to conduct due diligence of Pine Grove's assets. The Potential Bidders each had the opportunity to submit initial bids by 5pm EDT on May 1, 2003, and seven Potential Bidders did so. By May 8, 2003, the Debtors intend to select a "stalking horse" from among the Potential Bidders who submitted initial bids (the "Stalking Horse").

5.    During the second stage of the sale process, the Debtors intend to receive bids from all persons wishing to make a competing offer to that of the Stalking Horse. A competing bid must exceed that of the Stalking Horse by not less than 5%. If one or more such bids are received by the Debtors, the Debtors shall conduct an auction,

with bidding increments of not less than $50,000, to determine the winning bid.  In the event the Stalking Horse is not the winning bidder, the Stalking Horse shall be entitled to a break up fee equal to 3% of its initial bid (the "Break Up Fee").

### Committee's Objection

6.      On or about May 2, 2003, the Committee filed the Joint Committee's Response and Limited Objection to Debtors' Motion for Orders (A) Approving Sale Procedures and (B) Authorizing Sale of Substantially All Assets of Pine Grove Hospital Corporation Free and Clear of All Liens, Interests, Claims and Encumbrances (the "Objection").  Pursuant to the Objection, the Committee opposes the granting of the Break Up Fee to the Stalking Horse, alleging "that the Debtors' receipt of seven bids in the first stage of the sale process, plus the statements of at least six other interested bidders that they will bid in the future, is sufficient proof that there is no need to provide any party with a breakup fee." (Objection ¶ 6.)  Alternatively, the Committee argues that that the Break Up Fee of 3% is excessive.  (Objection ¶ 8.)  For the following reasons set forth below, the Court should overrule the Objection.

### Argument

7.      Contrary to the assertions of the Committee, the Break Up Fee is neither unnecessary nor excessive.  Rather, the Break Up Fee has served as a substantial inducement in precipitating the bidding process, and the resulting stalking horse bid will serve to encourage further bidding in the second phase of the sale process.

8.      "[Case law] suggest[s] three questions for courts to consider in assessing break-up fees: (1) is the relationship of the parties who negotiated the break-up fee tainted by self-dealing or manipulation; (2) does the fee hamper, rather than

encourage, bidding; [and] (3) is the amount of the fee unreasonable relative to the proposed purchase price?" Official Committee of Subordinated Bondholders v. Integrated Resources, Inc. (In re Integrated Resources, Inc.), 147 B.R. 650, 657 (S.D.N.Y. 1992), appeal dismissed, 3 F.3d 49 (2nd Cir. 1993); see also In re Twenver, Inc., 149 B.R. 954 (Bankr. D. Colo. 1992) (adopting same test).

9.    The relationship between the Debtors and the Potential Bidders who may become the Stalking Horse is clearly not tainted by self-dealing or manipulation. None of the Potential Bidders are nor have been insiders or affiliates of the Debtors. All of the initial bids submitted by the Potential Bidders have been, and the Debtors selection of the Stalking Horse will be, the product of arms-length transactions between the Debtors and the Potential Bidders. Consequently, the Break Up Fee is free of any self-dealing or manipulation.

10.    The Break Up Fee in this case clearly has encouraged and continues to encourage bidding. "There are really two time periods to consider when assessing the success of [a] break-up fee agreement in attracting bidders. First, one should determine whether the agreement serves as an inducement to get the bidding started. Next, it should be ascertained whether, once the bidding has started, the presence of the agreement serves to attract further bids. If the presence of the agreement serves both to start the bidding and to attract further bids, courts should approve them, absent self-dealing, fraud or bad faith by the bankrupt corporation." Mark F. Hebbeln, The Economic Case for Judicial Deference to Break-Up Fee Agreements in Bankruptcy, 13 Bankr. Dev. J. 475, 493 (1997).

11.    The Break Up Fee in this case clearly has served as an inducement to get the bidding started in this case.  As the Committee notes in its Objection, the Debtors have received seven initial bids.  However, the Committee mistakenly cites the number of initial bids as evidence that a break up fee is not required.  This ex post assessment fails to recognize that but for the promise of the Break Up Fee, there very likely would not have been seven bids.  Indeed, prior to the promise of a prospective break up fee, the Debtors had not received any serious offers respecting Pine Grove.  The Debtors believe that the promise of the Break Up Fee induced several parties to bid in the first phase of the sale process.

