IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - x
                                :
In Re:                          :
                                :
GREATER SOUTHEAST COMMUNITY :
HOSPITAL CORPORATION I          :
                                :     Case No. 02-2250
          Debtor                :
                                :
                                :     Washington, D.C.
- - - - - - - - - - - - - - x     April 9, 2003

**FILED**

**JUN - 3 2003**

Denise H. Curtis, Clerk
U.S. Bankruptcy Court for D.C.

TRANSCRIPT OF MOTIONS HEARING
BEFORE THE HONORABLE S. MARTIN TEEL, JR.

APPEARANCES:

| | |
|---|---|
| For Debtor Hospital: | ANDREW TROOP, ESQ.<br>PETER ISAKOFF, ESQ.<br>DERYCK PALMER, ESQ.<br>MARGARET PHILIPS, ESQ. |
| For Joint Committee of<br>  Unsecured Creditors | JONATHAN GOLD, ESQ. |
| For Joint Committee | SAM ALBERTS, ESQ. |
| For Health Care REIT | MICHAEL BERNSTEIN, ESQ. |
| For Merrill-Lynch Capital | RICHARD LEVY, ESQ. |
| For National Century<br>  Financial Ent., et al. | KEVYN ORR, ESQ. |

Proceedings recorded by the Court, transcript produced
By Pro-Typists, Inc., 1012-14th Street, N.W., Suite 307,
Washington, D.C. 20005, 202-347-5395
B7005/bf

For Official Committee of   BRENT PROCIDA, ESQ.
  Unsecured Creditors,
  And National Century
  Financial Base

For MedLine                  KENNETH KANSA, ESQ.

For U.S. Trustee:            B. AMON JAMES, ESQ.

- - -

## C O N T E N T S

| Witness | Direct | Cross | Recross |
|---|---|---|---|
| Thomas Barry | 23 | 37 | 55 |

## P R O C E E D I N G S

THE CLERK: All rise. This Honorable Court is again in session. Please be seated and come to order.

The next case on this afternoon's calendar is Case Number 02-2250, Greater Southeast Community Hospital, et al. The matter before the Court is a motion by Medical Staffing Network, to compel assumption or rejection of executory contract with Medical Staffing Network; a motion by Horizon Mental Health Management for administrative expenses and application for allowance of administrative expense claim; application by the Debtor for an order authorizing retention and compensation of professionals utilized in the ordinary course of business; motion filed by the Debtor for approval of stipulation and order modifying the automatic stay to permit Nathan Soule to pursue State Court litigation; application by the Debtor to employ Robert B. Johnson and Associates nunc pro tunc to January 27, 2003, as Healthcare Management Consultants; motion filed by the Debtor for an order pursuant to Sections 105(a), 363(b), and 364 of the Bankruptcy Code authorizing the Debtor's entry into Merrill Lynch commitment letter and payment of fees in connection therewith, and authorizing non-solicitation agreement and break-up fee; and if the parties would please come forward and state your names for appearance.

MR. TROOP: Good afternoon, Your Honor. My name is Andrew Troop, from the law firm of Weil, Gotshal & Manges, here today on behalf of the Debtors. I'm joined today by Deryck Palmer and Peter Isakoff, as well as a colleague, Margaret Philips.

MR. GOLD: Good afternoon, Your Honor, Jonathan Gold, on behalf of the Committee.

MR. ALBERTS: Good morning, Your Honor -- or, afternoon, Your Honor, Sam Alberts on behalf of the Joint Committee.

MR. LEVY: Good afternoon, Your Honor, Rick Levy on behalf of Merrill-Lynch Capital.

MR. ORR: Good afternoon, Your Honor, Kevyn Orr, Jones-Day on behalf of NCFE and its affiliates, and Your Honor, if I may, I would like to take this opportunity to move for admission, Mr. Lester Kirshenbaum, pro hac vice. Mr. Kirshenbaum is a member in good standing of the bar of New York and the United States District Court for the Southern District of New York, the United States District Court for the Eastern District of New York and the Second Circuit. He is familiar with bankruptcy rules, the local rules, and the Code of Professional Conduct.

THE COURT: Mr. Orr, there's a written motion pending that does not recite how often he's been admitted pro hac vice in the U.S. District Court for the District of

Columbia, or in this Court as a unit of the District Court, which is part of the application process.  Can you make a representation in that regard?

MR. ORR:  Your Honor -- yes, Your Honor, the representation would be that Mr. Kirshenbaum has not been previously admitted to this Court, nor has he previously applied.

MR. TROOP:  Before you rule, Your Honor, there is _____ judge.

THE COURT:  Well, the application is signed by what purports to be a signature of Mr. Orr, but it has slash RP after the signature, suggesting that it wasn't Mr. Orr who signed it, but RP, whoever RP is.

MR. ORR:  Your Honor, my copy doesn't have the RP.  I did sign off on the motion for admission, though, Your Honor.  I would be happy to sign it again, Your Honor.

THE COURT:  And the Certificate of Service has a typewritten slash, s, unslash, and then Mr. Kirshenbaum's name.  I think our local rules permit an attorney to sign even if he's not a member of our bar, but I think it has to be an original signature, not a slash s.

MR. ORR:  If Your Honor would permit, Your Honor, I would sign it again.

THE COURT:  Yes, please.  Let me hear the other appearances before I rule on the application to appear

pro hac vice.

MR. PROCIDA:  Good afternoon, Your Honor, Brent Procida from the firm of Ballard, Starr, Anderson, Ingersoll, here on behalf of the Official Committee of Unsecured Creditors and the National Century Financial Base.  I am also the subject of a pending motion for admission pro hac vice, which was filed with the Court earlier today.

THE COURT:  I think that one I signed.

MR. TROOP:  Your Honor, the Debtors have an objection, nonetheless.

THE COURT:  I'll take it as a motion to vacate the order.  You can raise that after --.

MR. JAMES:  Good afternoon, Your Honor, B. Amon James, on behalf of the U.S. Trustee.

MR. BERNSTEIN:  Your Honor, good afternoon, Michael Bernstein on behalf of Health Care REIT.

THE COURT:  I'll hear the objection to the one application and the motion to vacate the order entered as to the other application.

MR. TROOP:  Your Honor, the objection and the grounds for support of the motion to vacate are the same. These two attorneys represent creditors committees or a subcommittee in the case of NCFE.  NCFE is represented here, has appeared here, and as we have argued to Your

Honor before, creditors of our creditor do not have standing in these cases. There is no reason for them to be admitted. They can't appear. And accordingly, we would move that the Court not admit them for the purposes of appearing in this case. In addition --

THE COURT: Their clients are not allowed to be heard, is what you're saying.

MR. TROOP: Their clients cannot be heard. Whether they have -- whether they, on their own merits, could satisfy the requirements for being admitted pro hac in the case, we don't challenge that. They're attorneys in good standing. But they cannot be heard in connection with this case on behalf of their clients.

THE COURT: I'll grant the applications subject to objection to their clients being heard, based on the assertion of lack of standing.

MR. TROOP: I do note that in connection with a pleading that was filed by the NPF6 Subcommittee in the NCFE case, we have filed a motion to strike that, based upon a lack of standing.

THE COURT: I understand your position. Once they get up to argue, I'll address that issue.

Mr. Kirshenbaum says he's read our local rules, but the proposed order doesn't include the entities who are to receive copies of the order. Doesn't have to be a lot

of people receiving it, just whoever's really a logical person to receive it.  In this case, I'm sending a copy to Ms. Loiseau as local counsel, and Mr. Kirshenbaum as the affected attorney.

And we had another -- we had a motion to strike the other entered appearance.  That motion is denied without prejudice to the position that the attorney can't be heard -- the attorney's client can't be heard for lack of standing.

What's first, Mr. Troop?

MR. TROOP:  Your Honor, if we can take things in this order today, we'll start with the motion by Horizon with respect to its administrative expense, request for payment of administrative expense claim.  Your Honor, we'd like --

MR. KANSA:  Your Honor, if I may be interrupt?

MR. TROOP:  I'm sorry.

MR. KANSA:  I wasn't able to enter an appearance before, but appearing telephonically, Kenneth Kansa of _____ Wood on behalf of MedLine.

THE COURT:  All right.

MR. TROOP:  Your Honor, if I may, we'll take things in this order.  Horizon's motion for request for payment of administrative expense first, Medical Staffing Network motion second, the stipulation with respect to

lifting stay for Nathan Soule third, the application to retain Robert Johnson and Associates next, the application to employ ordinary course professionals after that, and finally, the motion with respect to the commitment letter from Merrill-Lynch.

Your Honor, with respect to the Horizon application, we would ask that the Court continue that matter generally to be remarked by the parties for hearing on notice.

THE COURT:  I'll continue it generally.

MR. TROOP:  Thank you, Your Honor.  With respect to Medical Staffing Network, Your Honor, we ask that that hearing be continued until April 23rd.  I believe, Your Honor, we're going to start at 2:00 o'clock in the afternoon on the 23rd.

THE COURT:  I'll continue the Medical Staffing matter until April the 23rd, 2003, at 2:00 p.m.

MR. TROOP:  Your Honor, with respect to the stipulation and order modifying the automatic stay with respect to Nathan Soule, Your Honor, the Debtors filed a motion on March 21st -- March 24th, Your Honor, seeking approval of that motion.  The Claimant has asserted a medical malpractice claim involving one of the Debtors, Pine Grove.

The Debtors and the Claimant have agreed to

modify the stay to permit Mr. Soule to pursue State Court litigation, but only to the extent that any judgment or settlement will be enforced against available proceeds of the Debtor's applicable professional liability insurance policies.  The Claimant has agreed in the stipulation to waive the right to any distribution from the Debtor's estates.

There have been no objections filed to the motion.  I would ask that the Court grant and approve the stipulation and enter an order modifying the stay.

MR. ALBERTS:  We have no objection, Your Honor.

THE COURT:  I've signed the order.

MR. TROOP:  Thank you, Your Honor.  Your Honor, at this time I will turn the podium over to my colleague, Mr. Palmer.

MR. PALMER:  Good afternoon, Your Honor.  The first motion I would like to address is the motion of the Debtor to retain Robert Johnson and Associates.

Your Honor, we received an objection -- actually, two objections, with respect to this, which I believe have both been resolved.  Both objections, Your Honor, raised the issue of by who or which of the Debtors is Mr. Johnson and his company, Johnson and Associates, going to be retained by, and how one can make sure that there's sufficient information provided for by the services of

Mr. Johnson.

I had an opportunity to meet with the counsel for the Creditors Committee, Your Honor, and we have agreed as follows, with respect to Mr. Johnson.

The Debtor would stipulate on today's record, Your Honor, that Mr. Johnson and his firm would be paid out of funds of Greater Southeast, and that any accounting done between the Debtors to show obligations between one another would note that Mr. Johnson is being paid out of Greater Southeast and _____ expense of only Greater Southeast.

Two, we would note that even though the engagement letter was signed by DCHC on behalf of Greater Southeast, that the services that are being rendered by Mr. Johnson are solely for the benefit of Greater Southeast.

Three, that Mr. Johnson will submit monthly invoices which will be reviewed, not only by the Debtor but also by the Committee and the U.S. Trustee's Office, and that Mr. Johnson agrees at the end of the case to submit a composite final bill which likewise would be reviewed by the Debtor, the Creditors Committee, and the Trustee.

I believe with those stipulations, Your Honor, resolve the objections. I would ask counsel for the Committee to confirm?

MR. ALBERTS: Yes, Your Honor, our concern with Mr. Johnson was the stated amount under the agreement,

about 780,000.  I think with the checks that Mr. Palmer has indicated concerning receiving monthly amounts and then a composite at the end provides the Committee with the ability to conduct some oversight over that.

With that, we're fine with the application.

THE COURT:  These monthly invoices are to be paid when?  Upon submission, or after some response time by the U.S. Trustee and the Creditors Committee, or --

MR. PALMER:  Well, we agreed on 15 days, Your Honor.

THE COURT:  You'll submit an order?  You've all agreed upon terms.

MR. PALMER:  That's correct, Your Honor.  We have to modify the proposed order to reflect the agreement that we struck, right, but --

THE COURT:  I won't ask for all the details if you've already ironed them out.  Thank you very much.

MR. PALMER:  Thank you, Your Honor.

THE COURT:  I'll await an order.

MR. PALMER:  Your Honor, the next motion we have is the motion for ordinary course professionals, and similarly like the motion with respect to Robert Johnson, we had an opportunity to discuss with the Creditors Committee their objection to that motion, and we've agreed on a couple of stipulations that I agreed to put on the

record and to reflect in a proposed order to submit to the Court.