12.    The selection of a Stalking Horse entitled to the Break Up Fee will further serve to promote bidding going forward in the second phase of the sale process.  As the Committee also notes in its Objection, several parties have expressed an interest in bidding after the Stalking Horse has been chosen.  In concluding that the existence of such parties must mean that the Break Up Fee is unnecessary, however, the Committee misses the point.  These parties that are waiting in the wings to bid later deliberately have chosen to wait for the Stalking Horse to be chosen.  They have decided to forego the opportunity to become the Stalking Horse themselves.  The reason is that the Stalking Horse serves a purpose: the Stalking Horse incurs the risk, expense and opportunity costs of conducting due diligence on an uncertain target.  See Hebbeln, supra, at 494.  Those interested parties not competing for the Stalking Horse position, being rational actors, have opted to "piggy-back" on the due diligence conducted by the Stalking Horse.  To compensate a stalking horse for incurring the risk, expense and opportunity costs of conducting initial due diligence, rather than waiting to "piggy-back" off the efforts of

another, is one of the principal justifications for awarding a break up fee. See id. The presence of several parties waiting in the wings for the Stalking Horse to be chosen, is concrete evidence that the Stalking Horse will serve its purpose of attracting additional bidders, justifying the payment of the Break Up Fee should the Stalking Horse ultimately not be the winning bidder.

13.     Further, the case cited by the Committee is inapposite to the facts of this case. In Gey Associates General Partnership v. 310 Associates, L.P., 2002 WL 31426344 (S.D.N.Y.), two parties, without the promise of a break up fee, had entered into contracts with the debtor prepetition to purchase certain real estate. The prepetition arrangement provided for the sale of the real estate to one of the parties, but, if that transaction did not close, the second party would be entitled to purchase the assets. A dispute developed with the first party and, as a consequence of the attendant delay, the debtor filed for bankruptcy. Unaware of those prepetition facts, the bankruptcy court approved a procedure for selling the real estate whereby the second party served as a stalking horse entitled to a break up fee. Upon learning of the prepetition sale agreements, the bankruptcy court vacated its order approving the break up fee because it had determined that the break up did not encourage bidding.

14.     The facts in the instant case are completely different. No parties conducted any significant due diligence, much less made an actual offer, prior to the promise of a break up fee. Further, in 310 Associates, there was no indication that any parties, other than the prepetition bidders, were likely to bid on the real estate. In this case, as discussed above, there are several parties awaiting the selection of the Stalking Horse and considering bidding in the second phase of the sale process.

14.    The Break-Up Fee of 3% is not excessive and instead is a "reasonable" percentage of the proposed sale price designed to maximize value for the assets to be sold by providing a reasonable incentive for bidders to come forward and take the risks inherent in serving as a stalking horse bidder.  Bankruptcy courts, in many instances, have approved break-up fees and expense reimbursements of 3% of the proposed sale price and in certain instances in excess of 3% .

15.    The Committee argues that the 3% proposed Break-Up Fee is excessive because it exceeds 1 to 2% of the purchase price which the Committee asserts is the "norm" for break-up fee ranges and cites for support to In re Twenver, Inc., 149 B.R. 954; Cottle v. Storer Communication, Inc., 849 F.2d 570, 578-79 (11th Cir. 1988) and In re Hupp Industries, Inc., 140 B.R. 191 (Bankr. N.D. Ohio. 1992), cases no more recent than 11 years ago.

16.    A careful review of the case law, including those cited by the Committee, reveals that bankruptcy courts take a case-by-case approach in determining what is "reasonable" with the decision turning ultimately on the bankruptcy court's findings of fact.  See In re APP Plus, Inc., 223 B.R. 870, 875 (Bankr. E.D.N.Y. 1998); In re Integrated Resources, 147 B.R. at 657; In Twenver, Inc, 149 B.R. at 956; In re Hupp Industries, Inc., 140 B.R. at 194.  Despite the reference in In re Twenver, Inc., bankruptcy courts, in many recent cases, have approved break-up fees up to 3% and found such fee to be a fair and "reasonable" percentage of the purchase price.  See e.g.. In re Global Crossing Ltd., Ch. 11 Cases No. 02-40187 (REG) through 02-40241 (REG) (Bankr. S.D. N.Y. March 25, 2002) (break-up fee of $30,000,000 approved equaling 4% of purchase price of $750,000,000); In re Acme Metals Incorporated, Ch. 11 Case No. 98-2179 (RJN)

(Bankr. D.Del. September 23, 2002) (break-up fee of $2,000,000 approved equaling 3.1% of purchase price of $65,000,000); In re Fruit of the Loom, Inc., Ch. 11 Case No. 99-04497 (PJW) (Bankr. D.Del. December 11, 2001) (break-up fee of $30,000,000 approved equaling 3.6% of purchase price of $835,000,000); In re Conseco, Ch. 11 Case No. 02-B 49672 (Bankr. N.D. Ill. December 20, 2002) (break-up fee of $35,000,000 approved equaling 3.18% of purchase price of $1,100,000,000).