The Committee objected on seven grounds, Your Honor. The first grounds was that they wanted to have an opportunity to review if there were any claims against any of the ordinary course professionals that are being retained pursuant to the procedures outlined in the Debtor's motion. The Debtor has agreed to provide a 21-day window after the affidavit of retention is filed, pursuant to 2014, so that both the Creditors Committee and the U.S. Trustee can review to see if there are any conflicts or any claims against the professional to be retained.

Item 2, Your Honor, the Committee was concerned that medical malpractice claims pre-petition, that a lot of time not be spent on that. We have made a representation to the Committee that the only claims that are being worked on are post-petition medical malpractice claims, because the Debtor is self-insured. I indicated I would put that on the record, and we will make sure the order that we submit to the Court reflects that.

Three, Your Honor, we have proposed that the professionals that are retained in the ordinary course would be paid on a rolling average. The Committee was concerned that -- they wanted to make sure there was consistency, so one month you wouldn't get a bill for

14

300,000, and over the next month you would get a zero bill, so we agreed that we would cap the ordinary course professionals on a rolling average of $60,000.00 on a monthly basis, and if the compensation exceeds 45,000, Your Honor, they'll agree that they'll comply with the interim compensation order.

Item 4, Your Honor, the Committee wanted to clarify and make sure that these ordinary course professionals were subject to disgorgement and reallocation in the event it's necessary, and we would stipulate that that's the case. The order will reflect that we submit.

Item 5, Your Honor, the affidavits that will be submitted pursuant to 2004, the Committee would like to have an opportunity of 14 days to review it, and we're going to include and extend that to the Committee and the U.S. Trustee.

Item 6, Your Honor, the Committee would like copies of all fee requests submitted by the ordinary course professionals, and we have agreed that they will get monthly copies and, obviously, the U.S. Trustee will get that also.

The last objection, Your Honor, the Committee has withdrawn, which was a requirement that they reserve the right to show cause -- or to make the Debtor show cause why these professionals should continue to be employed by the

estate.

Those six points of agreement, Your Honor, have been resolved, will be embodied in the order, and that we will show it to the Committee and the U.S. Trustee before we submit it to the Court.

MR. ALBERTS:  Your Honor, Mr. Palmer is absolutely right on all of those points.  There was one other request that we had made.  We have a professional employed, monitoring cases of NCFE, who's received very small payments on a monthly basis, and the agreement was that they can be treated in effect as an ordinary course professional so that they do not have to submit fee applications like the other professionals in this case, but will be paid and be compensated on the same terms as these ordinary course professionals, and that's Susan Riehl and Associates, out of Columbus, Ohio.

MR. PALMER:  Your Honor, the Debtor has no objection to that.

Your Honor, that resolves the objection of the Committee with respect to the ordinary course, we reserve with no other objection with respect to it, Your Honor.

THE COURT:  All right, I'll await your proposed order on that, as well.

MR. PALMER:  Thank you very much, Your Honor.  Your Honor, that brings us to the last item on today's

calendar, which is the motion to approve the commitment letter that the Debtor has entered into with Merrill-Lynch.

As Your Honor is aware, we are approaching the five-month mark in this case, and over the last 20 weeks the Debtor has addressed a number of problems in the respective estates.  One of the issues that has become very pronounced, and we've advised the Court from time to time on our progress, is the Debtor's search for DIP financing.

As Your Honor is aware, the Debtor had previously filed a motion to approve a commitment letter with GECC, and as Your Honor will hear from the witnesses that will be introduced this afternoon, Your Honor, the Debtor has withdrawn that motion.

We have re-filed, Your Honor, a motion with Merrill-Lynch which provides for a commitment to do DIP financing, a copy of which is attached to our motion, as Exhibit A.  The salient terms of the motion are as follows.

The Debtors agree and commit to pay Merrill a commitment fee of $275,000.00, and a work fee of a hundred thousand dollars.  We have entered into a commitment letter with Merrill-Lynch which obligates us to not to solicit alternative DIP financing.  And the third component, Your Honor, is that there's liquidated damages in the amount of 275,000 if the terms of the non-solicitation letter are breached, or 100,000 if the commitment is not approved by

April 9.

I think a little background is helpful, Your Honor, to understand how we got to where we are.

Your Honor, one of the issues that troubled Merrill in meeting with us and coming to an agreement is they wanted some protection insurance that notwithstanding the initial process that we conducted in which GECC was selected as the DIP lender, that this time their enhanced proposal under our changed conditions would not be shopped.

And the goal was to work very closely with the Debtor and the Creditors Committee in coming up with the best possible proposal, maximum borrowing ability, the lowest cost, at the best interest rate, with the strongest borrowing base that we could put together. They didn't want their time and effort, Your Honor, to be spent in putting that deal together and then having someone else come in and top that proposal, because we asked them to do something very unusual here, Your Honor.

We asked them, notwithstanding our change of circumstances, to go and simultaneously draft and negotiate with us the commitment letter as well as the DIP financing motion, and credit agreement, and DIP order, and all the other ancillary documents which I don't need to mention at this time, at the same time. And through an effort of a very intensive five- or six-day period, all of the parties

in this case -- namely, the Creditors Committee, the Debtor, as well as Merrill-Lynch, spent time in New York putting all of these documents together.

Now, Merrill did that at great personal exposure for their expenses, because we asked them to do it, and to induce them we agreed to sign this no-solicitation letter. Merrill has advised us, Your Honor, if their expense reimbursement is awarded by this Court today, that they are prepared to waive the non-solicitation letter that we had agreed to sign prior to today, to get to today's hearing.

And I'm going to ask -- I believe counsel from Merrill is in the courtroom?  I'm going to ask counsel to confirm my statement.

MR. LEVY:  Your Honor, Rick Levy on behalf of Merrill-Lynch Capital.  Mr. Palmer's comments are correct, with one minor correction, and that is it's upon payment of the commitment fee, not the work fee _____.

MR. PALMER:  The goal here, Your Honor, is to bring the Debtor's efforts over the last 14 weeks that we've been negotiating on the DIP financing, to a culmination.

As Your Honor recalls from the first hearing, when we got expense reimbursement with some of our lenders, we negotiated with GE Capital, Foothill Corporation, and Merrill-Lynch/LaSalle, as the three DIP lenders.  At that

time, we recommended that a due diligence fee of a hundred thousand be paid to each of GE and Merrill-Lynch/LaSalle, to create competition for the DIP and to obtain the most favorable DIP financing terms.

On March 12th, Your Honor, we selected GE, and filed the motion that I previously mentioned that we've now subsequently withdrawn. That motion provided for a $46 million revolving facility with a term loan of 14 million, and would pay a commitment fee to GE of 350,000, plus a further due diligence of a hundred thousand dollars.

Your Honor, the reason that we were required to re-tinker with our DIP financing proposal was two-fold. One, Your Honor and the Debtor were served with objections from the Creditors Committee with respect to the pricing of the DIP and other issues related thereto.

And two, Your Honor, we know that there's been a change of circumstances with the operations of these hospitals. In particular, Greater Southeast, Your Honor, is well aware that our certification provided by JCAHO has been an issue of some concern for us. We were informed in December and early January that there were a number of issues there that needed to be addressed. The hospital was put on probation with respect to those issues. And just recently, Your Honor, we've been informed, as of March

19th, that our accreditation was given a preliminary denial.

Now, obviously, Your Honor, Greater Southeast will work very hard to appeal that determination. The retention of Robert Johnson, which the Court heard earlier today, was designed to address a number of those deficiencies in our operation that led JCAHO to deny our accreditation. And we believe that with the steps that have been taken with the retention of Mr. Johnson and his colleagues, as well as the subcontractors that are working under his direction, the DIP that we're hoping to have approved by this Court as well as other efforts that management has taken to reduce costs and to improve operations, that Greater Southeast will be able to obtain its accreditation within the appeal period.

This is a significant change, Your Honor, of circumstance for us, because the JCAHO accreditation has the potential to affect our ability to bill and collect for Medicare and Medicaid. And while it's not an exact correlation, the loss of one can have a tremendous impact on the other.

Your Honor, we also have two other events that have occurred during this time, that has had an impact on us. One is the LPS certification that we've lost at Pine Grove, and has required us to reduce the census of that

location, and has accelerated our timetable to deal with asset disposition with respect to that entity.

The final and last thing, Your Honor, that had an impact on us was the sale of Mercy Hospital, which is a very direct competitor of Michael Reese, one of our hospitals in Chicago.  And it has had an impact because many of the doctors that work at our hospital also have privileges at Mercy Hospital.  And since the doctors share privileges at both hospitals and are aware of the issues in connection with Mercy, one can't help but wonder what the impact is going to be, given the uncertain outcome of what will be done with Michael Reese.

In light of these significant changes, Your Honor, GECC altered its DIP financing commitment to us. These changes also had a profound effect on our projections and required the Debtor and its professionals to do revised projections, and one of the things that has come out of this effort, Your Honor, is that notwithstanding the three, what I would call negative factors that I've just outlined for this Court, the Debtor's new revised projections indicate a strong turnaround has occurred and is occurring with respect to our operations.

Your Honor, I am going to reserve my right to make some further comments with respect to the DIP financing, but I would like to call my first witness,

Mr. Tom Barry, to talk about the process with respect to the DIP selection, Your Honor.

MR. ORR:  Your Honor, NCFE would object to the calling of Mr. Barry.  Under local Bankruptcy Rule 970, a witness list has to be provided prior to the hearing, and we have received no such witness list.

MR. PALMER:  Your Honor, we provided one to the Court, and I will provide a copy of that to Mr. Orr.

THE COURT:  We have a copy.  We can make a copy here.  Is there any reason not to proceed to take Mr. Barry's testimony, other than that?

MR. ORR:  No, Your Honor.  We just want to see who the witnesses are.

THE COURT:  You may call Mr. Barry.

MR. PALMER:  Tom Barry.

MR. ORR:  Your Honor, I'm sorry.  This does not satisfy the requirements of Rule 97, which specifically requires the witness, the area of the testimony, and the length of time for the testimony.  I understand that this is a form the Court uses, but --

THE COURT:  Overrule the objection.

MR. ORR:  I understand.

THE COURT:  I have the discretion to waive it.

MR. ORR:  I understand.

THOMAS BARRY WAS SWORN AND TESTIFIED AS FOLLOWS:

THE CLERK:  Please have a seat and state your name, please, for appearance.

THE WITNESS:  Thomas Barry.

**DIRECT EXAMINATION**

BY MR. PALMER:

Q    Mr. Barry, can you state by whom you're employed?

A    Cain Brothers.

Q    And what is your position with Cain Brothers?

A    I'm a principal.  I run the mergers and acquisition practice.

Q    And how long have you been at Cain Brothers?

A    Seven years.

Q    What is Cain Brothers' connections to the Doctor Community Health Care Corporation?

A    We're employed to represent them on certain aspects of the transaction.

Q    And are one of the aspects that you're employed related to the DIP financing?

A    Yes, it is.

Q    And what has been your role in connection with the DIP financing?

A    Coordinating with Huron to work jointly to find the best DIP proposal for Doctors Community.

Q    Have you seen the Debtor's motion to have its commitment letter approved?

A     Yes, I have.

Q     Have you seen the commitment letter that's attached to that?

A     Yes, I have.

Q     Are you familiar with that commitment letter?

A     Yes.

Q     Can you tell us why you believe that commitment letter is reasonable?

A     The commitment letter was struck after great review with it versus other DIP proposals, and it turned out to be the most flexible and the lowest cost, and provided the best overall structure for DCHC.

Q     Can you tell me the size of the facility under the commitment letter?

A     Notional amount is 35 million.

Q     You mentioned earlier that it was low cost.  Are you comparing it to the other DIP proposals that the Debtor received?

A     Yes, we are -- I am.

Q     And what are the factors that lead you to believe that this is the best approach for DIP financing?

A     We looked at the overall cost and the flexibility, and the ability to interact with the organization to provide the best terms of DCHC.

Q     You're familiar, as you indicated, with the commitment

letter.  There's a provision for material adverse change in the commitment letter, are you familiar with that?

A    Yes.

Q    And did you have specific discussions with Merrill-Lynch concerning whether our JCAHO accreditation would violate that material --

A    Yes.

Q    -- adverse change?

A    Yes.

Q    And could you describe your understanding of whether our accreditation would violate that material adverse change?

A    It would not.

Q    Mr. Barry, the Debtor's facility is seeking $35 million for DIP financing.  Was that always the amount that the Debtor was seeking?

A    No.

Q    What was the original amount?

A    Initially it was almost $80 million, and the amount has come down over time because the circumstances have changed.

Q    And could you tell me what those circumstances are?

A    First and most important was, is the granting of cash collateral.  And with cash collateral the size came down substantially, and into the range of 35 to 45.

Q    Have you been involved in the efforts between Doctors Community and its creditors to reach consensus on a DIP facility?