17.    In this instance, the Break-Up Fee is reasonable and falls within the range of what courts have recently found to be a fair and "reasonable."  Based on what courts have approved as a reasonable break-up fee percentage, the industry standard and expectation has moved towards 3%, and the Break-Up fee is designed to maximize the value of the assets by providing the expected incentives and protections that potential bidders expect in exchange for the risks of serving as the stalking horse.

WHEREFORE the Debtors respectfully request that the Court overrule the Objection.

Dated:  Washington, DC
   May 6, 2003

            Deryck A. Palmer
            WEIL, GOTSHAL & MANGES LLP
            767 Fifth Avenue
            New York, New York  10153
            (212) 310-8000

            Andrew M. Troop
            WEIL, GOTSHAL & MANGES LLP
            101 Federal Street
            Boston, MA 02110
            (617) 772-8300

            Peter D. Isakoff (D.C. Bar No. 358419)
            Holly E. Loiseau (D.C. Bar No. 452442)

WEIL, GOTSHAL & MANGES LLP
1501 K Street, N.W., Suite 100
Washington, D.C.  20005
(202) 682-7000

ATTORNEYS FOR DEBTORS AND
DEBTORS IN POSSESSION

## Certificate of Service

I, Andrew M. Troop, certify that I caused to be served a true and correct copy of the foregoing **Debtors' Reply to Joint Committee's Limited Objection to Debtors' Motion for Orders (A) Approving Sale Procedures and (B) Authorizing Sale of Pine Grove Hospital Corporation Free and Clear of All Liens, Interests, Claims and Encumbrances** via electronic mail and first class mail in accordance with the January 23, 2003 Notice Procedures Order on the parties/counsel on the attached service lists May 7, 2003

Andrew M. Troop

## PAPER SERVICE LIST
### (by first class mail and email)

| Name and Street Address | Email Address, if any |
|---|---|
| Any and all of the Debtors<br>c/o Doctors Community Healthcare<br>Corporation<br>6730 North Scottsdale Road<br>Suite 290<br>Scottsdale, Arizona 85253 | pleadings@doctorscommunity.com |
| Deryck A. Palmer, Esq.<br>Weil, Gotshal & Manges LLP<br>767 Fifth Avenue<br>New York, New York 10153<br>(Counsel for the Debtors) | deryck.palmer@weil.com |
| Andrew M. Troop, Esq.<br>Weil, Gotshal & Manges LLP<br>101 Federal Street<br>Boston, MA 021 10<br>(Counsel for Debtors) | andrew.troop@weil.com |
| Peter D. Isakoff, Esq.<br>Holly E. Loiseau, Esq.<br>Weil, Gotshal & Manges LLP<br>1501 K Street N.W. Suite 100<br>Washington, D.C. 20005<br>(Counsel for the Debtors) | peter.isakoff@weil.com<br><br>holly.loiseau@weil.com |
| B. Amon James, Esq.<br>Office of the United States Trustee<br>115 South Union St., Plaza Level<br>Suite 210<br>Alexandria, Virginia 22314 | B.Amon.James@usdoj.gov |
| Kevyn D. Orr, Esq.<br>Jones Day<br>51 Louisiana Avenue, N.W.<br>Washington, D.C. 20001<br>(Counsel for National Century Financial<br>Enterprises, Inc) | korr@jonesday.com |

Ken Kansa, Esq.                                      kkansa@sidlev.com
Bank One Plaza
Sidley, Austin, Brown & Wood LLP
10 South Dearborn Street
Chicago, Illinois 60603
(Counsel for Medline Industries, Inc.)

Guy S. Neal, Esq.                                    gneal@sidley.com
Natalie Kuehn, Esq.
Sidley, Austin, Brown & Wood LLP                     nkuehn@sidley.com
1501 K Street, N.W. Suite 600
Washington, D.C. 20005
(Counsel for Medline Industries, Inc.)