A    Yes.

Q    Could you explain briefly for the Court, that process?

A    We've tried to be very open with both the Creditors Committee for DCHC and with the team representing NCFE, to provide them with information on an expedient basis, to tell them what we're doing, who we're negotiating with, what the terms were, what the costs were, provide them with spreadsheets of those cost structures, and a comparison of the terms, to make it simple for them to determine, without reviewing source documents if they so desired, which was the most favorable transaction.

Q    There come a time when you had negotiations with creditors other than the DCHC Creditors Committee?

A    We have had discussions with representatives of certain of NCFE's creditors.

Q    Did you have negotiations with representatives of NCFE?

A    Yes, we have.

Q    And who were they?

A    We dealt with three firms -- Alvarez and Marcell, American Express, and FTI.

Q    And who does Alvarez and Marcell represent?

A    Alvarez and Marcell represents NCFE.

Q    And who does American Express represent?

A    NCFE.

Q    And who does FTI represent?

A    Believe certain of the creditors of NCFE.

Q    Now, did your discussions start with all three at the same time?

A    No, it did not.

Q    Who did your discussions initially start with?

A    Initially started with two representatives, one from Alvarez and Marcell, and one from American Express. Alvarez and Marcell was represented by David Coles, and American Express by Michael Lane.

Q    Now, Mr. Barry, this process has been going on for 14 weeks.  Have you been involved in it from the beginning?

A    Yes.

Q    And was Mr. Coles involved at the beginning?

A    Yes.

Q    Was Mr. Lane involved at the beginning?

A    Yes.

Q    Was the gentleman from FTI that you referred to, involved at the beginning?

A    I have not referred to anyone from FTI, I think, but no, FTI was not represented at the beginning.

Q    When you had these initial discussions with Mr. Cole

and Mr. Lane, can you indicate the nature of those discussions?  The type of information requested?

MR. ORR:  Objection, Your Honor, to the extent the question calls for hearsay.

THE COURT:  Overruled.

THE WITNESS:  The information was whatever they wanted they received.  We were very cordial.  People at DCHC bent over backwards to meet with them, spent time and fulfill all their information needs, and it was a very pleasant, cordial relationship.

BY MR. PALMER:  (Resuming)

Q    Were you providing information so they could familiarize themselves with our operations?

A    They had access to everything they wanted.

Q    And by "they," you're referring again to David Coles and --

A    Right.

Q    -- Michael Lane.

A    Yes, exactly.  And their requests were quite similar to what the Creditors Committee was looking for.

Q    Which creditors?

A    The DCHC Creditors Committee.  And also to certain of the DIP lenders.

Q    And did there come a time when things changed in your dialogue with Mr. Coles and Mr. Lane?

A    Yes.

Q    Can you explain what that was and when it was?

A    There began to be an inclusion of FTI in the process, and the dialogue, three, four weeks ago, became a sharper, more difficult terms of process.

Q    Did that delay your discussions at all?

A    It has delayed us, yes.

THE COURT:  What do you mean, "became sharper"?

THE WITNESS:  Sir, they became more aggressive in their negotiating, believed they weren't getting the information they were required, which -- and just took a different tone to the negotiations.

BY MR. PALMER:  (Resuming)

Q    During this time when you were having these dialogues and the DCHC Creditors Committee was doing its due diligence and NCFE was doing its due diligence, were there any discussions about the size of the debt, the nature of the debt, what it should cover and what it shouldn't?

A    There were discussions on those topics.

Q    And during this time, to your knowledge, did NCFE express a view as to what they thought the DIP should look like?

A    They had general comments, but not quite specific comments, per se.

Q    Did you discuss with NCFE the priming of their alleged

position in the DCHC?

A     Yes, that was on the table two and a half months ago.

Q     And what was your understanding of their position with respect to that?

A     That they would --

MR. ORR:  Your Honor, I'm going to renew my objection and ask for a continued objection to the extent the question solicits testimony that might be considered to be hearsay.

THE COURT:  Overruled.

THE WITNESS:  They agreed that they would do that.

BY MR. PALMER:  (Resuming)

Q     And did you continue having discussions with NCFE from that point, several weeks ago?

A     Yes, extensive discussions.

Q     And did you continue providing information to NCFE since that point a couple of weeks ago?

A     Technically, most of the information passed through Huron or through DCHC directly, but the company, either directly or through its intermediaries, did pass them information.

Q     And you were aware of it?

A     Yes.

Q     Did you participate in meetings, telephone calls, an

exchange of e-mails concerning this information?

A     Each of the three, yes.

Q     So you would have specific knowledge about the requests and whether there was compliance with those requests.

A     Yes.

Q     You also had specific knowledge about the various DIP proposals that DCHC had received, and their terms and conditions, correct?

A     Yes.

Q     Did you discuss the pros and cons of each of these proposals with NCFE?

A     Yes.

Q     And what did you tell them?

A     We told them where we came out in making a recommendation.  We gave them the core documents and we gave them our summaries of those documents, so that they had an oral report, a written summary, and the written core documents for each of the proposals.

Q     So, in Round 1, if I may, did they know you were going to select GECC as your DIP lender?

A     Yes.

Q     Did you explain to them why DCHC exchanged GECC for Merrill-Lynch?

A     Yes.

Q    And what did you tell them?

A    Told them that GECC raised its fees, became less flexible, and changed certain of its security provisions, and that that caused us concern about how we'd be able to close on a final -- on negotiations with them.

Q    And when did this change occur?

A    It occurred about three weeks ago.  Without looking at a calendar, I'd say about three weeks ago.

Q    Was it after the determination came down from JCAHO?

A    Yes, it was.

Q    Would it be fair to say you made a substantial effort to keep NCFE informed of your DIP efforts?

A    Yes.  The DCHC team and management, individually and collectively, did try to keep NCFE informed all the way through.

Q    And at the same time that you were keeping them informed, were you working with the Creditors Committee on this process?

A    I was working with the DCHC Creditors Committee, yes.

Q    Let's go back to the Merrill commitment letter.

A    Sure.

Q    Was Merrill aware of the change in the EBIDA (phonetic)?

A    Yes.

Q    And were they aware of the preliminary denial of

accreditation by the Joint Commission?

A    Yes.

Q    And did Merrill nonetheless make a lending proposal to the DCHC Debtors?

A    Yes.

Q    And how did that proposal compare to Merrill's initial proposal to the DCHC Debtors?

A    It was comparable.

Q    After reviewing Merrill's proposal, did negotiations with Merrill begin over a commitment letter?

A    Yes.

Q    And can you describe that process?

A    It was very rapid from the time we -- and this was all done in concert with the DCHC Creditors Committee.  In fact, they were very directly helpful in initial discussions with Merrill.  We began to aggressively move to draft as quickly as we could, documents that would be substantially complete, and we did that in about a four or five-day period.

Q    And who participated in that process?

A    It was the professionals representing DCHC, including lawyers and business folks, and the professionals representing the DCHC Creditors Committee, including lawyers and their business professionals.

Q    Do you know whether a draft of the Merrill commitment

was provided to NCFE?

A     Yes.

Q     Did you get comments back from them on that draft?

A     Not that -- not directly to me.

Q     Did you discuss it with them?

A     They were aware that they had it.

Q     And when was that draft sent to them?

A     Probably two weeks ago, Monday or Tuesday.

Q     What happened after you sent that draft?  Or that draft was sent --

A     Or a week ago.  Excuse me.  My weekends.  They've raised questions about the DIP, in terms of size, structure, sequence.

Q     Have you continued to have discussions with NCFE concerning that?

A     We've had e-mails, conversations and meetings, and the whole intent on our side is to promote a consensual, collegial process where everyone would agree to the terms and conditions, and the need for a DIP.

Q     When was the last time you spoke to NCFE?

A     This morning.

Q     Did the Creditors Committee participate in this process with you?

A     Yes.

Q     By the "Creditors Committee," I'm referring to the

DCHC --

A    Yes.  Yes.

Q    .-- Creditors Committee?  In your opinion, do you believe that the terms of the Merrill commitment are fair and reasonable in light of the marketing conditions and the financial conditions of the DCHC Debtors?

A    Yes.

Q    Are you aware of any proposal that would be better for the estates, based on pricing, structure or flexibility?

A    None.

Q    Have you spoken at all to other DIP lenders during this process so that you have a reasonable certainty that you've covered the marketplace?

A    Yes.

Q    Is there any other source of financing that you know of or that's available?

A    Well, NCFE has volunteered from time to time that they would act as a DIP, but that has never been forthcoming.

Q    Anyone else besides NCFE?

A    No.

MR. PALMER:  Excuse me one second, Your Honor.

MR. ORR:  Your Honor?  In order to expedite things, Your Honor, I would object to the introduction of any exhibits that weren't provided pursuant to an exhibit list under the same local rule, and have a standing

objection to that, Your Honor.

MR. PALMER:  This is Exhibit A to the motion, Your Honor.  That's the commitment letter.  It's the only exhibit I have.

THE COURT:  I'll take judicial notice of the commitment letter.

MR. PALMER:  Your Honor, I have no further questions for this witness.

THE COURT:  If you have a copy of the commitment letter for me, that's great.

Cross-examination, Mr. Alberts?

MR. ALBERTS:  None from the Committee, Your Honor.

THE COURT:  Mr. James?  Anyone else?

MR. ORR:  Yes, Your Honor.

THE COURT:  All right, Mr. Orr.

MR. ORR:  Thank you.

**CROSS EXAMINATION**

BY MR. ORR:

Q    Good afternoon, Mr. Barry.

A    Good afternoon.

Q    Mr. Barry, you testified that this process has been going on for 14 weeks?

A    Yes.

Q    Has that entire 14-week timeframe concerned the

Merrill-Lynch commitment?

A    No.

Q    When did the Merrill-Lynch commitment discussions for this commitment proposal begin?

A    Ten days ago.

Q    About ten days ago.  Do you know when the GECC commitment letter was withdrawn?

A    Define your terms a little better, I'm sorry, I don't understand.

Q    When actual notice was provided to the parties that this Debtor was no longer relying on the GECC commitment proposal.

A    I couldn't give you that date.

Q    Was it last week, approximately?

A    Again, I can't give you that date.

Q    Uh-huh?  You testified that this Debtor or you or other parties have been providing NCFE with everything they've wanted, wasn't that your testimony?

A    Yes.

Q    Do you know if they've been providing the information as you testified, everything they wanted, in which format?  For instance, do you know if it's being provided in PDF, Excel spreadsheets?

A    I do know that answer.

Q    Okay.  How is it being provided?

A   Well, interestingly enough, NCFE has complained that it has been receiving PDF files, but unfortunately they actually have the same documents in Excel format that they received two weeks.  So there has been some complaints that over the last few days that they've been getting PDF files and, frankly, we would probably be very happy to give them in Excel format so they could check the formulas, but we realized we're under a time constraint and to read the sophisticated models in the depth and necessity to go through them, you know, these are very long, with 40 or 60 spreadsheets attached to them, that no single human being could read those and figure them out.

So what we did is just we gave them the PDF and volunteered to run any scenarios or alternatives for the NCFE team so that they could then be brought up to speed to use it on their own.

Q   So then you would be aware that last week there was a promise made on behalf of these Debtors to provide this information to NCFE?

A   Mr. Orr, I didn't -- maybe I did not explain correctly.  But the Excel spreadsheet that they asked for, they had had in their possession for ten days prior to asking for it again.

Q   I'm not talking about that Excel spreadsheet.

A   Oh, okay, what were you -- I thought you were talking

about the PD -- whether a file was handed over in Excel or PDF.

Q    I'm talking about a representation for documents are going to be provided last week.  I know you're talking about the prior Excel spreadsheet.  I'm talking about a new transfer of documents that were going to be provided at the end of last week.  Do you know what I'm talking about?

A    The document that was provided at the end of last week, was provided in PDF format.  The prior document, which let's say that last week was Alternative J, Alternative I was provided in Excel format.

Q    Okay.

A    Alternative J was provided in PDF format.

Q    That's what I was going --

A    Okay.  However, the changes between the two were very nominal.

Q    But there wasn't an election made not to provide all the information at some point, is that correct?

A    Well, there was an election made, and for good reason.

Q    Mr. Barry, you're involved in preparing these projections, are you not?

A    Not really, no.  I mean, I --

Q    No?  Are you familiar with them?  You testified that you were familiar with them.

A    I'm familiar with them.

Q    Okay.  Do you know when these projections show that the Debtors would go cash flow negative?

A    It depends on which projection you're looking at.

Q    Well, which projections --

A    And it would depend on how do you define cash flow negative.

Q    The time that the Debtor's cash flow as opposed to account receivables is in a negative position.  Do you know what I mean?