Michael L. Bernstein, Esq.                           michael_bernstein@aporter.com
Charles A. Malloy, Esq.
Arnold & Porter                                      charles_malloy@aporter.com
555 Twelfth Street, N.W.
Washington, D.C. 20004
(Counsel for Health Care Reit, Inc.)

David Fisher, Esq.                                   David.Fisher@dc.gov
Corporation Counsel, D.C.
441 4th Street, N.W. 6th Floor North
Washington, D.C. 20001
(Counsel for the District of Columbia)

Sam J. Alberts, Esq.                                 salberts@akingump.com
Jonathan Gold, Esq.
Akin, Gump, Strauss, Hauer, & Feld                   jgold@akingump.com
1333 New Hampshire Avenue, N.W.
Suite 400
Washington, D.C. 20001
(Counsel for the Joint Committee of
Unsecured Creditors)

Michael Goodstein, Esq.                              michael.goodstein@arterhadden
Arter & Hadden
1801 K Street N.W. Suite 3001
Washington, D.C. 20006
(Counsel for Provident)

**ELECTRONIC SERVICE LIST**
**(by email only)**

Donald A. Workman, Esq.                                     dworkman@foleylaw.com
Roderick B. Williams, Esq.
Foley & Lardner                                                   rwilliams@foleylaw.com
Washington Harbour
3000 K Street, N.W., Suite 500
Washington, D.C. 20007-5109

Neil Demchick                                                     ndemchick@navigantconsulting.com
Navigant Consulting
2 North Charles Street, -
Baltimore, Maryland 21201.

Mitchell B. Weitzman, Esq.                                  Mweitzman@beankinney.com
Bean, Kinney & Korman, P.C.
2000 North 14th Street Suite 100
Arlington, Virginia 22201

Christy Hoffman, Esq.                                          choffman@jamhoff.com
James & Hoffman, P.C.
1101 17th Street, N.W., Suite 510
Washington, D.C. 20036

Kermit A. Rosenberg, Esq.                                  krosenberg@tighepatton.com
Tighe Patton Armstrong Teasdale, PLLC
1747 Pennsylvania Avenue, N.W.
Suite 300
Washington, DC 20006-4604

Haig Maghakian, Esq.                                          hmaghakian@milbank.com
Milbank, Tweed, Hadley & McCloy LLP
601 S. Figueroa Street, 30th Floor
Los Angeles, California 90017

William Douglas White                                        wdw@mcarthywhite.com
McCarthy & White, PLLC
8180 Greensboro Drive - Suite 875
McLean, VA 22102

Craig B. Young, Esq.
C. Todd Marks, Esq.
Connolly Bove Lodge & Hutz, LLP
1990 M Street, N.W.
Suite 800
Washington, D.C. 20036

cby@cblhlaw.com
ctm@cblhlaw.com

Margarita Ginzburg, Esq.
Lester M. Kirshenbaum, Esq.
Kaye Scholer LLP
425 Park Avenue
New York, NY 10022

mginzburg@kayescholer.com
lkirshenbaum@kayescholer.com

Charles R. Bennett, Jr., Esq.
Hanify & King,
Professional Corporation
One Beacon Street
Boston, MA 02108-3107

crb@hanify.com

Conrad K. Chiu, Esq.
Pitney, Hardin, Kipp & Szuch LLP
685 Third Avenue
New York, NY 10017-4024

cchiu@pitneyhardin.com

Lori L. Purkey, Esq.
Miller, Canfield, Paddock and Stone P.L.C.
444 West Michigan Avenue
Kalamazoo, MI 49007

purkey@millercanfield.com

Terry E. Hall, Esq.
Baker & Daniels
300 North Meridian Street Suite 2700
Indianapolis, IN 46204

tehall@bakerd.com

Steven Scow, Esq.
Sheppard, Mullin, Richter & Hampton LLP
650 Town Center Drive, Fourth Floor
Costa Mesa, CA 92626-1925

sscow@sheppardmullin.com

Daniel D. Doyle, Esq.
Spencer Fane Britt & Browne LLP
120 South Central Avenue 5th Floor
St. Louis, Missouri 63105

ddoyle@spencerfane.com

5

John Cunningham, Esq.                         jcunningham@whitecase.com
White & Case LLP
200 South Biscayne Blvd
Suite 4900
Miami, FL 33131

Rochelle A. Herzog                            rah@beverlyhillslaw.com
Zimmerman, Rosenfeld, Gersh & Leeds LLP
9107 Wilshire Boulevard Suite 300
Beverly Hills, CA 90210-5528