A    I do know that.  However, most organs -- health care organizations run a positive balance in that even ten days or 30 days is seen as minimal.  A typical rating requirement for a hospital is usually at a -- to receive an investment grade rating would be 60 days of cash.

Q    Sure.

A    And in that case, that would be, you know -- and 60 days here would be significant, more than zero and more than what we're receiving.

Q    Well, let's talk for a second about the projections --

A    Sure.

Q    -- that you do know about.

A    Uh-huh.

Q    Okay.  On the ones you do know about, when do they show that this Debtor will go cash flow negative?

A    They start to go cash flow negative, subject to the

41

circumstances and the receipt of certain funds, and if I accept your definition of cash flow negative which to be zero, which I don't accept --

Q    Okay, that's fine.

A    Okay.   In the end of May, June or July, depending on the scenarios that are run.

Q    But it could be as late as July?   That was your testimony.

A    Could be.   But I want to stress that I'm accepting your assumption that zero days is there.   It's like running your checking account.   At a certain point, you need more than zero cash.

Q    And you testified that the draft commitment letter from Merrill-Lynch was provided approximately a week ago?

A    That's right.

Q    You also testified that at the beginning you thought the DIP might be as large as $80 million?

A    Yes.

Q    Okay.   But it was due to the fact that you were able to resolve some cash collateral, using NCFE's interest, that you were able to downsize that DIP?

A    That's right.   By using cash collateral, we were able to bring the size down.

        MR. ORR:   Thank you, Your Honor.   Nothing further.

THE COURT: Unless somebody else is going to attempt to object, and this is -- Mr. Kirshenbaum, I don't know if you stated your appearance or not. State your appearance.

MR. KIRSHENBAUM: Yes, Your Honor. Lester Kirshenbaum, from Kay Sholer, which is counsel to the Official Committee of NPF6 Net Holders in the NCFE bankruptcy cases.

MR. PALMER: Your Honor, the Debtor would object on the standing to -- Mr. Kirshenbaum representing that constituency in this case.

THE COURT: Does your client have a claim in this case?

MR. KIRSHENBAUM: Your Honor, let me discuss my client's interests and I tell you why we believe we do have standing.

Your Honor, NPF6 is one of the two primary entities through which NCFE funded the various providers throughout the country that it funded, the other one being NPF12. The only creditors, virtually, Your Honor, for all intents and purposes, since these were captive, sole-purpose companies, both NPF6 and NPF12, the only creditors of NPF6 are the NPF6 noteholders, and they hold just short of $1 billion in claims against NPF6.

And, Your Honor, in addition, through the

indentured trustee in the NPF6 case, they have a security interest in all of the receivables that were either sold by this provider, as well as other providers, to NPF6, or the cash proceeds thereof.

In addition, Your Honor, again I'm familiar with the cases that Weil cited in their opposition. Those cases, Your Honor, all deal with individual creditors. I believe, Your Honor, that the case law -- although we haven't had a chance to brief this, of course, but I believe that the case law makes a clear distinction between the right of individual creditors and creditors committees.

As Your Honor is aware, there is a body of case law at the circuit level, various circuits as well as other courts, as well, that have ruled that creditors committees -- certainly official creditors committees, Your Honor, can intervene in adversary proceedings involving their debtor. In this case, Your Honor, a contested matter, a contested proceeding under the Bankruptcy Rules, is for all intents and purposes the equivalent of an adversary proceeding.

So while the NCFE debtor group as a whole, Your Honor, has appeared through Jones-Day, which is general counsel, I believe that the case law provides the right for creditors committees of those debtors to intervene in adversary proceedings and contested matters.

The direct connection, Your Honor, and the direct

interest as well, as I've indicated, really relates to the security interest and the lien that we enjoy in all of the proceeds of the receivable base, so that, you know, for all intents and purposes, Your Honor, you could almost view that relationship separate and apart from the NPF6 separate creditor claim, but you have a creditor in the amount of $1 billion, while the claim may be directly against NPF6 we do hold all of the proceeds of all of the receivables as part of our direct collateral base.

So we believe we have a direct interest in the outcome of this proceeding and in whatever ultimately happens to the proceeds of the receivables because that ultimately comes to us, Your Honor, it comes directly to us. Doesn't come to us through NPF6, it comes directly to us because it's our cash, it's our collateral, and so we have really a direct link to these debtors.

THE COURT:  The NCFE is the acronym that's been used to describe the lead debtor's cases pending in the Southern District of Ohio and NPV6 --

MR. KIRSHENBAUM:  NPF6, Your Honor.

THE COURT:  NPF6 is one of those debtors, is that correct?

MR. KIRSHENBAUM:  Yes, Your Honor.

THE COURT:  And that debtor is represented by Mr. Orr, correct?

MR. KIRSHENBAUM:  All of the debtors are represented -- all of the NCFE debtors as a whole are represented by Mr. Orr, yes.

THE COURT:  And that debtor has a claim against this estate?

MR. KIRSHENBAUM:  Yes, Your Honor.

THE COURT:  For what?  In what form?  Is it a secured claim, or just what?

MR. KIRSHENBAUM:  Well, it comes out of, Your Honor, it stems out of the financing of the receivables of various of the Greater Southeast entities.  In the case of NPF6, Your Honor, they financed a total of 120 million -- or, they advanced $120 million to Michael Reese.

THE COURT:  Whatever it is that NPF6 has, your client has a security interest in whatever NPF's interest is in that property.  Is that right?

MR. KIRSHENBAUM:  Your Honor --

THE COURT:  Enforceable against NPF6, correct?

MR. KIRSHENBAUM:  The receivables, Your Honor, all the receivables, come directly into the black box accounts that are in the name of the indentured trustee for the NPF6 noteholders.  Which, in this case, is Chase.  So that the funds go directly -- or the proceeds of all of those financings go directly to J.P. Morgan Chase, to a J.P. Morgan Chase bank account.

THE COURT: That's just talking about where something physically goes. I'm talking about ownership.

MR. KIRSHENBAUM: Owner -- yes, Your Honor.

THE COURT: Your claim is derivative of whatever NPF6 owns, correct?

MR. KIRSHENBAUM: Yes, Your Honor. NPF6 is the owner of the receivables. Again, according to our view and what we've represented to this Court.

THE COURT: Either that, or they've got a security interest --

MR. KIRSHENBAUM: Yes. Yes, Your Honor.

THE COURT: -- against whatever these debtors own.

MR. KIRSHENBAUM: Yes, Your Honor.

THE COURT: And you've got a security interest against whatever it is -- whatever interest it is that NPF6 has, whether a security interest or ownership of the accounts receivables of these debtors.

MR. KIRSHENBAUM: That's correct, Your Honor. As well as -- as I indicated, Your Honor, the noteholders in this particular case -- I can't speak for the other bankruptcy situations -- but in this particular case, where you have this single-purpose vehicle, NPF6, which is set up specifically in order to finance these providers, the entirety, the totality of the NPF6 creditor body, is the

creditor body -- is the noteholder group. We're told, in round num -- I said a little less than a billion, Your Honor. It's actually 925 million, I think is the number, as of the bankruptcy filing.

And as has been indicated, Your Honor, publicly in that case and I know that the Greater Southeast debtors and their counsel are well aware of this, the NCFE debtors are utilizing the Chapter 11 process as an orderly liquidation process for the benefit of their creditor body. And of course, that holds true not only of NPF6, Your Honor, but of course NPF12, and all the other creditors as well.

So in our view, Your Honor, we believe that and it's our view that the case law, which I think has pretty much uniformly, ever since the Third Circuit certainly pulled the first Cybergenics opinion, the case law pretty much uniformly indicates that creditors committees do have the right to intervene in adversary proceedings involving their debtors.

Now, of course, our debtor is NPF6, but our debtor is involved in this contested proceeding in the Greater Southeast case. For all intents and purposes, Your Honor, since the NPF6 noteholders are the entirety of the NPF6 estate, the NCFE management, the NCFE counsel, have very close, not only working relationship, Your Honor, but

really they look to their creditors to determine positions _____ of course they have to exercise fiduciary obligations and they have to, in the exercise of their fiduciary obligations, exercise independent judgment. But they certainly, you know, take our views and work very closely with us, Your Honor, in every facet of the case.

THE COURT: All right. Is that it?

MR. KIRSHENBAUM: Yes, Your Honor.

THE COURT: I'll hear Mr. Palmers, then. Whatever assistance he wants to give the Court on this issue.

MR. PALMER: Your Honor, I would just note a couple of things.

The cases that Mr. -- well, I'll step back. Mr. Kirshenbaum represents a subcommittee of a committee, as I understand it. He's not committee counsel. Ballard Spahr, who I believe is in the courtroom, is committee counsel. So even if those cases that he referred to said what he believed they did, it wouldn't be applicable. But those Third Circuit cases that we refer to, Your Honor, they relate to letting a committee intervene in an adversary proceeding in their Chapter 11 case, where their interest is not adequately represented by the debtor's counsel.

Mr. Kirshenbaum has twisted that and appeared

in someone else's Chapter 11 case, where the identical interest, Your Honor, is being represented by the law firm of Jones-Day on behalf of all those debtors. And when he says he has direct claims, there is no direct claim here, Your Honor. It's two steps removed. It's a very indirect claim.

I believe, Your Honor, as we said in our papers, that he has to demonstrate that his interests are not being adequately protected -- excuse me, adequately represented, and those cases make it very clear you got to move to intervene and you got to show why your interests are not being protected, and Mr. Orr has been at every one of these hearings, representing the interests of all the NCFE entities, Your Honor, and prior to today there's been no distinction, and I haven't heard any differences in argument, Your Honor, of why somehow the bondholders would have a different point of view than NCFE would, with respect to this facility, to warrant him coming into another Chapter 11 case -- not his own, not one where he's directly involved -- but one where he believes there is an indirect benefit here, Your Honor.

We would strongly oppose it, Your Honor.

MR. KIRSHENBAUM: Your Honor, can I just clarify a couple of points? I just want to be helpful to the Court and then also helpful to the Debtor, but I don't think it

will change their position.

We are not a subcommittee, Your Honor, from the perspective that I think is the more usual route, which is you have a committee appointed by the trustee, and then the committee itself votes to set up a subcommittee.  There was much discussion in the NCFE cases generally, Your Honor, about the number of committees that should be appointed, because there are many situations where you can have different interests on behalf of various of the subsidiaries in that group, Your Honor.

The U.S. Trustee saw fit to appoint a single committee, and the noteholders, Your Honor, both the 6 noteholders and the 12 noteholders, moved before Judge Calhoun to have Judge Calhoun either direct the Trustee, U.S. Trustee, to appoint separate official committees or separate official subcommittees.  Judge Calhoun, on January 9th of this year, entered an order appointing official subcommittees.

So these are court-appointed subcommittees, subcommittees in the sense, Your Honor, that every member of the subcommittee, of each subcommittee, is also a member of the General Creditors Committee, where Judge Calhoun specifically ordered their appointment on the basis that, and on the rationale that, each subcommittee or the NPF6 estate and the NPF6 creditor body and the NPF12 estate and

the NPF12 creditor body each had separate interests at which, at times, would clash with each other, which required and merited the appointment of separate creditor constituencies for those two debtors.

And, Your Honor, that was, to a large extent, I think, if I can remember Judge Calhoun's ruling on the record, there were many factors that went into it but one of the factors that he certainly relied upon was that between NPF6 and the $1 billion in claims against the NPF6 estate, and the NPF12 and the $2 billion in claims, in round numbers, against the NPF12 estate, that represented well over 99 percent of all of the claims against the totality of the NDFE debtors.

And so therefore, in the context of that, you know, that situation, Your Honor, Judge Calhoun ruled, and we believe quite correctly, that given the somewhat unique setup here, it really was appropriate for NPF6 and NPF12 to have -- or the creditors in those two, of those two debtors, to have separate representations.

In terms of Mr. Palmer's point, which is that in most cases the right to intervene will come up within the context of the creditors committee's own bankruptcy, I would agree with that. I think, Your Honor, most of the cases that rule on this point do involve situations where you're dealing with adversary proceedings or contested

matters within the creditors committee's own bankruptcy case.

But I would suggest, Your Honor, that there's nothing within the rationale behind those decisions, nothing within those decisions, that would, you know, limit it to the bankruptcy case of the particular creditors committee.  I think the rationale is very clear that the creditors committee representing and being itself a fiduciary for all the creditors of a particular estate, as opposed to just having an individual creditor with its own particular interest, a creditors committee with those fiduciary duties has a right to intervene in adversary proceedings or contested matters which affect its rights.

Where we have, Your Honor -- and just speaking for NPF6, not for NPF12, we have $120 million invested in the Michael Reese debtor, and we have, I believe, 25 or 30 million dollars invested in the Greater Southeast debtor.  Most of our --

THE COURT:  But it's through NPF6.

MR. KIRSHENBAUM:  I'm sorry, Your Honor?

THE COURT:  It's through NPF6 --

MR. KIRSHENBAUM:  Yes.

THE COURT:  -- not directly.

MR. KIRSHENBAUM:  Only --

THE COURT:  Anything else?

MR. KIRSHENBAUM:  No.  That is it, Your Honor.

THE COURT:  I'll grant the motion to -- the objection to not allow Mr. Kirshenbaum's client to be heard in this matter.  There is a right to intervene provision in the Bankruptcy Code.  Section 1109(b) provides that a party in interest, including the debtor, the trustee, a creditors committee, an equity security holders committee, a creditor, an equity security holder and any indentured trustee may raise and may be heard, and may appear on any issue in a case under this chapter.

NPF6 is appearing through counsel, Mr. Orr, today.  It is a creditor.  It's entitled to be heard.  But the creditors of the estate of NPF6 don't have a claim against this estate.  Their claims lie against the NPF6 estate, and there is no right for them to be heard as opposed to NPF6 being heard.  So the objection is sustained.

I'm going to take a recess.

MR.          :  Thank you, Your Honor.

THE CLERK:  All rise.  This Court will stand in a brief recess.

(Whereupon, a brief recess was taken.)

THE CLERK:  All rise.  This Honorable Court is again in session.  Please be seated and come to order.

MR. PALMER:  Your Honor, I don't know if there's

any more cross-examination, but I have no rebuttal for the witness, Your Honor.

THE COURT:  I take it nobody else wants to cross-examine the witness?

MR. ORR:  Your Honor --

THE COURT:  You may step down.

MR. ORR:  -- may I renew my cross-examination?

THE COURT:  You finished your cross-examination, Mr. Orr.

MR. ORR:  I know, Your Honor, but in light of the Court's ruling, I do have a few follow-up questions.

THE COURT:  All right, go ahead.

MR. ORR:  Thank you, Your Honor.

THE COURT:  Mr. Barry, I'll remind you that you're still under oath.

**FURTHER CROSS EXAMINATION**

BY MR. ORR:

Q    Briefly, Mr. Barry.  What provision for adequate protection of NCFE's interests have been made in the current proposal?

MR. PALMER:  Your Honor, I would object to that. It's beyond the scope of the motion before the Court today. The motion that's before the Court today is to provide for approval of the commitment letter.  The issue that Mr. Orr is raising now is an issue that we don't _____.

MR. ORR:  Your Honor, may I respond?

THE COURT:  Yes.

MR. ORR:  The way this commitment letter is structured, Your Honor, with the fees and with respect to the fact that Merrill-Lynch has decided to drop some of their concerns, the way this commitment letter is currently structured, Your Honor, the proposal that's on the table does not provide for certain protection.  And the way it's structured would mean that it is essentially almost a fait accompli, the way these debtors have also structured it so we can't go forward.

One of the penultimate issues for us, Your Honor, is whether or not, in terms of us analyzing the reasonableness of this DIP facility, there is no provision provided to us for adequate protection under this proposal. But certainly they've had to take that into account before they can come to this Court and ask for this Court to approve an additional $500,000.00 in fees so they can go forward with a proposal that does not provide those protections.

MR. PALMER:  Your Honor, those issues --

MR. ORR:  And that's a simple question.

MR. PALMER:  -- will be addressed in the DIP motion which the Debtor will be filing shortly.  The provision of whether there's adequate protection or not is

a legal conclusion that this Court makes after a proffer by the Debtor, has to establish his burden of proof with respect to getting the DIP financing approved. All we're asking the Court to do today is approve the commitment letter, which relates to the due diligence as well as the commitment fee, Your Honor, and we will address the issues that Mr. Orr is raising with respect to our DIP motion.

We think it's premature, Your Honor, and I would even cite and go to, Your Honor, to the case of Allegheny International, Your Honor, which is reported at 117 B.R., 171, where Judge Block, in approving a commitment letter for exit financing, where there was an objection by a creditor that the commitment letter contained provisions that would control the plan of reorganization, the Judge approved the commitment letter, Your Honor, indicating that it did not dictate terms of a future plan of reorganization, and that those issues could be addressed with respect to disclosure, voting, priority, and the confirmation of the plan, and that's at page 6 of that opinion.

I would say, Your Honor, by analogy, the same analysis could apply here, because any issue that's raised in the commitment letter as to whether the structure, the terms, the pricing, Your Honor, can be addressed at the DIP final hearing, we are not -- and I repeat -- we're not

seeking interim approval of the DIP here today, Your Honor. We're only seeking the commitment letter approval. You will address all those issues at the DIP hearing, Your Honor.

MR. ORR: Your Honor, respectfully. The Allegheny case focuses on a plan reorganization, as opposed to final approval of a DIP or commitment letter. The prominent feature of this commitment letter is a 364(d) priming lien. That is unless the parties are willing to admit that that might not be a provision they will ultimately seek approval for, and I don't think that's the case. If that is in fact what they're seeing approval for, Your Honor, they have to either -- only two ways can you get that lien. Either via our consent, or by providing adequate protection and assurance that our interests are taken care of. If the witness has said he's been intimately involved in all discussions regarding negotiations for this and other -- and other -- commitment letters, and other commitment DIP proposals, that witness has got to know what they've done so far with regard to protect the interests of the largest secured creditor of this estate.

And consequently, that is entirely relevant, given that it is such a prominent feature of this commitment letter proposal, and that is what -- they have

even attached to it what they propose to be the facility going forward.  It is not chimerical, it is not something that is supposed to be unanticipated.  It is an essential element of this proposal, and we have an opportunity and we have a right to know what they've done in terms of their due diligence in their negotiations to take care of those interests, at this time, before this Debtor pays another half million dollars in estate assets for that proposal to go forward.

THE COURT:  The Debtor's objection to the question is overruled.

MR. ORR:  Thank you, Your Honor.

BY MR. ORR:  (Resuming)

Q    Mr. Barry?

A    Would you restate the question, please?

Q    Sure, Mr. Barry.  What provision for adequate protection of NCFE's interest has been made according to this proposal?

A    That's a good question, and it's the first time it's been raised by NCFE in any form.  Which is interesting in itself that it's brought forward in this hearing, but you know, I think that that's something that we're working on and, you know, I think that it's going to be subject to what your position is.  In terms of negotiations.

Q    Mr. Barry, you say you're working on it.  Have you

been having discussions about aggregate caps; that is, limits on the amount of the draws under the DIP facility?

MR. PALMER: Your Honor, I'm going to object to the extent that Mr. Orr may be touching on issues that relate to attorney/client privilege, Your Honor.

MR. ORR: I'm not asking for discussions with his attorney, Your Honor. I'm asking for discussions with us, NCFE. That is not privileged.

THE COURT: Have you discussed with NCFE the aggregate caps on amounts of draws?

THE WITNESS: We've tried to. They've not provided us with any -- we've asked for those repeatedly over the last couple of weeks, since they've introduced the topic, but to date we've not received anything in writing or orally on any of those caps, other than that they would like to do it but that they reserve the right that was promised yesterday at noon and yesterday at 4:00, yesterday evening, and this morning, and then again at noon, and they just haven't been forthcoming.

BY MR. ORR: (Resuming)

Q    When did NCFE get the last, the latest assumptions and the latest proposals that you all ran?

A    We constantly revised our projections to take into account things that they've asked for. That information flow has been ongoing, as late as yesterday.

Q    Was there additional series of documents provided last night at approximately 7:00 o'clock?

A    I couldn't tell you the time.  You'd have to ask Mr. Howard for the time.

Q    Well, without the time.  Was there an additional series of documents provided sometime yesterday afternoon?

A    You know, you were talking about, you know, minor changes to documents overall.

Q    You've testified that you've been fully involved --

A    Yes.

Q    -- in the information flow.

A    Right.

Q    And you're fully aware of all aspects of the information --

A    Right.

Q    -- that's been provided to NCFE.

A    Right.

Q    Okay.  When was the last information provides NCFE?

A    It was yesterday.

Q    Approximately what time?

A    I'd have to check my e-mail log to figure out exactly what time.

Q    And there were assumptions provided with that information, was there not?

A    Well, I think one of the assumptions changed, Mr. Orr,

you know, that's -- I would say that they're not changing things directly. For example, we've built in the KRP (phonetic). At the initial time we built in the KRP, in studies that were done as long as three months ago, those were done at the corporate level. You have asked for those to be done at the individual facility level.

Now, the changes done to the documents, which Mr. Halloran could give you in greater depth than I could, yesterday showed the KRP at the individual level. So they're nominal changes, per se, but they don't change the basic economics.

Q    You've mentioned the KRP. Do the proposals and figures that you've run and provided NCFE assume that the KRP is going to be played out of the DIP?

A    They're paid out of the overall cash.

Q    Okay, does that include the DIP, though? Does it assume that the DIP will be funded at that point?

A    If they needed to, yes.

Q    So you've talked about caps. Have you also --

A    No, I haven't talked about caps, because no one has given us information on caps.

Q    But you have talked about caps --

A    Well, no --

Q    -- I'm not talking about information.

A    Let me summarize what's happened on the caps. You

have said, "We need them," we've said, "We have it," you have said -- "you," being NCFE -- have said, "What do you think are the right caps," and we say, "We don't believe we need caps.  If want to forward caps to us, forward them," and we've been waiting ten days, and as of this -- when I walked into the Court, we didn't have caps.

Q    Mr. Barry, my question was --

A    No proposal from you.

Q    I'm sorry.  My question was, but you have talked about caps, is that true?

A    We've talked about the weather, too.

Q    Mr. Barry, have you talked about caps?

A    We have, we have talked that you had proposed caps to us --

Q    Thank you.

A    -- and as of this date, we don't have caps.

Q    Thank you.  Have you talked about the issue of cross-collateralization?

A    Yes.

Q    Okay.  Have you talked about the issue for milestones for funding cutoffs?

A    I'm sorry, repeat that?

Q    Milestones.  That is, indications along the course of the DIP as of when funding by a facility would be cut off.

A    No.

Q     Okay.  Have you talked --

        MR. PALMER:  Your Honor, I'm going to object to that line of questioning.  I'm not sure where we're going here.  And we're far afield, and if we're going to start talking about every issue that has been talked about over the last 14 weeks, we'll be here for the next two days.

        MR. ORR:  Your Honor --

        MR. PALMER:  I don't understand the relevance of this, Your Honor.

        MR. ORR:  Your Honor, the relevance is the witness has testified that he's been intimately familiar with all aspects of information that's been provided to NCFE and all discussions, and I'm merely trying to elicit from this witness the scope of those discussions and issues that remain outstanding.  The witness says he has knowledge of them intimately.  There are just a few more I'd like to go over with this witness.

        THE COURT:  How much longer?

        MR. ORR:  Your Honor, I don't anticipate being longer than a few more minutes.

        THE COURT:  Overruled.

BY MR. ORR:   (Resuming)

Q     Mr. Barry, you talked about provision of information, as you stated here today also, is that correct?

A     Yes.

Q    Are those discussions ongoing?

A    Repeat that again, please?

Q    The production of information, the information flow, the exchange that you've discussed today, are those discussions ongoing with NCFE?

A    Yes, we're waiting for information from NCFE.

Q    Mr. Barry, you remember we briefly talked about the latest projections that were provided yesterday afternoon, correct?  From you, is that correct?

A    Not from me.

Q    Well, I mean "you," meaning the Debtor.

A    Yes.

Q    Okay.  Those projections -- when do those projections show the Debtor going negative, as we discussed it earlier today?

A    Under those set of assumptions, I believe it was June or July.

Q    June or July or August?

A    Yeah, of -- depending on your definition of when they go negative.  You're saying zero cash.

Q    Yes.

          MR. ORR:  I have nothing further, Your Honor.

          THE WITNESS:  Okay.

          MR. ORR:  Thank you.  Thank you, Mr. Barry.

          MR. PALMER:  No further questions for the

witness, Your Honor.

THE COURT:  You may step down, Mr. Barry.

THE WITNESS:  Thank you.

THE COURT:  Thank you.

MR. PALMER:  Your Honor, we had planned to have Mr. Halloran testify to the exchange of the information, but much of it has been addressed during the cross-examination of Mr. Barry, so in the interests of time and given how late we are, Your Honor, and the fact that I believe we're going to have substantial legal argument with respect to some of the points that have been raised in the objection, I'm going to truncate and pass over Mr. Halloran's testimony.

With respect to the last witness whom we have proposed, Your Honor, Mr. Demchak, he likewise, as the financial adviser to the DCH Creditors Committee, was going to testify to the discussions with NCFE, and I'll -- again, several of the points that we had hoped to address have been covered, so we will not call Mr. Demchak, Your Honor.

The Debtor would like to, Your Honor, go directly to legal argument as to the business judgment with respect to this approval as to the points that are in contention with the timing of many of the objections that have been raised with respect to the objection filed by NCFE, Your Honor, and why it's inappropriate at this time to hear

those issues, and those are issues better reserved for the hearing on the DIP motion.  As Your Honor --

THE COURT:  Is there any other evidence?

MR. ORR:  Your Honor, we had posited presenting additional evidence, but not at this time, Your Honor.

MR. PALMER:  Your Honor, I would like to -- if Your Honor is inclined to hear the legal argument?

THE COURT:  Yes, go ahead.

MR. PALMER:  I would like to address the issues raised by NCFE, and that is in objecting to the commitment letter, NCFE attempts to impose a burden on the Debtor at this preliminary stage to demonstrate to them how they are going to have adequate protection.  Your Honor, that's a test set forth in 364(d) of the Bankruptcy Code.  It's pursuant to the DIP financing motion, and in the event that the Debtor is unable to reach agreement with respect to that, we will address that issue.

In the motion that we filed, Your Honor, with respect to approval of the commitment letter, we make reference to what may be necessary to deal with the issue of NCFE's purported lien with respect to these assets, Your Honor, and I've consulted with Mr. Sam Alberts, counsel to the Creditors Committee, and the Debtor and the Creditors Committee will address the adequate protection, Your Honor, in the context of the motion in the event that there is not

a consensual resolution which, in plain English, Your Honor, means there may be further litigation between the parties to resolve that claim and to provide for the provision of adequate protection.

The second point that NCFE addresses, Your Honor, is that they want a cap imposed, reducing the DIP from 35 million, which is the Debtor's business judgment's approaching it, to 20 million. Your Honor, we strongly believe that what NCFE is doing is an undue leverage over our estates, because what Mr. Orr and the witnesses did not put on the record is obviously what's going on here.

We have worked closely with the Creditors Committee to avoid two things: one, Your Honor, being forced into having to acknowledge a claim at this time without the committee and the Debtor having an opportunity to complete their full investigation of the facts and surrounding investment of NCFE, and I note that I chose the word "investment" carefully, because there is some issue whether it truly was a loan, Your Honor.

Two, NCFE has sought to operate each hospital independently, Your Honor, which is inconsistent with the behavior of the structure of this financing that was set up, Your Honor. All of these debtors were treated, for most practical purposes as a common fund, Your Honor.

Your Honor, with respect to the NCFE concern that

there's excess availability under the DIP, this is a problem that is not new.  It came up in the cash collateral issue, Your Honor.  There were attempts to put restrictions.  And one of the reasons that that issue needs to be addressed at the DIP hearing instead of now, Your Honor, is we'll have a better idea at the DIP hearing, Your Honor, what the ultimate -- not only current cash needs are, but capital investment needs are, Your Honor.

Most recently, Your Honor, and it was in the newspaper so it's not something new, Greater Southeast is in need of a new sprinkler system with respect to its facility.  That's a $2 million expenditure, Your Honor.  As we sit here today, everyone recognizes there are a number of cash items that have to be taken into consideration. When we put on our evidentiary hearing with respect to the DIP financing, that will be addressed.

And it's premature for the Debtor, whether it benefits one creditor or another, to be forced at a commitment stage, Your Honor, to have to sit and specify the provisions on how it's going to use its cash as it goes forward. and whether they dispute our business judgment as to what the appropriate availability is with respect to it. They have produced no argument, case, or evidence, Your Honor, to determine why the Debtor's business judgment at this time, both with respect to the commitment letter and

its activities and conduct in this estate, should not be followed.

They also, Your Honor, in their objection, outline proposed procedures about funding and how it will be made available.  And what essentially NCFE is trying to do, Your Honor, is after each hospital, whether that hospital makes money or not, limit the proceeds to that hospital.  Your Honor, that's a formula for failure, simply because while we're accounting for the monies that are going between the institutions, on any given time, Your Honor, there could be a need in one institution or another.

Your Honor, to the extent the issue is at all relevant for today as to the input of NCFE on these proposed procedures, Your Honor, I would suggest that the Debtor's business judgment should be the primary motivator. It's a business judgment that's not only supported by the Debtor, but it's also supported by the Creditors Committee, who's been a party to this discussion, and by the "Creditors Committee," Your Honor, I'm talking about the DCHC. Creditors Committee, who have worked with this Debtor throughout this whole process.

What the Court is simply approving today is an expenditure, Your Honor, of about roughly 500-plus thousand dollars so that we can continue this process down the road. It's clear, and Your Honor can detect from the dialogue

that went on in Court today, that there are negotiations going on, there's a little bit of jockeying back and forth, but there is no risk to this estate. The only risk we have to this estate is not letting the process go forward, because then everything will stop.

The next point NCFE raises in its objection, Your Honor, is that they want to establish a timeline for which we have to do certain things under the D.C. Alliance Program. To enforce these milestones, Your Honor, they propose that no funding from the DIP facility should be available unless we agree to sell certain assets.

Your Honor, that's our business judgment. Again, NCFE should not be telling this Debtor and this Debtor's estate how to operate it. That's an issue, Your Honor -- if anyone wants to rebut our presumption, that's an issue that's more appropriately left to the Creditors Committee who are the beneficiaries of the issues here. It's inappropriate for a secure creditor -- alleged secure creditor, we spent six weeks at the beginning of this case litigating in three different jurisdictions with Your Honor, to dictate to this Debtor its business judgment and to dictate when it should sell its institutions or not.

The next point they raise, Your Honor, is about collateral. Your Honor, they make a point that the DIP proposal seeks to affect their collateral with some certain

equipment leases, Your Honor.  Your Honor, we understand this is a priming lien.  There are ongoing discussions that will address this issue but, again, it's premature.  Maybe at the end of the day, we've spoken to Merrill.  Maybe these equipment leases are excluded.  And it's my understanding that Merrill is inclined to exclude the equipment leases.  But at this point we don't need to address that today, because you're not granting a priming lien today.  All the Court is being asked to grant is approval of a commitment letter.

NCFE goes on and says that they don't want the carve-out to be the amount that's been negotiated, they think it should be cut in half, 50 percent.  Again, Your Honor, that only benefits NCFE.  As we have indicated to them that we believe we have substantial claims against them and that either the Debtor or the Creditors Committee is going to have to sue them.  This only benefits them by limiting the amount of resources available to this estate to defend itself and to prosecute its claims against NCFE.

They then go on to object, Your Honor, to say that the liquidated damages in the commitment fee is excessive.  Your Honor, under the circumstances here we think it's reasonable.  These are the best terms that we know that are available to do this DIP financing.  We've shopped this.  We've been in this process now for

14 months.  We started with three different lenders, after we culled that group down from a group of 15 lenders that we've worked with, and Your Honor heard about that at the cash collateral hearing.

And the last part of their objection, Your Honor, is to request additional information.  And what they're essentially trying to do, Your Honor, is negotiate through filing their objection, and we think that's inappropriate.  We've worked with them, we've assisted them, we're working the Creditors Committee, and we're assisting them.  We don't think that's an appropriate mechanism for them to do with respect to this.

And also, Your Honor, if they want to object to the DIP financing, they have the opportunity to take discovery with respect to that DIP motion.  That's the right remedy to address these issues, Your Honor.  And we'll respond to that discovery.

Your Honor, I think the last point that I would go to with respect to this is just highlighting the Allegheny International case, because Wells Fargo, who was the exit finance lender there, wanted its commitment letter approved in advance of the exit facility that would be part of the confirmation.  That's no different than Merrill-Lynch here, who's seeking to get its commitment letter approved prior to the final DIP hearing.

What the Debtor would like to do and what the Committee would like to do is have locked in a commitment, Your Honor, that cannot be revoked, to finance us.  That's going to help us, Your Honor, in the JCAHO process, where we're trying to keep our accreditation.  If we don't have the finances available, Your Honor, to make the capital investments that we need, whether it's additional equipment, it's repairs at Greater Southeast, and some source of long-term financing other than constant and frequent use of cash collateral which is unpredictable and dependent on our collections, Your Honor, it's going to be very difficult for us to demonstrate to JCAHO that they should reverse their decision on the denial of our accreditation.

What's helpful about the Allegheny decision is the judge there saw the wisdom of deferring substantive issues till the ultimate hearing.  And said, those issues as to the commitment letter can be dealt with, if you believe it dictates terms of the plan that will get resolved in the plan context.  I think, by analogy, Your Honor, and I recognize this is DIP financing, it's not exit financing, but the same analysis, I think, should apply here, Your Honor.  There is no reason why every issue that's been objected to by NCFE cannot be addressed at the day Your Honor does make the ultimate decision on whether

to approve the DIP financing.  And you have a unique situation here in that we're not seeking interim financing, Your Honor.  You're getting the full, entire period to hear our position with respect to the ultimate DIP financing here, and we think that's more than appropriate.  It's all the Bankruptcy Code requires.  There's no provision that requires them to know adequate protection, to know all these other issues at this stage, and they profess to be concerned because we're spending the commitment fee, Your Honor.  What we've spent litigating with them, the commitment fee pales in connection with it.

What I think is important at this point is that we allow the process to go forward.  Your Honor, if it is inclined, approves the commitment fee today, and whether we continue to negotiate with NCFE or re-start the litigation, that's an issue that will be resolved at a later date.  Thank you, Your Honor.

THE COURT:  Mr. Gold?

MR. GOLD:  Thank you, Your Honor.  I think Mr. Palmer has set forth the various arguments in response to NCFE's objection, and I'm not going to reiterate them.  I will just simply chime in and just say that the Debtors have articulated, in their motion, that they have certain needs and there are certain benefits to obtaining a revolving DIP facility.  I think in their business judgment

they've determined that the Merrill proposal represents the most appropriate alternative under the circumstances of this case, and wants to proceed with the process.

I think that the Committee believes that obtaining an available line of credit has advantages under these circumstances, and we are supportive of the Debtor's efforts in that regard.

I think that the Merrill proposal represents an outline of the most commercially reasonable means to obtain this line of credit that we've seen so far.  I think the Debtor believes that, and I think the Committee is supportive of that.

The terms do appear reasonable.  Obviously, everyone will have their right to oppose any particular issue at the final DIP hearing, once we have seen the final credit agreement and once we've seen a final DIP order. I think that we have been involved in a process, as Mr. Palmer has stated, obviously if the Court recalls our previous objection to the GE commitment letter, we did find it necessary to re-initiate communications with Merrill after reviewing the final GE commitment letter.  There were certain concerns that GE could not or would not accommodate, and we entered into discussions with Merrill to facilitate an alternative DIP financing arrangement.

Excuse me.

I think that Merrill was willing to come back to the table and re-initiate negotiations. Obviously, they were a little gun-shy about expending additional time, effort and money, only to possibly get trumped again. I think that the issues between the parties have been resolved by which you see here in the commitment letter, and the non-solicitation letter, which obviously has accommodated Merrill and they stand before you, seeking approval of the commitment letter.

I think that the Committee obviously did have a few remaining concerns with regard to the Merrill proposal, which have been dealt with and accommodated, as you will see in the revised proposed order that will be submitted to you, and I think that has dealt with the situation enough for us to move past this preliminary stage. I think that the Merrill proposal does represent a positive move, as compared to the GE proposal, from an economic and legal perspective. It's obvious the Debtor has diligently shopped this DIP facility, and engaged a number of potential DIP lenders, and has ultimately chosen Merrill Capital.

In that regard, we do support the commitment letter, and we submit that issue to be approved.

THE COURT:  Mr. Bernstein?

MR. BERNSTEIN:  Your Honor, as the Court is

aware, Health Care REIT filed a limited objection to the motion to answer and to the commitment letter, and since then we've had negotiations with the Debtor and also with counsel for Merrill-Lynch, and they've resolved the most important of Health Care REIT's issues, particularly as the Court will see, in the proposed revised order that the Debtor will submit, Merrill has agreed to subordinate its liens and security interests under the DIP facility to Health Care REIT's liens and security interests, and also as the Court has heard, they've agreed to eliminate the -- upon payment of the commitment fee, anyway, to eliminate the non-solicitation letter so that the Debtor would reserve the ability, if a better deal comes along, to pursue that and negotiate it, and if appropriate, take it. And that satisfies our most important objection, such that we won't object to the commitment letter motion.

I did want to make the point, as the Court's aware, and I've made this point to the Debtor and Merrill, as well -- as the Court's aware, we have a motion for adequate protection filed, which has been carried over by prior court order where we seek as adequate protection and also pursuant to Section 506 of the Bankruptcy Code, payment of our post-petition interest on a current basis, and I want to make it clear, some of the elements of this proposed financing I think probably make that motion more

compelling and the need for adequate protection more compelling, and we don't need to argue adequate protection today but I just want to make the point that by consenting to the entry of the commitment letter order, that we're not waiving any rights to argue about adequate protection at the appropriate time.

Thank you.

MR. PALMER:  Your Honor, I told Mr. Bernstein, I believe it is, before the hearing, that his consent to the commitment order, as far as the Debtor was concerned, was not prejudicial to any objection he may file to the ultimate DIP.  And I believe that's not objectionable to the Creditors Committee or the DIP lender, either.

THE COURT:  Anybody else in favor of the motion? All right, I'll hear opposition to the motion.

MR. ORR:  Good afternoon, Your Honor.  Much has been said today about whether or not it is appropriate for NCFE to come in at this point and object to the commitment letter.  In fact, Your Honor, the commitment letter as proposed compels NCFE to come in at this point, because prominently featured within that letter, in paragraph 6(a), is a proposal for a 364(d) priming lien.

As I said before, and I'm sure the Debtor recognizes, the only way that this Debtor can prime the interest of NCFE, aside from additional litigation

regarding the definition of what that interest is, is either via our consent or to provide for adequate protection of NCFE, which to date has been unfortunately lacking.

NCFE does not come in here today lightly, seeking to object to this commitment letter on behalf of this Debtor that provides medical services.  We're well aware of the context in which this Debtor is moving.  In fact, Your Honor, were circumstances different, or were we provided with the information and the provision of adequate protection, both substantively on the terms of the commitment, we might be in a position where our objection would be less vociferous or we'd be in a position to assist this Debtor.

However, to date, information is still ongoing, discussions are still being had between the parties about the provision of this commitment.

It's important, more importantly, Your Honor, for this reason. We're not seeking to shift the burden provided for in 364(d)(2) at this point to the Debtor.  What we are saying is that there's no exigency required for this commitment letter at this time, until some of the questions that the single largest creditor of this estate has, have been answered.

We have said to them repeatedly, that in terms of

80

the size of this facility, based upon their needs, which even today I believe the testimony was, depending upon the assumptions, which seem to change from time to time with the information provided, they may not even need a DIP facility until June, July, or perhaps even August, in terms of the necessity for going forward today in this manner.

Certainly, the necessity for going forward and paying almost $500,000.00 for a DIP fee, you know, before that is being done, without providing for the other protections to the single largest creditor of this estate, is inappropriate.

NCFE has tried to work with the Debtor, despite the protestations to the contrary. NCFE will continue to attempt to work with the Debtor, to try to resolve some of these issues. But NCFE thinks it is important so that no parties are under the illusion, least of all the lender to this Debtor, Merrill-Lynch, who is going to be committed, if this is approved, to go forward, there are no illusions about the concerns that NCFE has regarding the ultimate DIP facility.

First of all, NCFE has stated that it does have concerns about prudent financial controls for the use of any funds that are provided for the DIP facility. Two of five of these facilities are in serious trouble. Pine Grove will supposedly be closed soon. D.C. General,

between the JCAHO problems and the D.C. Alliance, has significant issues they need to resolve.  Were these debtors to come in and ultimately are going to ask this Court to lay on top of our interest a significant, millions of dollars perhaps, on top of our interest, without saying how they're going to protect those interests, is imprudent.  And it is unfair.

Secondly, with --

THE COURT:  Is the commitment fee coming out of your collateral?

MR. ORR:  Judge, as far as we know, yes.  We have an interest in all assets of the estate of the Debtor.  Including the account receivables.

MR. PALMER:  Your Honor, the commitment fee comes out of the use of cash collateral, which they've consented to, Your Honor.

MR. ORR:  But it's still our assets, Your Honor.

MR. PALMER:  It's in the budget, Your Honor.  They consented to the budget.

MR. ORR:  Well, we consented -- well, without arguing, Your Honor, we consented to the use of several hundred thousand dollars to pay the initial fee to Merrill-Lynch and GE.  We did not consent to non-solicitation and the break-up fees that were included.

MR.          :  Yeah, but that's going away.

MR. _____: It's gone (inaudible).

THE COURT: Excuse me. I couldn't hear that, Mr. Palmer.

MR. PALMER: I apologize, Your Honor. What I said is the budget contained both, Your Honor.

THE COURT: Well, obviously they've got to have cash collateral authority to use the cash collateral authority, and they say they think they have, and I'm not going to treat that as an issue before the Court today.

MR. ORR: Your Honor, it's our cash, and that's not the focus of our concerns, though. The focus of our concerns, if we can get back to why we're objecting to a commitment letter, we recognize this is not a DIP hearing. But why we're objecting to a commitment letter that so prominently, in essence, has the de facto terms of what may end up being the actual loan, is important to us.

We believe that the size of that loan, specifically, is excessive. Excess cash. We've had testimony before, at prior hearings, about the necessity for this Debtor to achieve certain objects and to address certain concerns of their physician community. We don't believe those are relevant concerns in terms of sizing of the DIP facility, but nonetheless, Your Honor, nonetheless, we also believe that is necessary, and a prudent financial practice, to have milestones, not with regard to resolving

the D.C. Health Alliance issues, _____ to the sales purpose that they've stated they want to complete. They have proffered that they're going to complete a process by August. We see no reason, if these Debtors have in their mind how they're going to complete a sales process, that they cannot provide milestones for us in terms of use of the cash that is going to be a priority over us before that has occurred.

We have asked them for no cross-collateralization. Because as we have said, Your Honor, two of these facilities have serious problems. Everyone recognizes that Michael Reese is a significant institution, for instance, with perhaps significant value. But we also recognize that some of the other debtors' value is less. We do not believe it is appropriate for the more valuable assets, in essence, to bolster the ones that are less valuable, at our expense.

And we continue to ask, Judge, and we always will, ask for information and data on a timely basis so that we can run appropriate assumptions to try to make the decisions that we have to make within our fiduciary duties, within our own bankruptcy. That is appropriate for us, it is necessary for us, we have got to do it to discharge our duties to our own creditor constituencies, and we would appreciate if the Debtor continues, as they say they will

cooperate, they will provide us with information, that they continue to do that.

More importantly, Your Honor, as we're sitting here today, we do not believe that there is any exigency requiring this Debtor to enter into a DIP facility commitment letter that may be a precursor for a DIP facility which is objectionable while the still have an opportunity to resolve the concerns that we have.  There's no exigency for the use of this cash.  While cash collateral may be volatile, the reality is that according to their own projections that have been furnished to us, they have sufficient cash to operate for several more months before this facility has to be approved.  That is appropriate.

In short, Your Honor, to reiterate, we do not necessarily object to the concept of a DIP facility for this Debtor.  But to pay these fees for this facility where no provision has even been proffered for how they're going to address our concerns of adequate protection, where no provision has even been decided as to how they're going to address some of the substantive issues we have regarding cross-collateralization, caps for the use of the money which is volatile, and milestones for cutoffs for that use, we feel is inappropriate.

In short, Your Honor, we would request that the

Court deny the motion for the commitment letter without prejudice, until these Debtors are able to show how they're going to address those concerns on behalf of NCFE.

Thank you, Your Honor.

THE COURT:  Mr. Palmer?

MR. PALMER:  May I briefly, Your Honor?

THE COURT:  Yes.

MR. PALMER:  Very brief.  The Court can clearly hear that there is a dispute as to the business judgment of the Debtor.  NCFE has one view of the world, we have a different.  We clearly believe that DIP in the appropriate size that we've selected, and the Committee is supporting -- our Committee is supporting -- is important for our employees through the key employee retention plan, it's important to the doctors groups, it's important to MSN and all the other players who have been before this Court, but it's most important, Your Honor, to JCAHO, who we're trying to convince to not unilaterally take our accreditation, and it's important, Your Honor, to maintaining the stability of these estates.

Your Honor, I alluded to it before.  I'll be even clearer now.  We believe that if we don't get the consent of NCFE, we're going to ask this Court to make some determinations with respect to their claim.  Your Honor, we need time, as lawyers.  We cannot, in a 15-day period,

present that necessarily to this Court and get a resolution. I will not allow this estate -- and the Creditors Committee agrees with this -- to be railroaded into a resolution that's satisfactory to one alleged secure creditor but is detrimental to everyone else, and we want to have the opportunity that if we have to try a case in front of this Court, we're not doing it within a short period of time, that this Court will have a full, complete opportunity to hear a complete litigation with respect to the NCFE claim. We're hoping we don't have to go there, Your Honor, but we may have to, and therefore we need to act now, because time is short.

We would ask the Court, based on the Debtor's business judgment, that you approve the commitment letter which is the necessary step for us to go forward and to subsequently file our DIP motion with the conditions, and Your Honor, we will address every issue that NCFE has raised today.

MR. GOLD: Your Honor, may I just make a few brief comments? I just want to echo the concerns of Mr. Palmer.

We are here in a preliminary matter, as far as the DIP process goes. We're here to approve a commitment letter, not the entire proposed DIP facility. Everyone, including the Committee, to the extent anyone has any

concerns about the DIP facility, can appear on April 30th, I believe it is now, and voice their concerns, and there will be a full evidentiary hearing regarding all the terms of the DIP.

I think the concern is, is that this process needs to move forward in a timely manner.  Obviously, things change.  Merrill is standing here today, committed to lend, and we need to move that process along.  The fear is if we postpone this hearing or this commitment letter is denied today, Merrill may walk from the table, leaving the Debtor limited options with regard to potential post-petition financing, and that can occur.  And that's why we all support the commitment letter being approved today, so that we can move the process along, get to April 30th, and the Debtor can put on its proof with regard to anything it needs to prove at that time, and move forward from there.

Thank you.

THE COURT:  What are the waivers that Merrill has made on the record today?  I'd like to have clarity as to that, and I take it, it has to do with page 2 of the April 3rd, 2003, non-solicitation and confidentiality agreement?  Paragraph 8?

MR. LEVY:  If I may, Your Honor?  Rick Levy, on behalf of Merrill-Lynch Capital.

We have agreed -- Merrill has agreed to

essentially waive the so-called non-solicitation letter upon approval of the commitment letter today, and the payment of the commitment fee.

The purpose of that letter was never to restrict the Debtor going forward.  It was simply to protect us really during a time period that's already elapsed, during which, as the testimony indicated, you know, Merrill and its professionals, you know, spent days and many, many hours preparing not only the commitment letter but the financing documents themselves.  And having gone through that, you know, the Debtor has acted in good faith, if the commitment letter gets approved today with the commitment fee paid, we're prepared --

THE COURT:  How much is the commitment?  275,000?

MR. LEVY:  There's been -- it's not $500,000.00.  It's $275,000.00, in the form of a commitment fee, and an additional $100,000.00 work fee deposit.  So it's a total of 375,000.

And the $275,000.00 commitment fee gets credited against the closing fee that would be payable, you know, if Your Honor were to approve the DIP financing at the hearing later this month.

THE COURT:  So as I look at paragraph 8 of the letter that sets forth the fee --

MR. LEVY:  Yes.  And that -- yeah, I mean, that's

accurate, paragraph 8.

THE COURT: So if --

MR. LEVY: But the non-solicitation agreement, you can forget about that. That's not going to be -- we're not asking the Debtor -- right, but this isn't -- you're not committing to payments now.

I'm sorry, did you want to go through all the fees?

THE COURT: I'd like to have clarity on the record, and it's not clear to me, because I'm not sure where they're contained in the documents, and --

MR. LEVY: Okay. Sure. I mean, the fee that's up for approval today is the commitment fee, which is a $275,000.00 fee.

The remaining fees, which we'll go through in a second, only apply with respect to once Your Honor approves the DIP financing, with one other exception, and that is the obligation of the Debtors to reimburse Merrill for its out-of-pocket expenses. Because obviously there's going to be work between now and the time of the final hearing, and Merrill, just like any other DIP lender, would expect to be reimbursed for its expenses.

But those are the two components that need to be paid between now and the final hearing. The remaining fees are pretty standard fees that would be required in any

financing, and those only become payable if and when Your Honor approves the DIP financing. We're not asking you to approve that now.

THE COURT: All right. Well, I'm looking at the agreement. Paragraph -- the agreement itself. Paragraph 7 is the work expense deposit of a hundred thousand dollars.

MR. LEVY: Yes.

THE COURT: Paragraph 8 is the commitment fee of $275,000.00.

MR. LEVY: Yes.

THE COURT: Then there are audit fees, out-of-pocket expenses, and administration fees, and a closing fee.

MR. LEVY: Right. And the --

THE COURT: The $275,000.00 gets credited to that $525,000.00 closing fee.

MR. LEVY: No, the 275 is.

THE COURT: Didn't I say 275?

MR. LEVY: I'm sorry, I thought you said 375. I'm sorry.

THE COURT: If I did, I meant $275,000.00 commitment fee gets credited to the closing fee. There is a collateral monitoring fee, which is a monthly fee once the DIP goes into effect, I guess.

MR. LEVY: That's correct. And the end use line

fee, paragraph 14, which is also a post-closing fee.  And a success fee.

THE COURT:  All right.  So what is happening is you're saying that if I grant the approval of the $275,000.00 commitment fee and the hundred thousand dollar work fee deposit, the non-solicitation and confidentiality agreement that's attached --

MR. LEVY:  Goes away.

THE COURT:  It doesn't go away with respect to confidentiality, but goes away with respect to any breakup fee.

MR. LEVY:  Frankly, Your Honor, to the extent -- I mean, this is a pretty standard commitment letter.  I think there may be confidentiality provisions in the commitment letter.  I think for the sake of simplicity, the whole letter goes away.

THE COURT:  All right.  So you're amending the agreement to --

MR. LEVY: Yes.

THE COURT:  -- delete that letter.

MR. LEVY:  The order that will be presented will do that.

MR. ORR:  Judge.  Your Honor, if I may, just for my clarification.

I assume this means -- there were two other fees.

The total fees were a hundred thousand that's already been paid, that's gone.  There is a hundred thousand working fee, which are going to apparently, if the Court is so disposed, approve, will be _____.  There's a $275,000.00 commitment fee.  Those are in.

My understanding, though, is that the $275,000.00 liquidated damages fee and the hundred thousand dollar _____ are gone.

MR. LEVY:  Goes away.  Those are gone.

THE COURT:  If you'd state it clearly into the microphone, please, those two fees are gone, correct?

MR. LEVY:  Yes.  They were never intended to be duplicative of the commitment fee, in any event, but the fees set forth -- the breakup fee in the non-solicitation letter would not be payable under any circumstances.

THE COURT:  Thank you very much.

MR. PALMER:  Your Honor, I have nothing further to add.

THE COURT:  Everybody's ready?  All right.

MR. KANSA:  Your Honor?

THE COURT:  Yes.

MR. KANSA:  Kenneth Kansa for MedLine.

THE COURT:  Yes, Mr. Kansa.

MR. KANSA:  Just a brief addition, that we have filed a short objection concerning certain of the terms of

the commitment order and the proposed treatment of MedLine under the DIP financing.  We have received assurances from the Debtors, and I'm told from -- that they have spoken with Merrill-Lynch on those points, and received a form of proposed order from the Debtors that states, in essence, that Merrill-Lynch will be subordinate to MedLine's position on the Michael Reese property, and with that qualification and certain others in the proposes order, it is acceptable to MedLine.

MR. LEVY:  Yes, I think that fully -- we've got language, as you've seen in the proposed revised order, that addresses your objection in the way you describe.

MR. KANSA:  And that is subordinate to the extent that they do have a lien.

MR. LEVY:  That's right.  These are -- right.

MR. PALMER:  If any.

MR. KANSA:  If any.

MR. PALMER:  If any.

THE COURT:  All right.

MR. PALMER:  That applies to all secure -- alleged secure creditors.

MR. KANSA:  Yes.

THE COURT:  Anyone else need to be heard any further?

MR. ORR:  Your Honor, we'd just like to have one

point of clarification.   Something that was just said recently, that there is a hearing on the 30th on the Debtor's motion for approval of the DIP facility?

MR. PALMER:  Your Honor, the Debtor anticipates, assuming that discussions continue, that we will be shortly filing a motion for DIP approval.  We have some terms that still need to be worked out, and we would be asking the Court for a hearing on the 30th of April, Your Honor.

But that's, as Your Honor will note from the commitment letter, that's the date by which we have to act. We've asked Merrill to give us a two-day extension to May 2nd?

MR. LEVY:  May 2nd.

MR. PALMER:  For the closing.

MR. LEVY:  Closing.

MR. PALMER:  But we would hope, assuming we finish all the paperwork and dot all the i's and cross all the t's, that we'd be back in front of the Court at the end of the month.

MR. ORR:  Just briefly, Your Honor.  Here again. There's been no motion filed, and to the extent that the terms are apparently going to affect this commitment letter, we would object.

THE COURT:  You know, Mr. Orr, I couldn't quite understand what you said at the end, there's a

qualification.  You object to the extent that --

MR. ORR:  No, Your Honor, we object to the approval of the commitment letter because it seems to us that if they're already contemplating an April 30th hearing for a motion that is yet to be filed, we haven't seen any terms for that hearing, and we would reserve our (inaudible).

MR. PALMER:  The commitment letter requires us to act by April 30th.  That's in the commitment letter.

MR. ORR:  That's -- but this Court does not have to be bound by your commitment letter.

THE COURT:  Mr. Orr.

MR. ORR:  I'm sorry, Your Honor.

THE COURT:  You were directing your comments not to me, but to Mr. Palmer, and it makes the record look awful.

MR. ORR:  Okay.  Your Honor, the Court does not have to be bound by the terms of the Debtor's commitment letter.

THE COURT:  This is a hearing on a motion to approve a commitment fee and a work fee deposit.  The commitment fee is for $275,000.00, the work fee deposit is $100,000.00.  The commitment fee relates to the Debtor's efforts to obtain debtor in possession financing.  The $275,000.00 commitment fee would be credited to a closing

fee under the preliminary draft of the -- I'll start over again.

The $275,000.00 commitment fee would be credited to the closing fee that the commitment letter indicates would be payable upon approval of the DIP financing.

The Court has heard evidence and the argument of counsel, and the Court will grant the motion for the following reasons.

The commitment letter is objected to by only one party, and that's the NCFE entities that are debtors in a pending case in the United States Bankruptcy Court for the Southern District of Ohio.  These entities claim an interest in the accounts receivables of the Debtor.  They claim ownership, or alternatively, if not ownership at least a security interest in the Debtor's accounts receivables.

Their objection goes to the preliminary terms in the commitment letter as to what lien rights would be given to the proposed DIP lender, Merrill-Lynch Business Financial Services, Incorporated, to protect its DIP financing.  The Debtor urges that that is an issue that can be addressed as part of the DIP financing motion that is forthcoming and that the Debtor anticipates having set for hearing on April the 30th, 2003.

The objection of NCFE is that why should the

Debtor spend $375,000.00 if the current proposal to obtain DIP financing includes a provision that does not assure adequate protection of NCFE's interests in the Debtor's accounts receivable.  That's the principal objection.

There are also objections to the size of the proposed financing, the milestones for the Debtor to use cash, the lack of any deadlines for how promptly the Debtor will address various matters in the case, such as sales of assets, the need for a provision regarding cross-collateralization and the impact of that upon the separate estates in this case, the need for information and data so that the proposals can be evaluated, and so forth.  All of these are matters that can be addressed at the final hearing on the motion for DIP financing.

The amount that's at stake here, $375,000.00, is simply a commitment fee to permit the Debtor to proceed with what has turned out to be the best of all possible DIP financing entities in the market.  And the Court heard extensive testimony about the Debtor's efforts to find the best terms and the best structure and the best cost, and this was it.  Given the problems that this bankruptcy case has presented in terms of the Debtor trying to work towards a successful reorganization while, at the same time, addressing the ongoing problems that these operating hospitals have had, including the JCAHO certification of

the Greater Southeast Community Hospital Corporation -- its accreditation is probably the more appropriate term, the Debtor's got to exercise some business judgment as to how it proceeds towards addressing in a diligent fashion moving this case towards a reorganization.

The Court cannot agree with the argument that the Court should not approve the commitment letter at this juncture because there's no exigency.  But everyone has agreed, prior to today, that the Debtor should be trying to move towards getting DIP financing.  It was only a question of whether those terms would be agreeable to everybody once they were obtained.  I can't see that $375,000.00 in the scheme of the assets involved in this case and the claims involved in this case is such a significant amount that it precludes the Debtor continuing to move, as it was previously with everybody very much aware of it, towards getting a DIP commitment letter in place so that it could then move towards approval of a DIP commitment letter.  An actual DIP financing in place.

It comes down to the business judgment of the Debtor in that regard as to whether this is the appropriate time to move in that regard or whether it should be done later.

There was cross-examination of the only witness in this case regarding when the Debtor would be at a zero

cash balance, which might be as late as August, it might be as early as June.  If this Court were to defer addressing the commitment letter, that would, of course, delay addressing the DIP financing itself, and you never know what's going to happen in a case in terms of what might cause a delay.  There's every possibility that if we delay the commitment letter for another month, that circumstances would arise that would prevent the DIP motion itself from being for another couple of months, and at that juncture the Debtor might be in financial straits.  And we have no guarantee that the Debtor will be able to use cash collateral when it gets to that point.

So the Court readily rejects the contention that there's no exigency that demands looking at this DIP commitment letter now.  It's been thoroughly vetted, in terms of exploring what's possible in the market, and this was the best that could be obtained.

Now, with respect to the question of adequate protection.  The Debtor suggests that it might somehow challenge NCFE's lien or ownership claim, and put the issue before the Court for litigation.  And of course, if that's a possibility, the Debtor has every right to not make a provision for adequate protection at this juncture.

Putting that aside, there is the issue of should the Debtor -- if there is no issue in that regard, should

the Debtor already have addressed that issue.  The Debtor wants to negotiate over the issue of what is the appropriate provision of adequate protection in the event that there is an ownership of accounts receivables or a security interest in accounts receivables on the part of NCFE.

Bankruptcy is quintessentially a forum in which multiple parties are making claims against the Debtor's estate, and that in the majority of times negotiated resolutions are reached simply because the cost of litigating the actual issues would far exceed the outcome if the parties are able to strike a negotiated settlement that results in essentially a win-win situation.

The Court believes that it is appropriate for the Debtor to use its business judgment, that it should go forward with this proposal at this time with the issue of adequate protection to be addressed through the way of negotiation.

Now, negotiation also includes the proposed DIP financier, Merrill-Lynch.  It has a stake in this.  It isn't spending its efforts on this just to take out a $375,000.00 in fees and walk away from it.  It has interest in seeing that this goes forward on reasonable business terms and it has an interest in negotiating to the extent that it can negotiate and still protect itself in an

appropriate fashion.

The Court believes that given that the amount at stake is only $375,000.00, this is an appropriate instance in which the Court should defer to the reasonable business judgment of the Debtor that this is an expense that is justified to be incurred and the Court will simply have to wait until the hearing on the motion to approve DIP financing before the Court addresses these various issues that NCFE has attempted to inject into the hearing today as grounds for not approving the commitment letter at this juncture.

For all of those reasons, the motion is granted, and I'll take a proposed order at this juncture.

MR. PALMER:  Thank you, Your Honor.  Your Honor, in light of some of the modifications that were negotiated right up to prior to this hearing, even some during this hearing, I would like to have the opportunity to submit the order first thing in the morning, if that's acceptable.

THE COURT:  That's fine.

MR. PALMER:  To Your Honor, but to -- I just want Merrill to indicate that we had a drop-dead date of May -- April 9th.  In light of the Court's willingness to approve it, that Merrill will accept the order being entered tomorrow.

MR. LEVY:  Absolutely, Your Honor.

THE COURT: All right.

MR. PALMER: Thank you very much, Your Honor.

THE COURT: Do we need to address the April 30th date and do we need to address what's going to happen once the motion for DIP financing gets filed in terms of its discovery?

MR. PALMER: I think we do, Your Honor. I would like to have an opportunity to talk to Mr. Orr first, to see if we can resolve some of those issues consensually, but if not, the Debtor will file its motion very shortly and we'll come back in front of the Court.

THE COURT: If you need a truncated discovery schedule, meaning shortened times for responses, I hope you can agree upon those between yourselves. If you can't, you can file an emergency motion for a hearing to set those, and essentially hold a status conference to set the ground rules. All right? Thank you.

MR. PALMER: Your Honor, before we go off the record, we would like the Court to hold the 30th, though, for the hearing, and we will be filing the motion, if that's an acceptable date.

THE COURT: I'll defer to Ms. Myers on that. She'll attempt to accommodate you. Thank you very much, counsel.

COUNSEL: Thank you, Your Honor.

THE CLERK:  All rise.  This Court stands in adjournment.

(Whereupon, proceedings were concluded.)

104

UNITED STATES OF AMERICA )
                         )        Case No. 02-2250
DISTRICT OF COLUMBIA     )

I, PAUL R. CUTLER, do hereby certify that a recording of the foregoing proceedings in the above matter was duplicated from an original recording by the Office of the Clerk, United States Bankruptcy Court for the District of Columbia, and that said duplicate recording of the proceedings was transcribed under my direction to typewritten form.

_____
                    PAUL R. CUTLER

I do hereby certify that the foregoing transcript was typed by me and that said transcript is a true record of the recorded proceedings to the best of my ability.

_____
                    BONNIE FURLONG

104